**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

HEARTFLOW, INC.,

*Plaintiff,*

v.

ELUCID BIOIMAGING INC.,

*Defendant.*

Civil Action No. 1:26-cv-14793

**COMPLAINT AND DEMAND FOR JURY TRIAL**

# COMPLAINT FOR PATENT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION

Plaintiff Heartflow, Inc. ("Heartflow" or "Plaintiff"), by and through its undersigned counsel, files this complaint under 35 U.S.C. § 271 for Patent Infringement, 18 U.S.C. § 1836 *et seq.* for Trade Secret Misappropriation, and M.G.L. c. 93, §§ 42–42G, the Massachusetts Uniform Trade Secrets Act ("MUTSA") against Defendant Elucid Bioimaging Inc. ("Elucid" or "Defendant") and further alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

## OVERVIEW

1. This is an action arising out of egregious violations of Heartflow's intellectual property rights by Elucid. In particular, Elucid's recent commercialization efforts of its $FFR_{CT}$ product demonstrate that Elucid built its product based on Heartflow's award-winning $FFR_{CT}$ Analysis product and innovations that required thousands of hours of painstaking research and development including millions of dollars of investment and *de novo* regulatory approval. Instead of leveraging its own technology and know-how, and respecting Heartflow's intellectual property rights, Elucid took shortcuts. For example, Elucid hired eleven employees from Heartflow who

had intimate knowledge about the development and design of Heartflow's products, patents, product design, highly confidential know-how and trade secrets, regulatory submissions and processes, commercialization and expansion plans, customer lists, and institutional knowledge about Heartflow's business operations from top to bottom. As just one example of the brazen nature of Elucid's violation of Heartflow's intellectual property rights, Elucid hired away Heartflow's Senior UX (User Experience) Designer who had knowledge about Heartflow's confidential internal conceptual product designs resulting in stark similarities between the Heartflow and Elucid products, as shown in an exemplary comparison below where Elucid unabashedly adopted the same color scheme:

**Heartflow's Product**




Ex. 1 (Heartflow's next-generation Plaque Analysis algorithm gains US FDA clearance, https://cardiovascularnews.com/hearflows-next-generation-plaque-analysis-algorithm-gains-us-fda-clearance/)

**Elucid's Product**




Ex. 2 (https://elucid.com/healthcare-professionals/#ffrct)







Heartflow $FFR_{CT}$ model and legend (left) (Ex. 1). Elucid $FFR_{CT}$ model and legend (right) (Ex. 2)

2. Heartflow brings this action to stop Elucid's continued infringement of four Heartflow patents, its continued misappropriation of Heartflow's trade secrets under the Defend Trade Secrets Act and the Massachusetts Uniform Trade Secrets Act, and any other violations of Heartflow's intellectual property rights that will be uncovered through discovery.

3. By this action, Heartflow seeks to protect the extraordinary investment that created the world's first AI-powered, non-invasive cardiac diagnostic platform, as recognized by the U.S.

Food and Drug Administration (FDA) and the Centers for Medicare & Medicaid Services (CMS). That investment is measured in hundreds of millions of dollars, decades of research protected by hundreds of patents and other types of IP, and the contributions of countless scientists, engineers, and physicians.

4. Recognizing the novelty in Heartflow's pioneering AI-powered, non-invasive cardiac diagnostic platform, which is protected by over 600 patents including the patents asserted in this complaint, the FDA granted Heartflow *de novo* clearance on November 26, 2014. Ex. 4 (https://www.accessdata.fda.gov/cdrh_docs/reviews/DEN130045.pdf). The *de novo* classification provides a pathway to classify "novel" medical devices for which there is no marketed "predicate device." Ex. 5 (https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/de-novo-classification-request#What_is_a_De_Novo_Classification_Request).

5. On November 6, 2017, the CMS assigned a "New Technology" Ambulatory Payment Classification recognizing Heartflow's first-of-its-kind, non-invasive technology that helps clinicians diagnose and treat patients with suspected coronary artery disease (CAD). Ex. 18 (https://ir.heartflow.com/news-releases/news-release-details/heartflow-announces-decision-centers-medicare-medicaid-services).

6. Fast forward to the present: on September 29, 2026, the FDA cleared Elucid's first CT-derived fractional flow reserve product, Elucid FFR-IQ, for commercial distribution. Ex. 6 (FDA Ltr. to Elucid, K262015 (September 29, 2026), and Elucid FFR-IQ 510(k) Summary). To win that clearance, Elucid identified a single predicate device—"Heartflow $FFR_{CT}$" (DEN130045)—and the FDA, accepting Elucid's comparison, "determined the device is substantially equivalent… to legally marketed predicate devices." *Id.* at 1. In its own side-by-side

comparison, Elucid declared its device the "[s]ame as predicate" in product code, regulation, classification, and output, and reported that Elucid, like Heartflow, develops and validates its models on the "[s]ame" ground truth: "[p]aired CT and invasive FFR data." *Id.*

7. That admission is the through-line of this case. Elucid has built its business on Heartflow's foundational technology: the patented inventions, designs, trade secrets including commercialization plans and customer lists, confidential regulatory and commercial know-how and processes including training processes to ensure product quality and reliability, that Heartflow spent more than a decade and hundreds of millions of dollars developing. Elucid now tells the market that it has designed around Heartflow's intellectual property by making statements such as that Elucid is "the first non-invasive FFR-CT analysis solution to take this into consideration, offering concordance between plaque data and FFR-CT data." Ex. 2 (https://elucid.com/healthcare-professionals/#ffrct).

8. Elucid's reliance on Heartflow did not begin in 2026. In September 2023, Elucid hired Windi Hary, who had served as Heartflow's Chief Regulatory and Quality Officer and had been a member of its leadership team for nearly thirteen years, to lead its regulatory functions. Heartflow promptly raised its concerns with Elucid in writing. It reminded Elucid of Ms. Hary's continuing confidentiality obligations. It also reiterated concerns it had already raised about Elucid's use of Heartflow's intellectual property, specifically its patent rights. Having put Elucid on notice of its former employee's continuing obligations, Heartflow reasonably expected that Elucid would honor those obligations and respect Heartflow's intellectual property rights. By a letter dated September 21, 2023, Elucid represented that it "respects the confidentiality and intellectual property of other companies, including Heartflow, and has no intention, nor desire, to cause Ms. Hary to violate any obligations she may have to prior employers." This was consistent

with past assurances in which Elucid represented that it respected other companies' intellectual property.

9. Within months of those communications, Elucid publicly announced that it was pursuing an indication for non-invasive fractional flow reserve (FFR), a measurement used to assess coronary blockages and the extent of ischemia. *See* Ex. 7 (https://www.biospace.com/elucid-raises-80-million-in-series-c-round-led-by-elevage-medical-technologies). In that announcement, Elucid claimed that its development product was "uniquely derived from its PlaqueIQ technology." But uniqueness is in the eye of the beholder.

10. Beginning in or around mid-2025, images of Elucid's forthcoming $FFR_{CT}$ device began to circulate, and the device looked strikingly similar to Heartflow's $FFR_{CT}$ Analysis. At the same time, Elucid continued to hire former Heartflow employees and to build out its sales force. Then, in September 2026, the FDA's clearance of FFR-IQ and Elucid's own 510(k) Summary confirmed what the images had suggested: Elucid had modeled its device on Heartflow's.

11. Those developments prompted Heartflow to look back at the departures of the former Heartflow employees who went on to work at Elucid. What Heartflow found confirmed its concerns. Several of those employees, including the senior leaders who now run Elucid's commercial organization, had forwarded Heartflow's confidential hospital account lists and contractual terms, physician lists, confidential commercialization and reimbursement know-how, market models, revenue forecasts, business plans, and sales performance data to personal email accounts shortly before leaving Heartflow. Those materials handed Elucid a ready-made blueprint for which markets to enter, which hospitals and physicians to target, and how to build and deploy a sales force in this very specific market of AI cardiovascular CT products, without the years of investment and trial and error that produced them.

## THE PARTIES

12. Plaintiff Heartflow, Inc. is a Delaware corporation with its principal place of business at 135 Main Street, Suite 1000, San Francisco, CA 94105.

13. Upon information and belief, Defendant Elucid Bioimaging Inc. is a Delaware corporation with its principal place of business at 399 Boylston Street, Suite 400, Boston, Massachusetts 02116. Elucid was founded in 2013 and develops AI-powered cardiovascular imaging software. Ex. 8 (Elucid Bioimaging Inc., https://elucid.com/).

## HEARTFLOW

### A. The Founders' Vision: From Stanford to a Revolution in Cardiac Care

14. Heartflow's story began not in a boardroom, but in a hospital bed. In 1978, a fifteen-year-old boy named Charles Taylor lay near death from a ruptured appendix. Ex. 9 (https://www.nobhillgazette.com/wellness/bay-area-based-heartflow-is-using-3d-modeling-to-produce-a-better-noninvasive-test-for/article_221da804-d9e7-5cf3-8deb-488e84c2bfe2.html). After intense weeks in the hospital, young Taylor recovered, and he was so inspired by the surgeon who saved his life that he resolved to pursue a career in science and medicine. *Id.* That journey would ultimately lead Dr. Charles Taylor to revolutionize how heart disease—the number one killer of men and women worldwide—is diagnosed and treated. *Id.*

15. By 1993, Dr. Taylor was a Ph.D. student in engineering at Stanford University. *Id.* That year, he attended a lecture that would change his life. *Id.* Dr. Christopher Zarins, Stanford's new chief of vascular surgery, gave a talk titled, "Blood Flow and Your Health." *Id.* "This is my calling," Dr. Taylor thought, as he listened to Dr. Zarins's lecture. *Id.* The next day, he went to see Dr. Zarins and asked, "Is there a role for me to work on this with you?" *Id.* That question would launch a decades-long partnership that would ultimately transform cardiovascular medicine. Dr. Zarins became Dr. Taylor's Ph.D. co-supervisor, and Dr. Taylor's doctoral thesis focused on using

computers to simulate blood flow in arteries, building on Dr. Zarins's research on understanding atherosclerosis including blood flow and plaque. *Id.* "One of [Dr. Taylor's] big ideas . . . was to use computer images to create a patient-specific model." *Id.* As leading experts, they published hundreds of articles and book chapters on their research related to atherosclerosis, plaque, blood flow, and medical image analysis.

16. Leveraging their foundational research, Dr. Taylor and Dr. Zarins cofounded Cardiovascular Simulation, Inc. in 2007. *Id.* The company became the first company-in-residence at the Mountain View-based Fogarty Institute for Innovation, a medical technology incubator. *Id.* In 2010, the company was renamed Heartflow, Inc. *Id.*

**B. Heartflow's Revolutionary Technology**

17. Heartflow's FDA-approved technologies form Heartflow's integrated AI diagnostic platform and are protected by hundreds of patents:

- $FFR_{CT}$ Analysis evaluates how artery narrowing (stenosis) affects blood flow to a patient's heart through a personalized three-dimensional model.
- Roadmap Analysis visualizes and quantifies the location and severity of stenoses on coronary computed tomography angiography ("CCTA") images.
- Plaque Analysis characterizes the composition and volume of plaque within the coronary arteries.
- Navigator combines anatomy, plaque, and physiology information and visuals into a precision tool for planning interventional procedures like coronary stents.

18. Working in concert, Heartflow's platforms leverage AI-powered assessment from a single CCTA scan to identify patients—whether symptomatic or asymptomatic—who may have an elevated risk of heart attack and how to best plan their medical or interventional treatment.

19. Heartflow began early-stage commercialization of its first product, the Fractional Flow Reserve derived from Computed Tomography ("$FFR_{CT}$") Analysis, in 2014 after *de novo* clearance from the FDA. Ex. 10 (FDA Approves Heartflow FFRCT: Non-Invasive Method for Determining Coronary Ischemia, https://www.ptca.org/news/2014/1126_HEARTFLOW.html). This groundbreaking technology offered a noninvasive method to detect and evaluate the severity of coronary artery disease. Using standard coronary CT angiography ("CCTA") images, $FFR_{CT}$ creates a three-dimensional model—a digital twin—of the patient's heart and coronary anatomy and calculates blood flow to identify pressure differences within the arteries. Ex. 11 (https://www.nsf.gov/science-matters/heartflows-ai-powered-medical-technology-debuts-nasdaq). This enables physicians to identify potential blockages that could precipitate a heart attack while also providing a functional assessment of the patient's coronary artery disease, helping them decide the optimal medical, stent, or surgical treatment of each patient. *Id.*

20. All along, Heartflow was protecting its pioneering technology by obtaining worldwide patent coverage, including in the field of using machine learning techniques in combination with one or more of $FFR_{CT}$, plaque, and coronary disease analysis. In 2016, Heartflow further enhanced its $FFR_{CT}$ technology by incorporating cloud-based infrastructure, enabling faster and more secure data transfer with clinicians, and improved machine learning algorithms. *Id.* Heartflow maintains an ongoing R&D pipeline of continued improvements and innovations, many of which leverage early inventions and patents. Backed by years of extensive R&D and protected by its patents, Heartflow also developed improvements to its $FFR_{CT}$ technology and new AI-powered products: Roadmap Analysis, Plaque Analysis, and Navigator.

### C. A World Leader Protected by Intellectual Property

21. Considering the revolutionary nature of its technology, Heartflow diligently sought to protect its groundbreaking research efforts, including through patents, and patent offices around

the world have awarded numerous patents to Heartflow. In October 2015, the United States Patent and Trademark Office issued Heartflow its fiftieth U.S. patent. Ex. 12 (https://ir.heartflow.com/news-releases/news-release-details/heartflow-secures-50th-us-patent). As then-CEO Dr. John H. Stevens stated at the time: “At our very core, we drive meaningful and continuous innovation. Aggressively protecting our technology is essential to our work.” *Id.*

22. Today, Heartflow has been granted over 600 patents globally, spanning 100 unique patent families. Dr. Taylor alone has over 220 issued or pending patents worldwide. From early in 2010, Heartflow undertook years of extensive efforts and innovation to build $FFR_{CT}$, Plaque, and the Heartflow platform, inventing techniques to analyze medical images, novel AI and machine learning methods to quantify coronary artery disease, plaque analysis, risk prediction, therapy planning, and various approaches for deriving blood flow and FFR from anatomic images, including machine learning methods. Heartflow invested significantly in R&D efforts, clinical studies, regulatory clearances, and pursuing patent protection for these extensive and category-creating innovations.

23. These patents include the four patents asserted in this complaint, namely U.S. Patent Nos. 9,754,082; 10,010,255; 9,770,303; and 9,070,214 (Exs. 13–16) (collectively, the “Asserted Patents”).

24. Heartflow’s early work within the fields of AI analysis of medical images, coronary anatomy and plaque quantification, and other related features is evidenced by the hundreds of diverse patents granted to Heartflow including, for example, asserted U.S. Patent No. 9,770,303 that is specifically tied to implementing innovative AI techniques for performing plaque analysis and has a priority date of December 18, 2013. There are many other such diverse patents in Heartflow’s portfolio.

**D. Recognition of Technical Innovation, Commercial Success, and Industry Praise of Heartflow's Technology Protected by Heartflow's Patents**

25. The *de novo* approval provided to Heartflow confirms that there was no "predicate device" and that Heartflow's use of $FFR_{CT}$ and 3D coronary anatomy models for the "clinical quantitative and qualitative analysis" of cardiac CT images warranted a classification for a "novel" medical device that is protected by Heartflow patents including the Asserted Patents. Exs. 13–16.

26. The *New England Journal of Medicine* cited Heartflow as being the most utilized AI-based technology in the U.S. based on insurance claims analysis. Ex. 17 (https://ai.nejm.org/doi/full/10.1056/AIoa2300030).

27. Heartflow paved the way for AI-based technologies to have codes and receive payment by Medicare and now has reimbursement for both $FFR_{CT}$ and Plaque Analysis. Assignment of the "New Technology" Ambulatory Payment Classification by CMS also confirms that Heartflow's technology and patents are directed to "New Technology." Ex. 18 (https://ir.heartflow.com/news-releases/news-release-details/heartflow-announces-decision-centers-medicare-medicaid-services). As part of receiving the New Technology Ambulatory Payment Classification by CMS, Heartflow's technology—including the use of machine learning/AI models in combination with $FFR_{CT}$ platforms and 3D models to diagnose coronary artery disease—received industry praise from commenters who remarked that such techniques were not routine or conventional and were a technical improvement over existing solutions:

> Commenters asserted that a $FFR_{CT}$ service provides information that cannot be obtained from standard analysis of a coronary computed tomography angiography image. Several commenters stated that $FFR_{CT}$ services can improve the quality of screening for coronary artery disease (CAD) while reducing costs. That is, the commenters stated that, unlike a coronary computed tomography angiography service, which merely produces images, the $FFR_{CT}$ service is able to directly produce $FFR_{CT}$ values by creating a 3-D model of the patient's coronary arteries using the previously acquired image. Moreover,

https://s3.amazonaws.com/public-inspection.federalregister.gov/2017-23932.pdf (Excerpts) (Ex. 19 at 280).

Commenters stated that, many times, a coronary computed tomography angiography indicates that a beneficiary may potentially have CAD and that without $FFR_{CT}$, providers will often request an invasive coronary angiogram to verify the presence of CAD. In many cases, the invasive coronary angiogram finds no occurrence of CAD. $FFR_{CT}$ services can provide analytic services not otherwise available to determine fractional flow rates in coronary arteries using the original coronary computed tomography angiography image and show whether a beneficiary has CAD without performing a coronary procedure.

*Id.*

28. The CMS noted that Heartflow's $FFR_{CT}$ platform "is a separate and distinct service from the original coronary computed tomography angiography service" and that "the $FFR_{CT}$ service generates data on FFR values that can only be obtained by performing the $FFR_{CT}$ service." *Id.* at 284.

29. Heartflow's $FFR_{CT}$ Analysis, Roadmap Analysis, and Plaque Analysis products are supported by the ACC/AHA Chest Pain Guideline and backed by more than 600 peer-reviewed publications. Ex. 20 (https://ir.heartflow.com/news-releases/news-release-details/heartflow-closes-98-million-convertible-notes-financing). Heartflow maintains deep partnerships with more than 1,400 hospitals in the U.S. and more globally, including 80% of the top 50 heart hospitals in the U.S. Ex. 21 (Heartflow Achieves Landmark Milestone of 500,000 Patients Assessed for Coronary Artery Disease (CAD) with $FFR_{CT}$ Analysis, https://finance.yahoo.com/news/heartflow-achieves-landmark-milestone-250-140000565.html).

30. Heartflow received significant industry praise for implementing AI techniques, machine learning models, and deep learning models to manage CAD. For example, *The Guardian* credited Heartflow for leading the charge to rely on AI to create a "revolution" and transform the

National Health Service. Ex. 22 (https://www.theguardian.com/technology/2018/jul/04/its-going-create-revolution-how-ai-transforming-nhs).

31. Additional examples of industry praise and recognition for Heartflow's patented technology include:

- Award in patient health magazine recognizing non-invasive AI analysis of a patient's heart: Ex. 23 (https://www.prevention.com/health/g30198374/health-breakthrough-awards/)
- 2019 Fast Company AI award: Ex. 24 (https://www.fastcompany.com/most-innovative-companies/2019/sectors/artificial-intelligence)
- 2011 EuroPCR Innovation Award: Ex. 25 **(**https://ir.heartflow.com/news-releases/news-release-details/heartflow-receives-2011-europcr-innovation-award)
- Diagnosis of Plaque Rupture: Ex. 26 (https://ir.heartflow.com/news-releases/news-release-details/technology-heartflow-provides-insights-help-identify-coronary)

32. Further, leading medical device companies such as GE, Siemens, and Philips entered into collaborative agreements with Heartflow recognizing the innovative use of AI and machine learning techniques:

- Ex. 27 (GE Healthcare, Heartflow enters into global collaboration agreement, Reuters).
- Ex. 28 (Siemens Healthineers and HeartFlow Collaborate to Provide Solution That Has Potential to Lower Cardiac Care Costs).
- Ex. 29 (https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2017/20170828-philips-and-heartflow-announce-global-collaboration-agreement.html?srsltid=AfmBOord28KbSucp0oOgNK5p3bFZsiGaS1hxNnFDg90CPuzNnUQuwQhx).

33. *Imaging Technology News* described Heartflow's platform as being directed to "groundbreaking technology" and "technology [that] provides both anatomical and functional assessment of the coronary arteries, a task no other method has accomplished to date." Ex. 30 (https://www.itnonline.com/article/clinical-applications-ffr-ct). It further noted that this "technology can help determine if any of the lesions are severely limiting blood flow and/or which lesion(s) are the most significant." *Id.*

34. On April 5, 2016, *Imaging Technology News* also described Heartflow's platform as being directed to "Novel technology" that "significantly reduces the need for invasive procedures to diagnose patients suspected of having coronary artery disease" and that it "is the only non-invasive technology to provide physicians insight into both the extent of a patient's arterial blockage and the functional impact the blockage has on blood flow." Ex. 31 (https://www.itnonline.com/content/one-year-platform-trial-results-reinforce-benefits-ffr-ct).

35. In a video interview discussing Heartflow's technology in or around August 5, 2015, Heartflow distinguished its technology from conventional techniques of detecting coronary artery disease by explaining the technical improvements as below: Ex. 32 (https://www.dicardiology.com/videos/video-implementation-and-science-behind-ffr-ct):

- "Historically we've had a number of limitations from either functional imaging or from anatomic imaging."
    - "From functional imaging we never saw the coronary arteries so that was a huge limitation to it. With coronary CT angiography we found the stenosis but didn't really know whether or not that stenosis was flow limiting and now we do."
    - "There's a lot of artifacts that you see with CT perfusion imaging. And again, it doesn't precisely localize the stenosis. Let's say you have an anterior defect in your perfusion and you assume that it's the LAD, the left anterior descending artery. But there might be multiple lesions across the course of that artery and you still are not quite certain which specific lesion causes the ischemia. That's what $FFR_{CT}$ has the benefit of offering."

- "[I]t's a truly disruptive technology….[Y]ou're able to pinpoint the exact location at which a patient becomes ischemic."

36. The National Institute for Health and Care Excellence (NICE) in the United Kingdom (UK) also recognized that Heartflow's $FFR_{CT}$ platform "showed high diagnostic accuracy and increased specificity with HeartFlow $FFR_{CT}$" compared with conventional CCTA alone and that "the committee considered the technology to be **innovative** and understood that its adoption may serve to simplify a complex patient pathway" and solve the problems in the field by reducing the need for invasive measurements and radiation exposure. Ex. 33 (https://www.nice.org.uk/guidance/htg429/resources/heartflow-ffrct-for-estimating-fractional-flow-reserve-from-coronary-ct-angiography-pdf-1809594120437701) (emphasis added).

37. Heartflow was recently named one of *Fast Company*'s Most Innovative Companies in Medical Devices for 2025 and won the Innovation in Cardiac Imaging award at the 2025 Global Cardiovascular Awards. Ex. 11 (https://www.nsf.gov/science-matters/heartflows-ai-powered-medical-technology-debuts-nasdaq). This comes after Heartflow already earned a spot on *Fast Company*'s list of "The World's Most Innovative Companies" only a few years prior. *Id.* Dr. Taylor's "pioneering" work with Heartflow led to his election to the National Academy of Engineering class of 2024. *Id.*

38. Heartflow has raised more than $1.2 billion of capital. *Id.* Thanks to its groundbreaking technology, Heartflow is now recognized as the most widely adopted AI solution in U.S. health care. *Id.* Heartflow's products have been used at over 1,500 hospitals in the United States to diagnose heart disease in over 600,000 patients. *Id.*

39. Heartflow's technology is protected by Heartflow's patents including the Asserted Patents.

**E. Heartflow's Technical, Regulatory, and Commercial Trade Secrets**

40. Heartflow spent more than a decade developing, clearing, and commercializing the first non-invasive, CT-derived FFR product, raising over $120 million to invest in research and development efforts on the path to obtaining FDA clearance and related necessary regulatory approvals. Along the way, it built a large body of non-public information that falls into three categories: technical, regulatory, and commercial. Heartflow protects that information through its patents and trade secrets.

41. **Technical Information.** Heartflow's proprietary algorithms, models, and data sets are the engine of its platform, and Heartflow protects them through both its patents and trade secrets. Heartflow's technical trade secrets include the non-public source code, algorithms, model architectures, processes, and parameters underlying $FFR_{CT}$ Analysis, Plaque Analysis, and Navigator, including: (a) the methods and software by which Heartflow generates patient-specific three-dimensional models of the coronary arteries from standard CCTA images; (b) the computational methods by which Heartflow simulates coronary blood flow and computes $FFR_{CT}$ values; (c) Heartflow's training and validation data sets, including its curated paired CT and invasive FFR data and a competitively differentiated data set of approximately 200 million annotated images assembled over more than ten years, and the methods by which those data were selected, labeled, and used to train and validate Heartflow's machine learning models; (d) non-public software documentation; (e) internal implementation and deployment know-how; (f) analyst processes, training, and quality assurance for same; and (g) machine learning and AI techniques regarding or developed in the course of creating the Heartflow platform, including each of $FFR_{CT}$ Analysis, Plaque Analysis, and Navigator (collectively, "Technical Information"). Technical Information does not include information disclosed in Heartflow's issued patents or

published patent applications, except to the extent Heartflow's non-public implementations go beyond those disclosures.

42. **Regulatory Information.** Heartflow obtained from the FDA the *de novo* classification of $FFR_{CT}$ (DEN130045), creating a new device classification for which no predicate device existed. In obtaining that first-of-its-kind classification and its later clearances, Heartflow developed regulatory trade secrets that include: (a) the full, non-public contents of its *de novo* request and later premarket submissions, which run to hundreds of pages, of which the FDA releases only a short summary; (b) Heartflow's regulatory strategy, roadmap, and internal sequencing for obtaining clearance of a novel AI-enabled, CT-derived physiologic simulation device; (c) Heartflow's non-public pre-submission communications with the FDA, the FDA's feedback, questions, and requests for additional information, and Heartflow's responses; (d) the design, protocols, statistical analysis plans, and non-public patient-level data of the clinical and validation studies supporting its submissions, beyond what Heartflow and its investigators have published; and (e) Heartflow's negative know-how, meaning what the FDA questioned, rejected, or required Heartflow to change, and which approaches Heartflow tried and abandoned ("Regulatory Information"). Regulatory Information does not include the *de novo* decision summary, 510(k) summaries, the classification regulation (21 C.F.R. § 870.1415), its special controls, or other information the FDA or Heartflow has made public.

43. **Commercial Information.** Heartflow treats all of its customer and commercial intelligence as confidential and proprietary. Heartflow's commercial trade secrets include its non-public: (a) customer and prospective-customer account and opportunity lists; (b) physician lists, referral lists, and contact lists; (c) customer-specific proposals and negotiated agreements, whose commercial terms are confidential between Heartflow and each customer and whose language and

structure Heartflow has negotiated and refined over years; (d) market-segmentation analyses, sales strategies, territory designs, and business plans; (e) market models and revenue forecasts; (f) internal performance data, including commercial, billable completed volume by region, daily sales reports, and area sales dashboards; (g) sales-compensation models; (h) hospital implementation, onboarding, and reimbursement resources; (i) board-level strategy presentations; and (j) pricing information and strategy (collectively, "Commercial Information"). This information could be used to start, grow, and scale a competing sales organization and its territories.

44. Heartflow's trade secrets also include combinations, selections, and compilations of the foregoing information, including the integrated body of technical, clinical, and regulatory information that enabled Heartflow to obtain the first FDA classification of a CT-derived FFR device, and knowledge of the relative importance of that information, regardless of whether any individual element is publicly known. Heartflow employees, including the former employees who later joined Elucid, had access to technical, regulatory, and/or commercial trade secrets as their role required.

45. Nearly all of the content of Heartflow's regulatory submission is confidential. A 510(k) submission can run more than 1,500 pages, of which the FDA summarizes and publishes only about three. When third parties request those filings under the Freedom of Information Act, the FDA redacts confidential material and then sends the filing to the submitter for further redaction. Inside Heartflow, access to regulatory files is limited to employees who need them to do their jobs.

## F. Heartflow Guards That Information With Contracts, Access Controls, and Confidential Treatment at the FDA

46. Heartflow requires its employees to sign confidentiality agreements. For example, in June 2010, Ms. Hary signed an At-Will Employment, Confidential Information, Invention

Assignment, and Arbitration Agreement with Cardiovascular Simulation, Inc., as Heartflow was then known. In it, she agreed to hold Heartflow's "Company Confidential Information" in the strictest confidence during and after her employment; not to use it except for Heartflow's benefit during her employment, and not to disclose it without written authorization; to return all Company property (including Company Confidential Information) when her employment ended, and not to recreate or deliver it to anyone else.

47. When Ms. Hary's employment ended on January 19, 2023, she signed an agreement in which she acknowledged receiving Heartflow's confidential and proprietary information, agreed not to make it known to the public, and agreed to return all of it, including all copies and excerpts, before her termination date. The other former Heartflow employees who later joined Elucid signed similar agreements. Scott Burger (on July 31, 2016) and Bowen Freeman (on July 5, 2016) signed the same form of agreement, which required each of them, on leaving, to return and not keep, recreate, or deliver Company Confidential Information, to consent to an exit interview, and to sign a Termination Certification. Jeremy Stralla signed an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement on November 27, 2017, and on his last day, December 11, 2020, signed a Termination Certification stating that he had returned all Heartflow records, data, and documents and would keep Heartflow's confidential information confidential. Bill Atteridg signed an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement on April 1, 2018, and a Proprietary Rights and Non-Competition Agreement in August 2023; each required him to return all Heartflow information, including electronically stored information, at the end of his employment.

48. Heartflow also restricts access to nearly all of its information systems, uses encryption, and trains its employees to protect the confidentiality of confidential and proprietary

Heartflow information. When it files regulatory submissions, Heartflow marks confidential and trade secret information, segregates sensitive material, and asks the FDA to redact proprietary content so that only the public summary is released.

49. These measures were reasonable in light of Heartflow's size and circumstances. From 2017 through 2020, when several departing commercial employees left, Heartflow was a privately held, venture-backed company with a far smaller workforce and infrastructure than it has today. It protected its information through written confidentiality agreements, role-based access restriction, encryption, training, and the confidentiality expectations it communicated to its sales force.

## ELUCID BIOIMAGING INC.

### A. Elucid's Background and Infringing Products

50. Initially, Elucid indicated that it would develop cardiovascular imaging analysis software that would focus on carotid arteries. Ex. 34 (Elucid Launches PlaqueIQ Image Analysis Software for the Carotid Arteries, https://elucid.com/elucid-launches-carotid-plaqueiq/).

51. Upon seeing the success of Heartflow's $FFR_{CT}$ product, however, Elucid changed its focus and decided to build and prepare to commercialize a competing product that relied on Heartflow's foundational intellectual property including patents, trade secrets, and confidential know-how. *See* Ex. 2 (https://elucid.com/healthcare-professionals/#ffrct). In particular, upon information and belief, instead of innovating for a unique solution, Elucid formulated a plan to hire away numerous employees from Heartflow to glean knowledge about Heartflow's products, regulatory process, commercialization efforts, customer relationships, and many other aspects of the institutional knowledge in an attempt to copy-paste the success of Heartflow while not respecting any of Heartflow's intellectual property rights.

52. In the process, Elucid launched a competing FFR$_{CT}$ product that directly competes with Heartflow's pioneering FFR$_{CT}$ Analysis. Ex. 35 (Elucid Bioimaging Inc. – overview, https://www.preqin.com/data/profile/asset/elucid-bioimaging-inc-/430946).

53. For example, in or around September 2025, Heartflow became aware of images of Elucid's forthcoming FFR$_{CT}$ device. The device looked strikingly similar to Heartflow's award-winning FFR$_{CT}$ Analysis product as shown in an exemplary comparison below:

**Heartflow's Product**




Ex. 1 (Heartflow's next-generation Plaque Analysis algorithm gains US FDA clearance, https://cardiovascularnews.com/hearflows-next-generation-plaque-analysis-algorithm-gains-us-fda-clearance/)

**Elucid's Product**




Image of Elucid’s forthcoming $FFR_{CT}$ device that Heartflow became aware of in September 2025. Ex. 2 (https://elucid.com/healthcare-professionals/#ffrct)

54. Upon information and belief, Elucid’s products employ AI algorithms, image processing techniques, coronary artery segmentation methods, plaque characterization technologies, and/or blood flow analysis methods that are covered by one or more claims of Heartflow’s patents. *Compare* Ex. 1 (Heartflow’s next-generation Plaque Analysis algorithm gains US FDA clearance, https://cardiovascularnews.com/hearflows-next-generation-plaque-analysis-algorithm-gains-us-fda-clearance/) *with* Ex. 8 (Elucid, https://elucid.com/) (reproduced below).

**Heartflow’s Plaque Analysis Product**




Ex. 1 (Heartflow's next-generation Plaque Analysis algorithm gains US FDA clearance, https://cardiovascularnews.com/hearflows-next-generation-plaque-analysis-algorithm-gains-us-fda-clearance/)

**Elucid's PlaqueIQ Product**




Ex. 2 (https://elucid.com/healthcare-professionals/#ffrct)

55. Relying on Heartflow's $FFR_{CT}$ product as a "predicate device," Elucid obtained FDA clearance for its FFR-IQ product. *See* Ex. 6 (Sept. 29, 2026 Ltr. from FDA to Elucid). Specifically, the FDA "ha[s] determined the [Elucid] device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices [Heartflow]." *Id.* at 1.

56. The regulatory process for Elucid was handled by the **same** person who contributed to the FDA *de novo* regulatory clearance and multiple subsequent FDA clearances for Heartflow's novel and groundbreaking product:

# 510(k) Summary

## Submitter Information

| | |
|---|---|
| Submitter / Manufacturer Name | Elucid Bioimaging, Inc.<br>399 Boylston Street, Suite 400, Boston, MA 02116 |
| Primary Correspondent & Contact Information | Windi Hary<br>Chief Regulatory and Quality Officer<br>Email ID: windi.hary@elucid.com |
| Secondary Correspondent & Contact Information | Hiral Vora<br>Lead Quality and Regulatory Affairs Specialist<br>Email ID: hiral.vora@elucid.com |
| Date Prepared | September 29, 2026 |

*See* Ex. 6 (Sept. 29, 2026 Ltr. from FDA to Elucid).

57. In approving Elucid's product, the FDA found numerous similarities between the "Technological Characteristics" of Elucid's product and Heartflow's predicate device:

## Summary of Technological Characteristics

| Comparison Criteria | Subject Device | Predicate Device | Comparison Assessment |
|---|---|---|---|
| | Elucid FFR-IQ (B.1) | HeartFlow FFRct v1.4 | - |
| 510(k) | K262015 | DEN130045 | - |
| Manufacturer | Elucid Bioimaging, Inc | HeartFlow, Inc. | - |
| Product Code | PJA | PJA | Same as predicate |
| Regulation | 870.1415 | 870.1415 | Same as predicate |
| Device Classification Name | Coronary vascular physiologic simulation software device | Coronary vascular physiologic simulation software device | Same as predicate |
| Device Class | II | II | Same as predicate |
| Input / Data Source | CT / K241524 (CT) | CT | Similar, however Elucid FFR-CT requires the output of K241524 as input |
| Output | Graphics and text results of noninvasively derived FFR-CT that can be accessed by end users/physicians using a device with internet connectivity | Graphics and text results of noninvasively derived FFR-CT that can be accessed by end users/physicians using a device with internet connectivity | Same as predicate |
| Ground Truth for Model Training | Paired CT and invasive FFR data | Paired CT and invasive FFR data | Same |

*See* Ex. 6 (Sept. 29, 2026 Ltr. from FDA to Elucid).

**B. Elucid's Systematic Recruitment of Heartflow Employees**

58. The similarity in the design and technical scope of Elucid's system to Heartflow's is not surprising in view of Elucid's systematic, wholesale recruitment of Heartflow's workforce to build its product and business.

59. Heartflow is the source of a significant number of Elucid's employees. Ex. 36 (CapIQ Report on Elucid). Of all the companies from which Elucid has recruited talent, Heartflow

tops the list, with eleven former Heartflow employees now working at Elucid. *Id.* at 18. No other company has contributed more personnel to Elucid's ranks.

60. By systematically recruiting Heartflow's employees, Elucid has acquired not just talent, but, it appears, the institutional knowledge, proprietary methods, technical approaches, regulatory strategies, and competitive insights that Heartflow's employees developed over years of work at the company that pioneered this field.

61. The scale of this recruitment is striking, and itself suspect. Elucid has hired more employees from Heartflow than from any other source—more than from major healthcare conglomerates like Philips (9 employees), more than from prestigious academic medical centers like Brigham and Women's Hospital (10 employees) or Massachusetts General Hospital (7 employees), and more than from established medical imaging companies like Siemens Healthineers (6 employees) or GE HealthCare (5 employees). *Id.* at 18 (reproduced below).

**Employee Movement | Elucid Bioimaging Inc. - All**




| **Previous Employer** | **Inbound Count** |
|---|---|
| HeartFlow, Inc. | 11 |
| The Brigham and Women's Hospital, Inc. | 10 |
| Philips North America LLC | 9 |
| Massachusetts General Hospital, Education Centre | 7 |
| Beth Israel Deaconess Medical Center, Inc. | 6 |
| Siemens Healthineers AG | 6 |
| Engooden Health Inc. | 6 |
| Terarecon Inc. | 5 |
| Boston University Chobanian & Avedisian School of Medicine | 5 |
| GE HealthCare Technologies Inc. | 5 |

62. This pattern of hiring demonstrates that Elucid has deliberately targeted Heartflow as a source of competitive intelligence. Each former Heartflow employee who joins Elucid brings knowledge of Heartflow's technology, its development processes, its regulatory strategies, and its commercial approaches, which is precisely the knowledge that would be most valuable to a competitor seeking to replicate Heartflow's success. Each hire encouraged Elucid to hire more employees from Heartflow to gain institutional knowledge.

### C. Elucid Hires Windi Hary—Former Heartflow Executive with Confidentiality Obligations

63. Elucid hired Windi Hary, a nearly thirteen-year Heartflow veteran and member of Heartflow's leadership team, to serve as its Chief Regulatory and Quality Officer. Ex. 37 (Elucid Appoints Windi Hary to Lead Regulatory Affairs and Quality Management, https://elucid.com/elucid-appoints-windi-hary-to-lead-regulatory-affairs-and-quality-management/).

64. Ms. Hary joined Heartflow in 2010, the year the company was founded, and remained there for nearly thirteen years. On June 3, 2010, Ms. Hary executed an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Hary Agreement") with Heartflow. Under the Hary Agreement, Ms. Hary agreed to maintain the confidentiality of Heartflow's proprietary and confidential information both during and after her employment.

65. During her nearly thirteen years at Heartflow, Ms. Hary served as a fiduciary of the company. In that capacity, she gained intimate knowledge of virtually every aspect of Heartflow's operations that would be valuable to a competitor. She became deeply familiar with Heartflow's technology, its planned technological developments and product strategies, its proprietary data, its clinical trials, and its regulatory strategies and confidential regulatory documents and FDA

correspondence. She had access to every document and detail regarding how Heartflow's product, process, and business operate. As a member of Heartflow's leadership team, Ms. Hary was also privy to Heartflow's commercial strategy, including where Heartflow planned to focus its efforts and where it chose not to compete.

66. The knowledge Ms. Hary built up over nearly thirteen years at Heartflow would be extremely valuable to any competitor. Both before and after Ms. Hary joined Elucid, Elucid made statements intended to ease Heartflow's concerns. On August 31, 2022, Elucid's counsel answered Heartflow's notice of its patent rights by stating that "Elucid does value and respect third-party intellectual property rights" and that Elucid "will consider the information provided." Ex. 38. Also around this time, Elucid represented publicly that its forthcoming $FFR_{CT}$ product, which measures coronary blockages and the extent of ischemia, would be "uniquely derived from its PlaqueIQ technology." Ex. 7 (https://www.biospace.com/elucid-raises-80-million-in-series-c-round-led-by-elevage-medical-technologies). After Heartflow wrote to both Elucid and Ms. Hary on September 12, 2023, about her obligations, Elucid again stated that it "respects the confidentiality and intellectual property rights of other companies, including Heartflow." It further stated that it "is not seeking to acquire – and has not acquired – Heartflow's trade secrets or proprietary information" and it "did not hire Ms. Hary to obtain such information." Elucid went further and called Heartflow's concerns "unfounded accusations." Ex. 39. Ms. Hary's counsel likewise called the idea that Elucid hired her to use Heartflow's confidential information "absurd and baseless." Ex. 82. Despite these assurances, it now appears, upon information and belief, that Elucid hired Ms. Hary precisely because of her intimate knowledge of how Heartflow developed, validated, and obtained FDA authorization for the first device of its kind.

67. Ms. Hary remains bound by the confidentiality obligations she undertook in the Hary Agreement. Upon information and belief, Elucid has had the benefit of Ms. Hary's knowledge of Heartflow's non-public regulatory information in preparing and pursuing FDA clearance of FFR-IQ, a device that Elucid told the FDA is substantially equivalent to Heartflow's own and for which Ms. Hary served as Elucid's primary correspondent with the FDA.

68. Upon information and belief, through Ms. Hary, Elucid acquired actual knowledge of Heartflow's technology, its patent portfolio, its product development strategies, its regulatory strategies, and its commercial plans. Ms. Hary spent nearly thirteen years at Heartflow and served on its leadership team; there is no question that she possessed precisely the knowledge that would be most valuable to a competitor like Elucid.

69. Elucid's decision to hire Ms. Hary as its head of Quality and Regulation, a role that directly implicates the regulatory strategies and product development approaches that Ms. Hary learned at Heartflow, demonstrates that Elucid sought to exploit Ms. Hary's knowledge of Heartflow's confidential information. This knowledge, coupled with Elucid's decision to develop and commercialize directly competing products without seeking a license from Heartflow, constitutes willful infringement of Heartflow's patents.

70. Elucid's willfulness is further demonstrated by Heartflow's prominence in the field. Heartflow pioneered the AI-powered cardiac CT analysis market in 2014, has secured over 600 patents globally, and is a publicly traded company. As a direct competitor operating in the same narrow market, Elucid was fully aware of Heartflow's patent portfolio. Elucid chose to develop and commercialize infringing products despite this knowledge.

71. Indeed, when the FDA cleared Elucid's FFR-IQ device, it addressed the letter to Windi Hary as Elucid's Chief Regulatory and Quality Officer. *See* Ex. 6 (Sept. 29, 2026 Ltr. from FDA to Elucid).

**D. Elucid Hires Additional Former Heartflow Employees**

72. Among the former Heartflow employees hired by Elucid is Scott Burger, who between December 2022 and March 2024 served as Elucid's Chief Commercial Officer. Ex. 40 (Elucid Appoints Scott Burger as Chief Commercial Officer, https://elucid.com/elucid-appoints-scott-burger-chief-commercial-officer/). Mr. Burger previously held the position of Commercial Vice President at Heartflow, where he gained comprehensive knowledge of Heartflow's sales strategies, customer relationships, pricing models, and competitive positioning. At Elucid, Mr. Burger led the company's sales, marketing, market access, and customer success functions—functions of which he developed close knowledge at Heartflow. *Id.*

73. Upon information and belief, each of the eleven former Heartflow employees who now work, or have worked, at Elucid (summarized below) had access during their Heartflow employment to Heartflow's technical, regulatory, and/or commercial trade secrets (described in Section E above), and brought specialized knowledge of Heartflow's operations to Elucid, whether in technology development, regulatory affairs, commercial strategy, or other functions.

74. For example, in addition to the regulatory knowledge and strategy Elucid sought and accessed through the hiring of Ms. Hary, Elucid also hired other employees to specifically learn about Heartflow's commercialization strategy, product development, operations, design, and quality assurance practices.

75. For example, in or around March 2024, Elucid hired Sophie Khem as its Senior Vice President for Clinical Quality & Delivery. Previously—between 2012 and 2022—Ms. Khem worked for Heartflow in several roles, including as Senior QC Manager; Director of Process and

Quality Engineering; and Vice President of Process and Quality Engineering. In these roles, Ms. Khem developed intimate knowledge regarding Heartflow's product development, operations, product validation, and quality assurance processes, including at a senior level.

76. Similarly, Elucid also hired Kathy Yuen as its Senior Product Designer. Previously—between 2019 and 2024—Ms. Yuen served as Heartflow's Senior UX (User Experience) Designer. In this role, Ms. Yuen learned about Heartflow's confidential internal conceptual product designs, including Heartflow's user interface.

77. The former Heartflow employees, who now work (or have previously worked) at Elucid, are listed below:

| **Former Heartflow Employee Name** | **Duration at Heartflow** | **Role at Heartflow** | **Role at Elucid** |
|---|---|---|---|
| Windi Hary | 12 years, 7 months | Chief Regulatory and Quality Officer, Senior Vice President (Global Clinical, Quality and Regulatory Affairs), Vice President (Global Clinical, Quality and Regulatory Affairs), Director (Quality and Regulatory) | Chief Regulatory and Quality Officer |
| Scott Burger | 3 years, 11 months | Commercial Vice President (West) | Chief Commercial Officer |
| Bill Atteridg | 5 years, 10 months | Area Sales Director, Sr. District Sales Manager, District Sales Manager | Area Sales Director<br><br>(Cardiovascular and Medical device sales experience across SaaS/AI Cardiac Imaging, Interventional and EP) |
| Jeremy Stralla | Approx. 3 years | District Sales Manager | Area Sales Director<br><br>(Sales for PlaqueIQ and $FFR_{CT}$ AI medical technology for cardiovascular disease) |

| Former Heartflow Employee Name | Duration at Heartflow | Role at Heartflow | Role at Elucid |
|---|---|---|---|
| James Mills | 2 years, 6 months | District Sales Manager | U.S. Sales Manager<br><br>(Medical device sales experience across vascular, sales operations, and sales management) |
| Talia D’Ambruoso | 1 year, 8 months | Product Manager | Group Product Manager (current), Sr. Product Manager (former) |
| Sophie Khem | 10 years, 2 months | VP (Process and Quality Engineering), Director (Process and Quality Engineering), Sr. QC Manager | Sr. Vice President, Clinical Quality and Delivery |
| Nicholas Mills | 2 years, 5 months | Territory Sales Manager | Area Sales Director<br><br>(SaaS, cloud solutions, IT services, and healthcare sales experience) |
| Kathy Yuen | 5 years | Sr. UX Designer | Sr. Product Designer<br><br>(Interaction design, spatial design, experience design, and UX research specialties) |
| Bob Tingley | 4 years, 5 months | Area Sales Director (Eastern US), District Sales Manager (FL) | Area Sales Director – US<br><br>(Shaping go-to-market commercial strategy and portfolio pipeline management) |
| Bowen Freeman | 3 years, 1 month | Area Sales Director, District Sales Manager | U.S. Director of Sales and Marketing<br><br>(Selling AI software that models atherosclerotic plaque from a standard CTA) |

78. Collectively, these individuals possess a comprehensive understanding of Heartflow's business that no competitor could obtain through legitimate means.

79. Indeed, Heartflow brought legal action against one of these former employees, Nicholas Mills, for violating his post-employment contractual obligations by joining Elucid after resigning from his employment with Heartflow. *See* First Amended Complaint, *Heartflow, Inc. v. Nicholas Mills,* No. 6:26-cv-00032-ACC-LHP (M.D. Fla. Jan. 12, 2026), ECF No. 11. Specifically, Mr. Mills had an agreement with Heartflow that limits him from working in certain areas or with certain customers for a certain period. While the litigation resolved amicably, Mr. Mills is still bound by the applicable terms of his agreement with Heartflow.

80. The systematic nature of this recruitment, with eleven employees coming from a single competitor, and Heartflow serving as Elucid's largest source of talent, demonstrates a deliberate strategy to appropriate Heartflow's institutional knowledge. This is not a case of occasional employee movement between competitors; it is a coordinated effort to build a competing business on the foundation of Heartflow's proprietary expertise.

**E. 2026: Elucid's FDA Clearance Confirms Its Reliance on Heartflow's Device**

81. On August 28, 2026, Elucid submitted a traditional 510(k) premarket notification for FFR-IQ (K262015), which the FDA received on August 31, 2026. On September 29, 2026, the FDA found FFR-IQ substantially equivalent to Heartflow's $FFR_{CT}$, which Elucid had identified as its predicate device. The FDA classified FFR-IQ under the same regulation and product code that govern Heartflow's $FFR_{CT}$ (21 C.F.R. § 870.1415; product code PJA), a classification that exists only because of Heartflow's pioneering *de novo* request. The FDA addressed its clearance letter to Ms. Hary, whom Elucid's 510(k) Summary also lists as its primary correspondent. Ex. 6 (FDA 510(k) Ltr. and 510(k) Summary, K262015).

82. In addition to her involvement in Heartflow's *de novo* request, Ms. Hary also led six subsequent FDA clearances to improve, refine, and expand Heartflow's $FFR_{CT}$ product. Ms. Hary, therefore, had access to all information and correspondence from these seven clearances to help inform Elucid's strategy.

83. A 510(k) applicant ordinarily identifies a legally marketed predicate device and shows that its own device has the same intended use and technological characteristics that are the same as, or do not raise different questions of safety and effectiveness than, the predicate's. Heartflow does not contend that relying on a predicate is improper in itself. What matters here is what Elucid chose to tell the FDA: that its device is the "[s]ame as predicate" in product code, regulation, classification, and output, and that it uses the "[s]ame" ground truth for model training, "[p]aired CT and invasive FFR data." Elucid identified only one difference, that its device does not use computational fluid dynamics, and represented that the difference does "not raise different questions of safety or effectiveness." Ex. 6 (510(k) Summary) at 2–3, 5. That public summary was the first confirmation available to Heartflow that Elucid had modeled its product on Heartflow's.

84. Elucid continues to promote and offer for sale its newly approved FFR-CT product that was built upon Heartflow's foundational intellectual property.

elucid

**Elucid**
12,744 followers
15m •

+ Follow ···

We're headed to #TCT2026 in San Diego!
Visit us at Booth 3424 to see how Plaque-IQ™ and BioIntegrated FFR-IQ™ bring anatomy, biology, and physiology together in one comprehensive view of coronary disease.

Sessions to note:
TCT AI Lab 3 | 12:20–1:50 PM
Real World Applications of AI: AI-Powered CT for Interventional Procedures
Featuring a lecture by Jagat Narula, MD, PhD.

Training Pavilions | 2:00–3:30 PM & 4:00–5:30 PM
Integrating Plaque Biology and BioIntegrated FFR-CT for Lesion-Level Risk Assessment: Hands-on sessions featuring Amir Ahmadi, MD; Hiram G. Bezerra, MD, PhD; and Hector M. Garcia-Garcia, MD, PhD.

We look forward to connecting with the interventional cardiology community and advancing the conversation around the future of coronary imaging!
#TCT2026 #FFRCT #CCTA #interventionalcardiology #cardiovascularimaging




Ex. 41 (https://www.linkedin.com/posts/elucid-inc_tct2026-tct2026-ffrct-activity-7518050243054264321-kSSn?utm_source=share&utm_medium=member_desktop&rcm=ACoAABsrFAwBT2hzYaiO64fsCBHPTyhD0Dsb4qM).




Ex. 3 (https://elucid.com/).

**HEARTFLOW DISCOVERS ELUCID'S COPYING AND MISAPPROPRIATION**

**A. Elucid Copied Heartflow's Pioneering Technology and User Interface**

85. It is self-evident, including based on publicly available information, that Elucid built its $FFR_{CT}$ product by improperly leveraging Heartflow's pioneering technology, product design (including its user interface), and know-how.

86. For example, there are stark similarities between the Heartflow and Elucid products as shown in an exemplary comparison below where Elucid unabashedly adopted the same color scheme:

**Heartflow's Product**




Ex. 1 (Heartflow's next-generation Plaque Analysis algorithm gains US FDA clearance, https://cardiovascularnews.com/hearflows-next-generation-plaque-analysis-algorithm-gains-us-fda-clearance/)

**Elucid's Product**




Ex. 2 (https://elucid.com/healthcare-professionals/#ffrct)

87. Further, analysis by Prytania Research—an equity research firm that conducted extensive diligence into the competitive landscape for AI-powered CCTA—confirms that Elucid's products are strikingly similar to Heartflow's proprietary technology. In a September 2026 initiation report, Prytania Research compiled findings based on interviews with former Heartflow employees, competitors, cardiac radiologists, interventional cardiologists, and non-invasive cardiologists. *See* Ex. 42 (Prytania Research Heartflow (Sept. 10, 2026)). Those findings leave no room for doubt that Elucid has modeled its offerings on Heartflow's pioneering platform.

88. Most notably, one physician interviewed by Prytania Research described Elucid's product in unequivocal terms: "Elucid, interestingly, **is a carbon copy of HeartFlow**, at least from the vessel modeling and the FFR product. I have not seen as in-depth what their plaque product is going to look like or PCI planning, but **from an FFR standpoint it looks all the world like a HeartFlow and is probably difficult to differentiate**. I am not sure how that IP works. As long as that stands up, it would be a very easy transition for me to say that Elucid is a dollar cheaper per scan, so let's switch over to that." *Id.* at 30 (emphasis added).

89. This characterization—a "carbon copy" that is "difficult to differentiate"—speaks volumes about the degree to which Elucid has replicated Heartflow's technology. Tellingly, even this physician expressed uncertainty about "how that IP works," implicitly acknowledging that Elucid's mimicry raises serious intellectual property concerns.

90. Prytania Research further confirmed the functional equivalence between the two companies' products. Elucid, like Heartflow, is expected to provide FFR values on a continuous, per-vessel basis—the same detailed, quantitative output that Heartflow pioneered and that distinguishes its technology from less precise competitors. As one interventional cardiologist told Prytania Research, "Heartflow and Elucid…give[] me the roadmap. I know exactly where the

blockage is, what I need to treat, and what my residual physiology is going to be. My preference as an interventional cardiologist is very heavily in the Heartflow and Elucid camp." *Id.* at 32. That a practicing cardiologist groups the two together—in contrast to other competitors—underscores the extent to which Elucid has positioned its product as a functional duplicate of Heartflow's patented product.

91. Other physicians and industry participants reached the same conclusion. One physician who had used Elucid's products stated: "I've used products from Keya and Elucid. The resolution and the user interface are different from Heartflow, but a lot of the end result depends on the acquisition and the CT machine itself. I didn't find a big margin of error. I would say they are comparable to Heartflow." *Id.* at 30.

92. The market recognizes Elucid as Heartflow's most threatening imitator. A research participant told Prytania Research: "Once Elucid launches, that's, I would say, the biggest concern for Heartflow." *Id.* at 27. Another industry participant stated bluntly: "If they do things right, Elucid will be able to take significant market share." *Id.* at 28. Still another physician confirmed that Elucid is the competitor he "would be most interested in potentially switching to once they have a fully released and FDA-cleared product." *Id.* at 31. Another reported that "[i]f we switch to Elucid, then everybody in the country switches to Elucid. It would shift market share, yes." *Id.* at 30.

93. These assessments, gathered independently from physicians and industry participants with no stake in this litigation, confirm that Elucid has built its business strategy around replicating Heartflow's product and undercutting it on price—leveraging Heartflow's years of innovation, clinical validation, and market development for Elucid's own commercial gain.

### B. Heartflow's Look Back Reveals That Departing Commercial Leaders Sent Heartflow's Sales Playbook to Personal Email Accounts

94. These developments, together with the number of former Heartflow employees working at Elucid, prompted Heartflow to review the Heartflow email accounts of former employees who went on to work at Elucid. The review showed that several of them forwarded Heartflow documents to personal email accounts shortly before they left Heartflow.

a. Scott Burger: Mr. Burger submitted his resignation from Heartflow on June 10, 2020. In the weeks before he left, he forwarded to his personal Gmail account Heartflow spreadsheets of hospital segmentation, target hospitals, account opportunities, and physicians ranked by CCTA volume; Heartflow market models and a 2018 revenue forecast; hospital contracts and proposals; and Heartflow implementation and prior-authorization resources. He also sent a presentation he had given to Heartflow's Board of Directors, titled "Creating a Hyper Growth Environment within Heartflow," to a medical-technology recruiter outside Heartflow. Mr. Burger later became Elucid's Chief Commercial Officer, leading Elucid's sales, marketing, market-access, and customer-success functions—functions of which he developed detailed knowledge at Heartflow.

b. Bowen Freeman: Mr. Freeman submitted his resignation on August 25, 2019, and his last day at Heartflow was August 31, 2019. Shortly before he left, he emailed himself a proprietary compensation tracker. Then, on August 30, 2019, he asked for additional IT access and, after doing so, emailed himself an August 2019 area sales dashboard, sales-compensation trackers listing hospitals by name, hospital and surgeon contact lists, a

physician referral and billing list, and a regional business development plan. Mr. Freeman later became Elucid's U.S. Director of Sales and Marketing.

c. Bill Atteridg: Mr. Atteridg signed a Nondisclosure Agreement with Heartflow on September 22, 2021, and submitted his resignation on December 18, 2023, asking that his last day be January 2, 2024. Before he left, he forwarded to a personal account Heartflow's West Area Business Plan; its Q4 2019 and Q4 2020 sales power rankings; its daily U.S. sales reports for 2022 and the first three quarters of 2023; its 2023 quarterly business review (ASD Q2 Review, Q3 Plan to Win); and charts of commercial, billable completed volume by region with data from July 2021 through January 2024. Mr. Atteridg later became an Area Sales Director at Elucid.

d. Jeremy Stralla: Mr. Stralla was a District Sales Manager at Heartflow until December 11, 2020. Shortly before he left, he forwarded Heartflow documents to a personal email account, including Heartflow's 2018 cardiology mailing list of physicians, a list of cardiologists who ordered CTA Heart from January through November 2020, two versions of a physician referral and billing list, a May 2019 spreadsheet of target hospitals with a presentation on the strategy behind Heartflow's U.S. customer targeting, a Q4 compensation calculator listing Heartflow customers, an August 2018 overview of the $FFR_{CT}$ program at UCH with related sales strategies, and a November 2020 presentation reviewing an imaging implementation at a San Diego hospital. He also forwarded to himself years-

old email threads with Heartflow customers. In 2025, Mr. Stralla became an Area Sales Director at Elucid.

**C. Heartflow Uncovers the Misappropriation in 2026**

95. The emails were sent from Heartflow accounts to private accounts outside Heartflow's systems and were not flagged at the time, and none of the employees disclosed that they had kept Heartflow materials. Heartflow therefore did not learn, and had no reason to learn, that specific documents had been taken when the employees left. Heartflow first learned of the misappropriation through the review described above94.

96. Hiring a competitor's former employees is not misappropriation, and an employee's move to a competitor does not put the former employer on notice that trade secrets were taken. Heartflow first had reason to suspect misappropriation in or around mid-2025, when images of Elucid's forthcoming FFR device circulated while Elucid continued to hire former Heartflow employees and expand its sales force. Elucid's September 2026 FDA clearance, and the public 510(k) Summary that accompanied it, then confirmed Elucid's reliance on Heartflow's device.

**D. Elucid Uses Heartflow's Information to Compete**

97. Upon information and belief, Elucid has had the benefit of Heartflow's non-public Regulatory Information in preparing and pursuing its FFR-IQ submission. The basis for this belief is as follows: (i) Ms. Hary was Heartflow's regulatory lead and knew the non-public contents of Heartflow's submissions, the FDA's feedback on them, and Heartflow's regulatory strategy; (ii) Elucid hired Ms. Hary into a materially identical role to the one she held at Heartflow; (iii) Elucid chose Heartflow's $FFR_{CT}$ as its predicate and represented that the device is the same as Heartflow's in every compared respect but one; (iv) Ms. Hary was Elucid's primary correspondent with the FDA on the FFR-IQ submission; and (v) the information about what the FDA required of

Heartflow is not public. Upon information and belief, Ms. Hary's knowledge was necessary to refine Elucid's regulatory strategy to obtain a successful FDA clearance because Elucid obtained necessary approval after she joined and the FDA approval indicates that she was the "Primary Correspondent" with the FDA. *See* Ex. 6 (FDA Ltr. to Elucid, K262015 (September 29, 2026), and Elucid FFR-IQ 510(k) Summary).

98. Upon information and belief, Elucid has used Heartflow's Commercial Information to approach Heartflow's hospital accounts and to adopt similar sales strategies. The basis for this belief is as follows: (a) Elucid's commercial organization is led by former Heartflow sales leaders, including Mr. Burger, Mr. Freeman, Mr. Atteridg, and Mr. Stralla, who took Heartflow account, physician, segmentation, performance, and strategy materials; (b) Heartflow has observed Elucid approaching its accounts and adopting comparable strategies; and (c) market participants describe Elucid's product as positioned to switch Heartflow's customers on price.

99. Even where some of Heartflow's commercial information is several years old, it gave Elucid a strategic blueprint that Elucid could not have built on its own without years of effort and expense. Heartflow's hospital segmentation, target-hospital and physician lists, market models, adoption-rate assumptions, revenue forecasts, territory designs, and regional performance data reflect what Heartflow learned, through more than a decade of commercialization, about which markets and hospitals adopt CT-derived FFR, how quickly, through which referring physicians, and at what volumes. Upon information and belief, that blueprint guided Elucid's choices about which markets, accounts, and physicians to pursue, how to size and deploy its sales force, timing and strategy for commercial launch, commercial models, and where to focus its limited research and development spending, allowing Elucid to avoid the cost and time Heartflow invested and to obtain a head start in a market Heartflow created.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

100. Heartflow brings this action for patent infringement under the patent laws of the United States, 35 U.S.C. § 271 *et seq*.

101. This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States.

102. This Court has personal jurisdiction over Elucid because Elucid has committed acts of patent infringement within this judicial district, has conducted business in this judicial district, has purposefully directed activities at residents of this judicial district, and has purposefully availed itself of the privileges of conducting business in Massachusetts such that Elucid should reasonably anticipate being hauled into court in this judicial district, including by sales, service, and maintenance of accused products and services in this judicial district, and inducing others to commit acts of patent infringement in this judicial district.

103. Upon information and belief, Elucid's principal place of business is located in this district at 399 Boylston Street, Suite 400, Boston, Massachusetts 02116.

104. Upon information and belief, Elucid has marketed, promoted, sold, and offered to sell its infringing products and services, including PlaqueIQ™, to healthcare providers, hospitals, and health systems located within the District of Massachusetts.

105. Upon information and belief, Elucid's infringing products and services have been used by healthcare providers and hospitals within the District of Massachusetts to diagnose patients with coronary artery disease including at least at Massachusetts General Hospital. *See, e.g.*, Ex. 43 (https://clue.mgh.harvard.edu/elucid-study/elucid-study-team/).

106. Elucid maintains an interactive, commercial website at https://elucid.com/, through which it markets its products and services to healthcare providers nationwide, including those

located in the District of Massachusetts. The website allows healthcare providers to request information, access product demonstrations, and engage with Elucid's commercial team.

107. Venue is proper in this judicial district as to Elucid pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(b) because Elucid has committed acts of infringement in this district and has a regular and established place of business in this district.

108. Heartflow also brings this action for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), and the Massachusetts Uniform Trade Secrets Act, M.G.L. c. 93, §§ 42–42G ("MUTSA").

109. This Court has subject matter jurisdiction over Heartflow's DTSA claim under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). It has supplemental jurisdiction over Heartflow's MUTSA claim under 28 U.S.C. § 1367(a) because that claim arises from the same facts as the DTSA claim and forms part of the same case or controversy.

110. This Court has personal jurisdiction over Elucid on Heartflow's trade secret claims because Elucid maintains its principal place of business at 399 Boylston Street, Suite 400, Boston, Massachusetts, and because the uses alleged below, including the preparation and submission of Elucid's FFR-IQ premarket notification from that address, occurred in this District. Venue for those claims is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because Elucid resides in this District under § 1391(c)(2) and a substantial part of the events giving rise to the claims occurred here.

## ASSERTED PATENTS AND TECHNICAL INNOVATIONS THEREOF

111. The Asserted Patents are U.S. Patent Nos. 9,754,082, 10,010,255, 9,770,303, and 9,070,214.

112. As noted above and incorporated herein by reference, each of the Asserted Patents and the claimed inventions thereof are directed to "novel," "groundbreaking," "disruptive,"

"innovative," and "new" technologies that did not have a predicate device. These innovations and distinctions over routine and conventional techniques were recognized by the FDA, CMS, and many others in the industry.

113. As noted above and incorporated herein by reference, each of the Asserted Patents and the claimed inventions thereof are directed to novel and technically innovative technologies as recognized by the repeated citations of these patents by Elucid on its own patents.

114. Further, each of the Asserted Patents and the claimed inventions thereof are directed to novel and technically innovative technologies as recognized by the repeated citing of these patents by many entities operating in the field of medical devices, including, for example, Siemens Medical Solutions USA, Inc., Emory University, Cleerly, Inc., and Elucid.

115. Elucid's knowledge about Heartflow's patents, including the Asserted Patents, is readily apparent based on Elucid repeatedly citing to Heartflow's patents on the face of its own patents as shown below:

| Heartflow's Patent | Elucid Patent(s) Citing Heartflow's Patent |
|---|---|
| US 9,754,082 | US11071501B2<br>US11087459B2<br>US11087460B2<br>US11113812B2<br>US11120312B2<br>US11508063B2<br>US11676359B2<br>US12008751B2<br>US12026868B2 |
| US 10,010,255 | US11071501B2<br>US11087459B2<br>US11087460B2<br>US11113812B2<br>US11120312B2<br>US11508063B2<br>US11676359B2<br>US12008751B2<br>US12026868B2 |
| US 9,770,303 | US11071501B2 |

| Heartflow's Patent | Elucid Patent(s) Citing Heartflow's Patent |
|---|---|
| | US11087459B2<br>US11087460B2<br>US11113812B2<br>US11120312B2<br>US11508063B2<br>US11676359B2<br>US12008751B2<br>US12026868B2 |

116. Further, during prosecution of its patent applications, Elucid admitted that claims directed to similar subject matter—but with later priority dates—are directed to patent-eligible inventions. These statements also apply to the claims of the Asserted Patents.

117. For example, during the prosecution of Elucid patent application (U.S. Patent Application No. 17/838,146) with a much later alleged priority date of June 10, 2021, Elucid represented to the U.S. Patent and Trademark Office (USPTO) that claimed methods that rely on neural networks trained on non-invasively obtained imaging data provide "technical improvements" in the field of atherosclerotic cardiovascular disease. *See* Ex. 44 (Amendment and Remarks filed by Elucid in U.S. Patent Application No. 17/838,146, dated December 20, 2022); Ex. 45 (Supplemental Amendment and Remarks filed by Elucid in U.S. Patent Application No. 17/838,146, dated January 27, 2023). Elucid made the following representations and provided the following party admissions:

a. Elucid represented that "claim 1 is not directed to an abstract idea." Ex. 44 at 11.

b. Elucid represented that claim 1 recites "creating a training set comprising the first input and the second input, training a neural network using the training set, the neural network configured to predict molecule levels based

on the non-invasively obtained data," and that "[t]his language is similar to what the USPTO has noted is acceptable under Section 101." *Id.* at 12.

c. Elucid represented that "claim 1 as a whole provides the technical improvements in overcoming problems…e.g., an ability to construct a high-dimensional representation of input data." *Id.*

d. Elucid represented that the claimed system provides virtual omics data to a systems biology model of atherosclerotic cardiovascular disease to generate a patient-specific systems biology model, and that "the virtual 'omics engine 310 enables calibrating a systems biology model without the need to perform an invasive blood test or biopsy.'" *Id.*

118. During the prosecution of another Elucid patent application (U.S. Patent Application No. 18/319,053), titled "Progressive Exploitation of Multi-Energy and Photon Counting Modalities," Elucid provided the following representations and party admissions:

a. Elucid represented that the claimed steps of analyzing received imaging data to determine characteristics of a vessel wall and deriving quantities characterizing vascular disease "cannot be performed mentally because, for example, a human cannot observe the one or more characteristics of the vessel wall." *See* Ex. 46 (Amendment and Remarks filed by Elucid in U.S. Patent Application No. 18/319,053, dated December 5, 2023) at 9.

b. Elucid represented that "the claimed invention improves the technological field of computer-aided phenotyping (CAP) of disease," including "improved soft tissue contrast," "improved characterizing tissue," "classifying phenotype," "stratifying risk," "performing multi-scale

modeling aided by multiple energy or contrast excitation and evaluation," and "application of single vs. multi-phase acquisitions as well as broad spectrum spectral CT to assess atherosclerotic plaque tissues in the vessel wall and perivascular space." *Id.* at 10.

c. Elucid represented that "claim 1 has a practical application" and that "the invention itself amounts to significantly more, thus rendering the claim patent eligible," and that an "inventive concept" may be found where "generic components operate in an unconventional manner to achieve an improvement in computer functionality." *Id.* (quoting *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (Fed. Cir. 2016)).

d. In a subsequent filing, Elucid further represented that determining quantities characterizing "vascular leak, macrophages, angiogenesis, calcification (CALC) map, lipid rich necrotic core (LRNC) map, fresh idiopathic pulmonary hemosiderosis (IPH) map, matrix (MATX) map, micro calcification, erosion, old IPH map, or thrombus" using "digital subtraction, digital addition, a multivariate statistical process, excitation selection process or a combination thereof" are steps that "cannot be performed mentally because, for example, a human cannot practically perform the processes in their mind." *See* Ex. 47 (Amendment and Remarks filed by Elucid in U.S. Patent Application No. 18/319,053, dated May 7, 2024) at 6-7.

e. Elucid represented that these claim limitations are tied "to the practical application of improved CAP" and that "claims as amended improve technology." *Id.* at 8.

119. The above admissions by Elucid, numerous citations to the Asserted Patents by medical device entities including on the faces of their own patents, industry praise, commercial success, FDA *de novo* approval, *i.e.*, "De Novo classification for novel devices," and Centers for Medicare and Medicaid Services' decision to assign "New Technology Ambulatory Payment Classification" confirm that claims of the Asserted Patents are patent-eligible for being directed to an inventive concept, present a technical improvement and innovation, and are not directed to well-understood, routine, and conventional techniques.

120. Further, consistent with the findings of the FDA and CMS, a third government agency—the USPTO—made additional findings regarding Heartflow's patents being directed to technical innovations. For example, during prosecution of the '082 Patent, in the first Office Action, the Examiner rejected the then-pending claims under § 101 as allegedly directed to "the abstract idea of displaying cardiovascular information." Ex. 48 ('082 File History) at 125. Heartflow responded with amendments and arguments explaining that the claims are not directed to an abstract idea, but instead recite a specific application of patient-specific image data and a model of blood flow through an artery of the patient's heart to determine and display blood flow characteristics, and that the claims improve the technical fields of "anatomical modeling, graphical rendering, and cardiovascular diagnostics." *Id.* at 149-55. Following further amendments, including limitations requiring determining a centerline of the patient's artery from the image data and linearizing the image data along that centerline, the Examiner withdrew the § 101 rejections of the system and computer-readable-medium claims, and then withdrew all remaining § 101

rejections. *Id.* at 250-51, 335. In doing so, the Examiner expressly found that "the claims are limited to a particular end use, patient modeling of blood flow characteristics in an artery of the heart," distinguishing them from the unpatentable algorithm in *Gottschalk v. Benson*, which "was not limited to any particular apparatus or machinery or to any particular end use or art or technology." *Id.* at 335. The '082 Patent thus issued only after the USPTO examined, and was persuaded of, its patent eligibility under § 101.

121. Similarly, during prosecution of the '255 Patent, the Examiner rejected the pending claims under 35 U.S.C. § 101 as allegedly directed to "the abstract idea of determining a fractional flow reserve using known machine learning methods," and maintained that rejection in a Final Office Action. Ex. 49 ('255 File History) at 99-101, 148-51. In response, Heartflow explained, with citations to the specification, that the claimed invention improves the functioning of the computer and the field of medical diagnostics by replacing computationally burdensome, physics-based simulations with a "computationally inexpensive" and rapid, noninvasive determination of FFR, that training a machine-learning algorithm on data from a plurality of individuals is not something that can be performed mentally, and that the claims further require generating and displaying a geometric model of the patient's stenosis indicating the determined FFR value to assist in the diagnosis and treatment of coronary vascular disease. *Id.* at 131-36, 441-46. After considering these amendments and arguments, the USPTO allowed all pending claims without any remaining § 101 rejection. *Id.* at 467-69.

## <u>COUNT I – ELUCID'S INFRINGEMENT OF U.S. PATENT NO. 9,754,082</u>

122. Heartflow incorporates all preceding paragraphs by reference.

123. U.S. Patent No. 9,754,082 (the "'082 Patent") duly issued on September 5, 2017, and is entitled "Systems and methods for reporting blood flow characteristics." A copy of the '082 Patent is attached as Exhibit 13.

124. Heartflow is the owner by assignment of the ’082 Patent and possesses all rights under the ’082 Patent, including the exclusive right to recover for past and future infringement.

125. The ’082 Patent is directed to a system for displaying a blood flow characteristic of a patient, such as fractional flow reserve (FFR). For example, the ’082 Patent discloses at least one computer system configured to receive patient-specific image data regarding a geometry of the patient’s heart, create a model of blood flow through at least a portion of an artery of the patient’s heart based on the patient-specific image data, use the created model to non-invasively determine at least one value of the blood flow characteristic within the portion of the artery, and generate an electronic display comprising at least three parallel, coextensive representations of the portion of the artery and the at least one value of the blood flow characteristic—(i) a line plotted over a first axis running from the proximal end to the distal end of the artery portion against a second axis corresponding to values of the blood flow characteristic, (ii) an anatomy image of the artery portion oriented parallel to, and with its ends aligned with, the first axis, and (iii) a model of the artery portion oriented parallel to the first axis bearing an indicator of the value of the blood flow characteristic at the corresponding location—wherein indicators of the at least one value of the blood flow characteristic in at least two of the representations are aligned. *See* ’082 Patent at Abstract, Claim 1.

126. The ’082 Patent explains that, at the time of its priority date, noninvasive tests such as electrocardiograms, treadmill tests, echocardiography, single positron emission computed tomography (SPECT), and positron emission tomography (PET) typically did not provide a direct assessment of coronary lesions or assess blood flow rates, and that coronary computed tomographic angiography (CCTA) could not provide direct information on the functional significance of coronary lesions, *e.g.*, whether the lesions affect blood flow. *Id.* at 1:34-55. As a

result, patients often required invasive diagnostic cardiac catheterization, in which the functional significance of a lesion is assessed by inserting a pressure wire to measure FFR, such that the decision to treat a lesion could be made only after the cost and risk of catheterization had already been incurred. *Id.* at 1:60-2:23. The ’082 Patent thus identifies a need for more accurate data relating to coronary lesions, including their size, shape, location, and functional significance, and a need “to generate and display reports relating to patient-specific blood flow characteristics.” *Id.* at 1:28-30, 2:24-35.

127. The ’082 Patent solved these problems by providing systems and methods for non-invasively determining patient-specific blood flow characteristics, such as FFR, from a model created from patient-specific image data (*e.g.*, CCTA), so that “the decision whether to treat a lesion may be made without the cost and risk associated with invasive procedures,” and by generating an electronic report that displays those values in a manner directly correlated with the patient’s anatomy. *Id.* at 4:35-48, 5:55-6:10. For example, the ’082 Patent discloses displaying an anatomy image of an artery oriented in a substantially linear fashion together with a “pullback curve” in which one axis represents the proximal and distal portions of the artery and a second axis represents the blood flow characteristic, such as FFR, along with a combined image of the artery colored or patterned according to the blood flow characteristic at each corresponding point, and a leader line or dual indicators that connect corresponding points across the images. *Id.* at 12:13-58, 13:45-14:11, 23:1-16, Figs. 4, 8, 13K. These parallel, coextensive, and aligned representations allow a physician to identify, at the same longitudinal location, both the anatomy of a lesion and its functional (hemodynamic) significance. *Id.* at 7:61-65.

128. Evidence that the ’082 Patent is valid and is directed to novel and inventive technology is discussed above in at least paragraphs 20-29 and 111-121 and incorporated by

reference. Further, the ’082 Patent has been recognized as a foundational patent as shown by the fact that it has been cited in at least 71 additional patents, including patents filed by Elucid.

129. Upon information and belief, Elucid has directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’082 Patent, including at least Claims 1-18, by making, using, testing, offering to sell, and/or selling in the United States products and services that practice the inventions claimed therein, including, but not limited to, Elucid FFR-IQ (also referred to as BioIntegrated FFR-CT or plaque-based $FFR_{CT}$), alone or in combination with Elucid’s Plaque-IQ™ software, including its Lesion Inspection Tool (collectively, “the Accused ’082 Elucid Products”). For example, Elucid describes a “comprehensive clinical platform” offering “histology-validated plaque analysis including lipid-rich necrotic core, biology-based FFR-CT, and stenosis,” together with “a new user interface.” Ex. 8 (https://elucid.com/). Elucid further states that its “transparent, segment-by-segment breakdown is automatically summarized in a clinical dashboard as well as a physician-validated PDF report,” including a “Straightened Multi-Planar Reconstruction (MPR) – Visual confirmation of the entire vessel path.” Ex. 50 (https://elucid.com/healthcare-professionals/).

130. On September 29, 2026, the FDA cleared Elucid FFR-IQ (B.1) under 510(k) No. K262015 as a “[c]oronary vascular physiologic simulation software device” that “provides FFR-CT (CT-derived FFR) values computed from coronary CTA images using AI-enabled algorithms.” Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 4-5. In its 510(k) submission, Elucid identified Heartflow’s own $FFR_{CT}$ product (DEN130045) as the predicate device, and represented that its device has the same product code, regulation, device classification, output, and ground truth for model training (“[p]aired CT and invasive FFR data”) as Heartflow’s $FFR_{CT}$. *Id.* at 5-7.

131. Heartflow reserves the right to discover and pursue any additional infringing products and services that incorporate infringing functionalities. For the avoidance of doubt, the Accused ’082 Elucid Products are identified to describe Elucid’s infringement on an exemplary basis and in no way limit the discovery and infringement allegations against Elucid concerning other products that incorporate the same or reasonably similar functionalities.

132. Upon information and belief, Elucid directly infringes by making and using the claimed system in the United States when, for example, performing testing and validation studies, including studies submitted to the FDA, generating reports for investigational and research use, training hospital employees, conducting webinars, conducting demos at events, and/or producing videos showing how the Accused ’082 Elucid Products operate. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/).

133. Each of the Accused ’082 Elucid Products, either alone or in combination with each other, implements a system for displaying a blood flow characteristic of a patient, wherein the blood flow characteristic comprises FFR. Elucid’s platform outputs FFR values, which Elucid refers to as “FFRCT” or “FFR-CT,” for each analyzed coronary segment and lesion. Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report); Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 50 (https://elucid.com/healthcare-professionals/).



elucid

| | PATIENT ID | DATE OF BIRTH | SEX | CT STUDY DATE | |
|---|---|---|---|---|---|
| Plaque_+_FFR_Demo_3 | Plaque_+_FFR_Demo_3 | -- | Female | 06/06/2019 | View Results on Web ↗ |

**Patient Overview**

**Dominance:** Right Dominant

CAD-RADS
3 / P4 / I+

Total Plaque
1,211.6 mm³
LRNC 419.4 NCM 739.6 CP 52.6

**High Stenosis:** 50-69%
dRCA

**Segments with FFRct < 0.8**
R-PDA R-PLB dRCA dLAD

**FFR Overview**

**Stenosis Overview**



| Segment | FFRct | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.99 | 36.3 | 0 | 29.3 | 7 | 1-24% |
| pLAD | 0.89 | 241.9 | 12.6 | 149.2 | 80.1 | 25-49% |
| mLAD | 0.85 | 149.3 | 4.7 | 95.3 | 49.3 | 25-49% |
| dLAD | 0.78 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.86 | 56.6 | 0 | 39.6 | 17 | 25-49% |
| dLCX | -- | -- | -- | -- | -- | -- |
| pRCA | 0.97 | 38.2 | 4.4 | 29.2 | 4.6 | 25-49% |
| mRCA | 0.93 | 121.5 | 0.9 | 84.4 | 36.2 | 1-24% |
| dRCA | 0.77 | 392.4 | 21.9 | 185.6 | 184.9 | 50-69% |

Elucid Bioimaging, Inc.
Powered by CT Virtual Histology™

UDI 8745Elucid81/2026 June_wi-092c1a7a_3187_v9_2026-06-29
INVESTIGATIONAL DEVICE NOT FOR CLINICAL USE

Series: IMR1-Edge, 75% 1

Ex. 50 (https://elucid.com/healthcare-professionals/).




| Segment | FFRCT | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.98 | 55.3 | 2 | 53.3 | 0 | 25-49% |
| pLAD | 0.79 | 114.4 | 31.5 | 80.3 | 2.6 | 50-69% |
| mLAD | 0.79 | 5.2 | 1.2 | 4 | 0 | 25-49% |
| dLAD | 0.74 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.93 | 54.4 | 10 | 43.5 | 0.9 | 1-24% |
| dLCX | 0.92 | 0 | 0 | 0 | 0 | 0% |
| pRCA | 0.95 | 197.8 | 0.8 | 179.4 | 17.6 | 1-24% |
| mRCA | 0.93 | 78 | 0 | 71.9 | 6.1 | 1-24% |
| dRCA | 0.90 | 47.1 | 0 | 47.1 | 0 | 1-24% |

Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1.



**Left Main + Left Anterior Descending**

Total Plaque 184.9 mm3

NCM 147.6 mm3 80%

CP 34.7 mm3 19%

LRNC 2.6 mm3 1%

50-69% Highest Degree of Stenosis pLAD

0.70 Lowest FFR DI

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|
| LM-1 | 50-69% | -- | -- | -- | 229.8 | 181.5 | 44.8 | 3.5 |
| DI | 25-49% | 0.99 | 0.94 | -0.05 | 112.5 | 104.0 | 5.9 | 2.6 |
| LAD | 50-69% | 0.99 | 0.79 | -0.20 | 175.1 | 137.7 | 34.8 | 2.6 |
| DI-1 | 50-69% | 0.94 | 0.70 | -0.24 | 9.5 | 9.5 | 0.0 | 0.0 |



*Id.* at 2.




Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:49.

134. At least Claim 1 requires at least one computer system configured to "receive patient-specific image data regarding a geometry of the patient's heart." Upon information and belief, the Accused '082 Elucid Products receive a patient's coronary computed tomography angiography (CCTA) image data. For example, Elucid states that "[p]hysicians send patient images to Elucid with a single mouse click," after which Elucid applies its image-restoration algorithms and analysts "segment the data to create a 3D model of the patient's coronary arteries." Ex. 55 (FDA approves Elucid's PlaqueIQ software for CVD assessment, https://www.medicaldevice-developments.com/news/fda-approves-elucids-plaqueiq-software-for-cvd-assessment/); Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). For example, "Elucid PlaqueIQ is an image analysis software that is used to process,

review, and analyze CT images," such as for "the non-invasive evaluation and assessment of plaque quantification and morphology (e.g., atherosclerosis) from previously acquired CT angiography." Ex. 57 (K241524 510(k) Summary, https://www.accessdata.fda.gov/cdrh_docs/pdf24/K241524.pdf) at 4, 6. "Elucid analyzes a CT scan by applying machine learning to determine plaque type and quantity as though you were looking at excised patient tissue under microscope, providing information not discernable from a standard CT scan." Ex. 58 (Elucid - Delivering Personalized Patient Care, https://medhealthoutlook.com/elucid/).




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 12:49.




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 17:38.




Ex. 60 (Elucid at SCCT 2024: Precision Cardiovascular Pathways with Histology-based Plaque Quantitation, https://www.youtube.com/watch?v=XGVvOo0kWzc) at 17:29.

135. At least Claim 1 also requires creating "a model of blood flow through at least a portion of an artery of [t]he patient's heart based on the patient-specific image data." Upon information and belief, the Accused '082 Elucid Products create such a model. Elucid describes its FFR-CT as "an AI model that predicts FFR at any point. It gives you a value in the vessel and it's driving from all biological and physical properties," which models how the vessel "behaves at the time of maximal hyperemia." Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 15:31-16:02. Public reports further describe that Elucid's FFR-CT product "reconstructs 3D arterial models to evaluate vessel anatomy, plaque composition, and ischemia" and "calculates pressure drops across coronary lesions by combining fluid dynamics with underlying plaque morphology." Ex. 62 (Elucid Raises $55M to Expand Non-Invasive Cardiovascular Diagnostic Platform, https://hitconsultant.net/2026/09/02/elucid-raises-55m-series-d-ai-plaque-iq-biointegrated-ffr-ct-cardiovascular-diagnostics/). Elucid also explains that "[t]he performance of the vessel during maximum hyperemia is dependent upon plaque composition" and that its FFR-CT "goes beyond the physical properties of the vessel and the lesion to include biological and morphological properties as well." Ex. 50 (https://elucid.com/healthcare-professionals/). "Elucid's machine learning algorithms analyze plaque build-ups in the artery walls to calculate potential blood flow." Ex. 63 (Elucid clears $27M funding for heart disease diagnostic AI, https://www.fiercebiotech.com/medtech/elucid-clears-27m-funding-heart-disease-diagnostic-ai). As Todd Villines, the former Chief Medical Officer of Elucid, explained: Elucid "can take the output of [its] plaque model and then use those annotations as inputs into the machine learning $FFR_{CT}$ models. So, that's exactly what [they] do, is use those annotated, those plaque annotations

from [their] FDA-cleared histology-based plaque analysis software as one of the key inputs. Now, [they] do this down the entire coronary artery and build a model that adds to that based on a host of other variables from the CT scan itself and potentially even from the patient themselves." Ex. 64 (Transcript of Preventing Heart Attacks and Strokes with Todd Villines from Elucid, https://share.transistor.fm/s/751e78b2/transcript).




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 20:05.

136. At least Claim 1 also requires, "using the created model, non-invasively determin[ing] at least one value of the blood flow characteristic within the portion of the artery of the patient's heart." Upon information and belief, the Accused '082 Elucid Products non-invasively determine FFR values from models created from the received CCTA data. For example, a sample Elucid report lists an $FFR_{CT}$ value for each analyzed segment (*e.g.*, pLAD 0.79, D1 0.70)

and proximal FFR, distal FFR, and ΔFFR values for each lesion (*e.g.*, LAD 0.99 / 0.79 / -0.20). Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-2. Elucid touts its "non-invasive FFR-CT analysis solution" and distinguishes its FFR-CT product from "invasive pressure-wire evaluations without requiring hospital catheterization." Ex. 50 (https://elucid.com/healthcare-professionals/); Ex. 62 (https://hitconsultant.net/2026/09/02/elucid-raises-55m-series-d-ai-plaque-iq-biointegrated-ffr-ct-cardiovascular-diagnostics/).




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 17:38.




Ex. 50 (https://elucid.com/healthcare-professionals/).

elucid

| | PATIENT ID | DATE OF BIRTH | SEX | CT STUDY DATE | |
|---|---|---|---|---|---|
| Plaque_+_FFR_Demo_3 | Plaque_+_FFR_Demo_3 | -- | Female | 06/06/2019 | View Results on Web ↗ |

## Patient Overview

**Dominance:** Right Dominant

CAD-RADS
3 / P4 / I+

Total Plaque
1,211.6 mm³

| LRNC | NCM | CP |
|---|---|---|
| 419.4 | 739.6 | 52.6 |

**High Stenosis:** 50-69%
dRCA

**Segments with FFRct < 0.8**
R-PDA R-PLB dRCA dLAD

### FFR Overview




### Stenosis Overview




| Segment | FFRct | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.99 | 36.3 | 0 | 29.3 | 7 | 1-24% |
| pLAD | 0.89 | 241.9 | 12.6 | 149.2 | 80.1 | 25-49% |
| mLAD | 0.85 | 149.3 | 4.7 | 95.3 | 49.3 | 25-49% |
| dLAD | 0.78 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.86 | 56.6 | 0 | 39.6 | 17 | 25-49% |
| dLCX | -- | -- | -- | -- | -- | -- |
| pRCA | 0.97 | 38.2 | 4.4 | 29.2 | 4.6 | 25-49% |
| mRCA | 0.93 | 121.5 | 0.9 | 84.4 | 36.2 | 1-24% |
| dRCA | 0.77 | 392.4 | 21.9 | 185.6 | 184.9 | 50-69% |

Elucid Bioimaging, Inc.
Powered by CT Virtual Histology™

UDI 8745Elucid81/2026 June_wl-092c1a7a_3187_v3_2026-06-29
INVESTIGATIONAL DEVICE NOT FOR CLINICAL USE

Series: IMR1-Edge, 75% 1

Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:49.

137. At least Claim 1 also requires generating "an electronic display comprising at least three parallel, coextensive representations of the portion of the artery and the at least one value of the blood flow characteristic, wherein indicators of the at least one value of the blood flow characteristic in at least two of the representations are aligned." Upon information and belief, the Accused '082 Elucid Products generate such a display. As Elucid's presenter explained in an Elucid-sponsored webinar, a user can "add the FFR the bio-integrated FFR…both in the [] numerical fashion that you can [] put any point and then get a number there or in a color scheme fashion on a straight NPR or a curved NPR or in a 3D fashion or a pullback curve." Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform) at 24:47-25:03. Elucid's platform presents a "comprehensive clinical platform

with plaque on top[,] the actual vessel in the middle[,] lesion detection[,] the FFR[,] the lesion related tool and a cross-sectional view." *Id.* at 12:17-12:25.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:17.




Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:49.

138. At least Claim 1 also requires that "a first representation of the at least three representations comprises a line plotted over a first axis and a second axis, wherein a first end of the first axis corresponds to a proximal end of the portion of the artery, a second end of the first axis corresponds to a distal end of the portion of the artery, and the second axis corresponds to values of the blood flow characteristic." Upon information and belief, the Accused '082 Elucid Products display a "pullback curve" of FFR along the vessel. Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform) at 25:03. Elucid's report plots FFR-CT values on a vertical axis (*e.g.*, from 0.50 to 1.00) against the vessel segments ordered from proximal to distal (*e.g.*, LM, pLAD, mLAD, dLAD). Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 2-4. A presenter described Elucid's electronic display as "almost like [] representing what would be a pressure wire pullback or an FFR

pullback.” Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform) at 44:38-44:46.




Ex. 50 (https://elucid.com/healthcare-professionals/) (showing a line plotted against a horizontal “$FFR_{CT}$ Pullback” axis and a vertical axis spanning LM to dLAD, *i.e.*, proximal to distal ends of a portion of the artery).




Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 2.

139. At least Claim 1 also requires that "a second representation of the at least three representations comprises an anatomy image of the portion of the artery oriented parallel to the first axis, wherein a first end of the anatomy image corresponds to a proximal end of the portion of the artery and is aligned with the first end of the first axis, and a second end of the anatomy image corresponds to a distal end of the portion of the artery and is aligned with the second end of the first axis." Upon information and belief, the Accused '082 Elucid Products display a "Straightened Multi-Planar Reconstruction (MPR)," which provides "[v]isual confirmation of the entire vessel path," and allow physicians to "layer Plaque-IQ images over the raw CT." Ex. 50 (https://elucid.com/healthcare-professionals/). The straightened MPR is an anatomy image of the artery portion running from its proximal to its distal end, and is displayed parallel to and aligned with the FFR pullback curve. Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform) at 20:10-20:25, 24:13-25:11.




Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 2.

140. At least Claim 1 also requires that "a third representation of the at least three representations comprises a model of the portion of the artery oriented parallel to the first axis and an indicator, on the model, of the at least one value of the blood flow characteristic at a corresponding location in the portion of the artery, wherein a first end of the model corresponds to a proximal end of the portion of the artery and is aligned with the first end of the first axis and the first end of the anatomy image, and a second end of the model corresponds to a distal end of the portion of the artery and is aligned with the second end of the first axis and the second end of the anatomy image." Upon information and belief, the Accused '082 Elucid Products display a segmented model of the vessel—showing "the [lumen and] wall" and color-coded "plaque composition"—on which FFR is displayed "in a color scheme fashion on a straight [M]PR." Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform) at 24:31-24:56. Elucid's reports similarly display the vessel model color-coded by $FFR_{CT}$ value against a 0.00-1.00 legend marked at 0.80 ("Functionally Significant," "May Be," "Not Significant"). Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1. Elucid further markets "Transparent Segmentation" with "color-coded plaque morphology mapping" that

allows physicians "to see how FFR-IQ is derived from Plaque-IQ." Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 2.

141. Upon information and belief, in the Accused '082 Elucid Products, the FFR pullback curve, the straightened anatomy image, and the color-coded vessel model are displayed

parallel and coextensive with one another for the same vessel portion, such that the FFR indicators on at least two representations are aligned at the corresponding proximal-to-distal location. Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform) at 12:08-12:25, 20:10-20:25, 24:47-25:28. Indeed, Elucid's platform "combin[es] everything together . . . all in one box for a lesion that [] you select the beginning and end." *Id.* at 25:11-25:20; Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-4.




Ex. 50 (https://elucid.com/healthcare-professionals/).

142. Additional evidence of the Accused '082 Elucid Products infringing at least Claim 1 is included in the documents below, including representations Elucid made in its publications and presentations about the techniques it implements in the Accused '082 Elucid Products.




Ex. 66 (CCTA 3.0 | Remove the Blindfold: Integrating Plaque Biology & Physiology for Clinical Decisions, https://www.youtube.com/watch?v=Tz6MCKEI6GY) at 22:35.

Elucid FFR-IQ is a coronary physiological simulation software for the clinical quantitative and qualitative analysis of previously acquired Computed Tomography DICOM data for clinically stable patients with suspected coronary artery disease. It provides FFR-CT (CT-derived FFR) values computed from coronary CTA images using AI-enabled algorithms. FFR-IQ is intended to support the functional evaluation of coronary artery disease.

Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 4.

## Device Description

FFR-IQ is a BioIntegrated coronary physiological software for the clinical quantitative and qualitative analysis of previously acquired Computed Tomography DICOM data for clinically stable patients with known or suspected coronary artery disease. It integrates anatomy and biology (such as plaque composition and amount which impacts vasodilation) to estimate FFR-CT values from static coronary CTA images with extracted coronary tree structures using deep learning neural networks. Elucid's FFR-IQ analysis is intended to support the functional evaluation of Coronary Artery Disease. Using the 3D segmentation results of Plaque-IQ, an AI-enabled algorithm assesses FFR-CT (CT-derived FFR) values along the coronary tree.

Elucid's FFR-IQ is deployed and controlled by Elucid. FFR-IQ is AI-enabled.

## Summary of Technological Characteristics

| Comparison Criteria | Subject Device | Predicate Device | Comparison Assessment |
|---|---|---|---|
| | Elucid FFR-IQ (B.1) | HeartFlow FFRct v1.4 | - |
| 510(k) | K262015 | DEN130045 | - |
| Manufacturer | Elucid Bioimaging, Inc | HeartFlow, Inc. | - |
| Product Code | PJA | PJA | Same as predicate |
| Regulation | 870.1415 | 870.1415 | Same as predicate |
| Device Classification Name | Coronary vascular physiologic simulation software device | Coronary vascular physiologic simulation software device | Same as predicate |
| Device Class | II | II | Same as predicate |
| Input / Data Source | CT / K241524 (CT) | CT | Similar, however Elucid FFR-CT requires the output of K241524 as input |
| Output | Graphics and text results of noninvasively derived FFR-CT that can be | Graphics and text results of noninvasively derived FFR-CT that can be | Same as predicate |

Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 6.

143. The foregoing features and capabilities of each of the Accused ’082 Elucid Products, and Elucid’s description and/or demonstration thereof, including in advertising, reflect Elucid’s direct infringement by satisfying every element of at least Claim 1 of the ’082 Patent under 35 U.S.C. § 271(a).

144. Upon information and belief, Elucid has induced infringement, and continues to induce infringement, of one or more claims of the ’082 Patent, including at least Claims 1-18, by actively and knowingly inducing others, including healthcare providers and hospitals in the District of Massachusetts and throughout the United States, to directly infringe one or more claims of the ’082 Patent through the use of Elucid’s products and services. For example, Elucid instructs hospital employees and physicians, including through its website, webinars, product demonstrations, events, and instructional videos, to use the Accused ’082 Elucid Products in an infringing manner. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/).

145. Upon information and belief, Elucid has contributed to the infringement of one or more claims of the ’082 Patent, including at least Claims 1-18, by providing products and services that constitute material parts of the claimed inventions, knowing the same to be especially made or adapted for use in an infringing manner. For example, the Accused ’082 Elucid Products include at least one software component that generates the FFR pullback curve, straightened anatomy image, and FFR color-coded vessel model for display in the Elucid viewer and reports. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention, and upon information and belief, is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Elucid is liable for infringement of the ’082 Patent pursuant to 35 U.S.C. § 271(c).

146. Upon information and belief, Elucid has been on notice of the ’082 Patent at least since its issuance, and Elucid’s infringement of the ’082 Patent has been and continues to be

willful. For example, through its hiring of eleven Heartflow employees, including Windi Hary, a nearly thirteen-year Heartflow veteran who served on Heartflow's leadership team and as a fiduciary of the company, Elucid acquired actual knowledge of Heartflow's technology, patent portfolio, product development strategies, regulatory strategies, and commercial plans. Indeed, Ms. Hary is the primary correspondent on Elucid's FDA 510(k) submission for FFR-IQ, in which Elucid identified Heartflow's $FFR_{CT}$ product as the predicate device and compared its technological characteristics to Heartflow's $FFR_{CT}$. Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 5. Elucid also had actual or constructive knowledge of Heartflow's patents given Heartflow's pioneering role in the AI-powered cardiac CT analysis market since 2014, Heartflow's extensive patent portfolio of over 600 patents globally, Heartflow's status as a publicly traded company, and Elucid's direct competition with Heartflow in the same market. Despite this knowledge, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license.

147. By the time of trial, Elucid will thus have known and intended (since receiving such notice) that its continued actions would actively induce and contribute to actual infringement of one or more claims of the '082 Patent, including at least Claims 1-18.

148. Despite this actual knowledge of Heartflow's patents, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license of those patents.

149. Elucid undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '082 Patent, which has been duly issued by the USPTO and is presumed valid. For example, Elucid has been aware of an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '082 Patent based on the actual knowledge of its former Heartflow employees and Heartflow's prominence in the field, and

that the ’082 Patent is valid. On information and belief, Elucid cannot reasonably, subjectively believe that its actions do not constitute infringement of the ’082 Patent, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Elucid has continued its infringing activities. As such, Elucid willfully infringes the ’082 Patent.

150. Heartflow has been damaged by Elucid’s infringement of the ’082 Patent and is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284.

**COUNT II – ELUCID’S INFRINGEMENT OF U.S. PATENT NO. 10,010,255**

151. Heartflow incorporates all preceding paragraphs by reference.

152. U.S. Patent No. 10,010,255 (the "’255 Patent") duly issued on July 3, 2018, and is entitled "Systems and methods for estimating ischemia and blood flow characteristics from vessel geometry and physiology." A copy of the ’255 Patent is attached as Exhibit 14.

153. Heartflow is the owner by assignment of the ’255 Patent and possesses all rights under the ’255 Patent, including the exclusive right to recover for past and future infringement.

154. The ’255 Patent is directed to methods, systems, and computer-readable media for determining FFR for a stenosis of interest using a trained machine-learning algorithm rather than a physics-based simulation. For example, the ’255 Patent discloses receiving a patient’s medical image data including the stenosis; extracting anatomical and/or geometric features for the stenosis; training a machine learning algorithm on measured FFR values and anatomical and/or geometric features of a plurality of individuals; determining an FFR value for the stenosis from the patient’s extracted features using the trained algorithm; and generating and displaying a geometric model of the stenosis that indicates the determined FFR value. *See* ’255 Patent at Abstract, Claim 1.

155. The ’255 Patent explains that, at the time of its priority date, patients presenting with chest pain were subject to noninvasive tests such as ECG, treadmill tests, SPECT, PET, and CT, “none of which measure blood flow and provide only anatomic information or indirect indications of disease,” so that “many patients require invasive catheter procedures to assess coronary blood flow.” ’255 Patent at 1:44-49. Those invasive measurements of FFR “present severe risks to the patient and significant costs to the healthcare system.” *Id.* at 2:1-12. And while noninvasive tests had been developed that use a patient-specific geometric model derived from CT “to simulate the blood flow using computational fluid dynamics (CFD),” such “physical simulations demand a substantial computational burden that can make these virtual, noninvasive tests difficult to execute in a real-time clinical environment.” *Id.* at 2:13-32. There was thus a need for “rapid assessment of blood flow to enable use in emergency rooms, in-patient treatment, and onsite hospital use.” *Id.* at 1:55-58.

156. The ’255 Patent solved these problems by “using machine learning to predict the results of a physics-based simulation,” in “a training phase in which a machine learning system is trained to predict one or more blood flow characteristics” and “a production phase in which the machine learning system is used to produce one or more blood flow characteristics and clinically relevant quantities of interest.” *Id.* at 2:45-55. More specifically, the invention models FFR “as a function of a patient’s vascular cross-sectional area, diseased length, and boundary conditions,” and uses “machine learning techniques…to solve for the functions that cause the estimated FFR to approximate the measured FFR,” where “the measured FFR may be calculated by traditional catheterized methods.” *Id.* at 3:27-57. Features may include “cross-sectional lumen area along the coronary centerline,” “locations of stenotic lesions,” and “lengths of stenotic lesions,” and results may be displayed as “images, renderings, tables of values, or reports,” including

"positive/negative/inconclusive indications…(ie FFR> or <0.80)." *Id.* at 8:64-9:8, 12:1-6. Therefore, a computationally inexpensive, rapid, and noninvasive determination of FFR for a stenosis of interest is achieved.

157. Evidence that the '255 Patent is valid and is directed to novel and inventive technology is discussed above in at least paragraphs 20-29 and 111-121 and incorporated by reference. Further, the '255 Patent has been recognized as a foundational patent as shown by the fact that it has been cited in at least 150 additional patents, including patents filed by Elucid.

158. Upon information and belief, Elucid has directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '255 Patent, including at least Claims 1-4, by making, using, testing, offering to sell, and/or selling in the United States products and services that practice the inventions claimed therein, including, but not limited to, Elucid FFR-IQ (B.1), alone or in combination with Elucid's Plaque-IQ™ software, Lesion Inspection Tool, viewer, and reports ("the Accused '255 Elucid Products"). On September 29, 2026, the FDA cleared Elucid FFR-IQ (B.1) under 510(k) No. K262015 as a "[c]oronary vascular physiologic simulation software device" that "provides FFR-CT (CT-derived FFR) values computed from coronary CTA images using AI-enabled algorithms." Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 4-5. In its 510(k) submission, Elucid identified Heartflow's own $FFR_{CT}$ product (DEN130045) as the predicate device, and represented that its device has the same product code, regulation, device classification, output, and ground truth for model training ("[p]aired CT and invasive FFR data") as Heartflow's $FFR_{CT}$. *Id.* at 5-7.

159. Heartflow reserves the right to discover and pursue any additional infringing products and services that incorporate infringing functionalities. For the avoidance of doubt, the Accused '255 Elucid Products are identified to describe Elucid's infringement and in no way limit

the discovery and infringement allegations against Elucid concerning other products that incorporate the same or reasonably similar functionalities.

160. Upon information and belief, Elucid directly infringes by using the claimed method in the United States when, for example, performing testing and validation studies, including studies submitted to the FDA, generating reports for investigational and research use, training hospital employees, conducting webinars, conducting demos at events, and/or producing videos showing how the Accused ’255 Elucid Products operate. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/).

161. Each of the Accused ’255 Elucid Products, either alone or in combination with each other, performs a method for determining FFR for a stenosis of interest for a patient. FFR-IQ “assesses FFR-CT (CT-derived FFR) values along the coronary tree.” Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 6. Elucid’s report provides, for each lesion, proximal FFR (PFFR), distal FFR (DFFR), and change in FFR (ΔFFR). Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-5. Elucid’s “approach to FFR estimation, which [its CEO] called ‘biointegrated FFR-CT,’ integrates anatomical narrowing with plaque burden and vasodilation impairment rather than relying on fluid dynamics modeling alone.” Ex. 67 (How Elucid Plans To Outperform HeartFlow Without Computational Fluid Dynamics, https://insights.citeline.com/medtech-insight/device-area/cardiology/how-elucid-plans-to-outperform-heartflow-without-computational-fluid-dynamics-TE5E7R26GFBW7PO6OJHZSEQT74/).




Ex. 50 (https://elucid.com/healthcare-professionals/).

elucid

| | PATIENT ID | DATE OF BIRTH | SEX | CT STUDY DATE | |
|---|---|---|---|---|---|
| Plaque_+_FFR_Demo_3 | Plaque_+_FFR_Demo_3 | -- | Female | 06/06/2019 | View Results on Web ↗ |

## Patient Overview

**Dominance:** Right Dominant

CAD-RADS
**3 / P4 / I+**

Total Plaque
**1,211.6** mm³

| LRNC | NCM | CP |
|---|---|---|
| 419.4 | 739.6 | 52.6 |

**High Stenosis:** 50-69%
dRCA

**Segments with FFRCT < 0.8**
R-PDA R-PLB dRCA dLAD

### FFR Overview




### Stenosis Overview

Not Analyzed




| Segment | FFRCT | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.99 | 36.3 | 0 | 29.3 | 7 | 1-24% |
| pLAD | 0.89 | 241.9 | 12.6 | 149.2 | 80.1 | 25-49% |
| mLAD | 0.85 | 149.3 | 4.7 | 95.3 | 49.3 | 25-49% |
| dLAD | 0.78 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.86 | 56.6 | 0 | 39.6 | 17 | 25-49% |
| dLCX | -- | -- | -- | -- | -- | -- |
| pRCA | 0.97 | 38.2 | 4.4 | 29.2 | 4.6 | 25-49% |
| mRCA | 0.93 | 121.5 | 0.9 | 84.4 | 36.2 | 1-24% |
| dRCA | 0.77 | 392.4 | 21.9 | 185.6 | 184.9 | 50-69% |

Elucid Bioimaging, Inc.
Powered by CT Virtual Histology™

UDI 8745Elucid81/2026 June_wl-092c1a7a_3187_v3_2026-06-29
INVESTIGATIONAL DEVICE NOT FOR CLINICAL USE

Series: IMR1-Edge, 75% 1

Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:49.

162. At least Claim 1 requires "receiving medical image data of the patient including the stenosis of interest." Upon information and belief, the Accused '255 Elucid Products receive the patient's coronary CTA data, including the stenoses to be analyzed. For example, Elucid states that "[p]hysicians send patient images to Elucid with a single mouse click," after which Elucid applies its image-restoration algorithms and analysts "segment the data to create a 3D model of the patient's coronary arteries." Ex. 55 (FDA approves Elucid's PlaqueIQ software for CVD assessment, https://www.medicaldevice-developments.com/news/fda-approves-elucids-plaqueiq-software-for-cvd-assessment/); Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). For example, "Elucid PlaqueIQ is an image analysis software that is used to process, review, and analyze CT images," such as for "the non-invasive evaluation and assessment

of plaque quantification and morphology (e.g., atherosclerosis) from previously acquired CT angiography." Ex. 57 (K241524 510(k) Summary, https://www.accessdata.fda.gov/cdrh_docs/pdf24/K241524.pdf) at 4, 6. "Elucid analyzes a CT scan by applying machine learning to determine plaque type and quantity as though you were looking at excised patient tissue under microscope, providing information not discernable from a standard CT scan." Ex. 58 (Elucid - Delivering Personalized Patient Care, https://medhealthoutlook.com/elucid/). As another example, Elucid FFR-IQ analyzes "previously acquired Computed Tomography DICOM data" and estimates FFR-CT values "from coronary CTA images." Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 4. Its input/data source is "CT." *Id.* at 6.




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 12:49.




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 17:38.




Ex. 60 (Elucid at SCCT 2024: Precision Cardiovascular Pathways with Histology-based Plaque Quantitation, https://www.youtube.com/watch?v=XGVvOo0kWzc) at 17:29.

163. At least Claim 1 also requires "extracting a set of anatomical and/or geometric features for the stenosis of interest from the medical image data of the patient." Upon information and belief, the Accused '255 Elucid Products extract anatomical and geometric features for each stenosis. Elucid's FFR-CT model uses "quantitative plaque and lumen characteristics derived from coronary computed tomography angiography," with "[q]uantitative plaque and geometric features sampled along the vessel centerline" used as model inputs. Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48. Elsevier, https://doi.org/10.1016/j.jcct.2026.05.120) at S47. Elucid FFR-IQ estimates FFR-CT values "from static coronary CTA images with extracted coronary tree structures" and uses "the 3D segmentation results of Plaque-IQ." Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 6. Public reports likewise describe that Elucid's software "reconstructs 3D arterial models to evaluate vessel anatomy, plaque composition, and ischemia." Ex. 62 (Elucid Raises $55M to Expand Non-Invasive Cardiovascular Diagnostic Platform, https://hitconsultant.net/2026/09/02/elucid-raises-55m-series-d-ai-plaque-iq-biointegrated-ffr-ct-cardiovascular-diagnostics/). Elucid's plaque quantification software can be used "to extract quantitative plaque morphology," where "[a]bsolute volume per coronary artery and per lesion, cross-sectional area of tissue characteristics for each cross section as well as the proportional occupancy of each tissue type, and maximum values for each coronary artery and lesion were calculated. Wall area or volume was calculated as the overall vessel area or volume minus the lumen area or volume. Vessel structure measurements included the degree of stenosis (calculated both by area or diameter), wall thickness (distance between the lumen boundary to outer vessel wall boundary), and remodeling index (the ratio of vessel area with plaque to a vessel area without

plaque used as reference).” Ex. 69 (Varga-Szemes, Ákos, et al. “Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve.” *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 308; Ex. 70 (Study Confirms Elucid’s AI Software Accurately Estimates Lesion-Specific Ischemia Compared to Standard of Care, https://elucid.com/study-confirms-elucids-ai-software-accurately-estimates-lesion-specific-ischemia-compared-to-standard-of-care/).




Ex. 71 (Sponsored webinar | Advanced coronary plaque analysis & next generation FFRCT in clinical care, https://www.youtube.com/watch?v=gl1K-ubinA4) at 44:36.

164. At least Claim 1 also requires “receiving a set of training data comprising: (1) measured FFR values and (2) anatomical and/or geometric features, of a plurality of individuals.” Upon information and belief, the Accused ’255 Elucid Products have received and rely upon such training data. Elucid represented to FDA that the “Ground Truth for Model Training” for FFR-IQ is “[p]aired CT and invasive FFR data.” Ex. 6 (FDA 510(k) Clearance Letter and Summary,

K262015 (Sept. 29, 2026)) at 5-7. Elucid's model was developed using "935 patients from seven institutions," whose CCTA datasets "underwent lumen and vessel wall segmentation followed by histology-based plaque characterization," with "[i]nvasive FFR measurements…co-registered to corresponding CCTA-derived vessel locations for both model training and evaluation." Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48).




**Fig. 1.** Correlation matrix and heat map. Correlation matrix (left), and heat map (right) indicating relationships after unsupervised hierarchical clustering of plaque morphology measurements, by patient. Features are centered and scaled. Y denotes LOW-FFR (<0.80) and N stands for normal FFR (≥0.80). CALC, calcium; LRNC, lipid rich necrotic core; MATX, matrix; IPH, intra-plaque hemorrhage; CALCVolProp, CALC volume proportion; LRNCVol, LRNC volume; LNRCVolProp, LRNC volume proportion; MATXVol, MATX volume; MATXVolProp, MATX volume proportion; MaxCALCArea, maximum CALC area; MaxCALCAreaProp, maximum CALC area proportion; MaxDilationByArea, maximum dilation by area; MaxIPHArea, maximum IPH area; MaxLRNCArea, maximum LRNC area; MaxLRNCAreaProp, maximum LRNC area proportion; MaxMATXArea, maximum MATX area; MaxMATXAreaProp, maximum MATX area proportion; MaxPlaqueBurdenAreaRatio, maximum plaque burden area ratio; MaxRemodelingRatio, maximum remodeling ratio; MaxStenosisByArea, maximum degree of stenosis by area; MaxWallArea, maximum wall area; MaxWallThickness, maximum wall thickness; MaxWallToLumenAreaRatio, maximum wall to lumen area ratio; WallVol, wall volume.

Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 309.

**Table 1**
Plaque morphology feature summary statistics in original scale in the normal and low FFR groups.

| Feature | Training | | | Sequestered Test | | |
|---|---|---|---|---|---|---|
| | FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value | FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value |
| CALC volume proportion | 0.06 | 0.07 | 0.324 | 0.04 | 0.08 | 0.093 |
| LRNC volume ($mm^3$) | 17.31 | 39.37 | <0.001 | 15.09 | 38.52 | 0.035 |
| LRNC volume proportion | 0.1 | 0.11 | 0.337 | 0.11 | 0.11 | 0.445 |
| MATX volume ($mm^3$) | 69.02 | 175.63 | <0.001 | 53.74 | 197.89 | <0.001 |
| MATX volume proportion | 0.61 | 0.58 | 0.167 | 0.62 | 0.58 | 0.206 |
| Maximum CALC area ($mm^2$) | 1.96 | 4.01 | 0.008 | 1.38 | 3.54 | 0.026 |
| Maximum CALC area proportion | 0.18 | 0.27 | 0.032 | 0.11 | 0.29 | 0.01 |
| Maximum dilation by area ($mm^2$) | 0.67 | 1.99 | <0.001 | 0.78 | 2.18 | 0.031 |
| Maximum IPH area ($mm^2$) | 1.61 | 3.26 | <0.001 | 1.17 | 3.13 | 0.017 |
| Maximum LRNC area ($mm^2$) | 2.55 | 4.23 | 0.005 | 2.23 | 4.29 | 0.039 |
| Maximum LRNC area proportion | 0.23 | 0.34 | 0.002 | 0.2 | 0.33 | 0.041 |
| Maximum MATX area ($mm^2$) | 6.61 | 10.36 | 0.002 | 5.87 | 11.71 | 0.001 |
| Maximum MATX area proportion | 0.86 | 0.87 | 0.373 | 0.85 | 0.87 | 0.733 |
| Maximum plaque burden area ratio | 0.76 | 0.86 | <0.001 | 0.76 | 0.83 | 0.096 |
| Maximum remodeling ratio | 1.65 | 2.92 | <0.001 | 1.61 | 3.12 | 0.014 |
| Maximum degree of stenosis by area ($mm^2$) | 0.43 | 0.6 | 0.004 | 0.29 | 0.49 | 0.019 |
| Maximum wall area ($mm^2$) | 10.91 | 18.29 | <0.001 | 9.64 | 19.78 | 0.003 |
| Maximum wall thickness (mm) | 1.94 | 2.58 | 0.001 | 1.74 | 2.32 | 0.036 |
| Maximum wall to lumen area ratio | 6.12 | 9.03 | <0.001 | 4.85 | 8.26 | 0.091 |
| Wall volume ($mm^3$) | 124.25 | 314.42 | <0.001 | 96.3 | 339.93 | <0.001 |

FFR, fractional flow reserve; CALC, calcium; LRNC, lipid reach necrotic core; MATX, matrix, IPH, intra-plaque hemorrhage.

*Id.* at 310.

165. At least Claim 1 also requires "training a machine learning algorithm based on determined associations mapping the measured FFR values and the anatomical and/or geometric features, for each of the plurality of individuals." Upon information and belief, Elucid trained FFR-IQ's deep learning model on associations between the co-registered invasive FFR measurements and the features at corresponding vessel locations for each patient in its training set. Elucid states that "935 patients…were used for model development, including pretraining and fine-tuning," that the features "were used as inputs to a deep learning neural network model," and that invasive FFR was "co-registered to corresponding CCTA-derived vessel locations for…model training." Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48). FFR-IQ estimates FFR-CT "using deep learning neural networks." Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 6. Elucid's earlier published work likewise trained machine learning models, including artificial neural networks and ridge regression, on plaque morphology measurements against "physical FFR as gold standard

ground truth." Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 308. Elucid explains that "[m]achine learning is foundational to making the software go" and Elucid uses "algorithms that were trained by histology, using traditional image processing techniques to recognize different types of plaque based on histology." Ex. 64 (Transcript of Preventing Heart Attacks and Strokes with Todd Villines from Elucid, https://share.transistor.fm/s/751e78b2/transcript). Elucid's FFR-CT "uses machine learning. It integrates all of the plaque outputs…that is already included in [Elucid's] FDA-cleared software, and then using machine learning can predict across the entirety of the coronary arteries what the invasive FFR or fractional flow reserve would be." *Id.* In explaining its machine-learning process, Elucid's representative explained:

> [W]e use machine learning to take all of those outputs from our software and to integrate them across the entire coronary tree. These have been trained on thousands of invasive fractural flow reserve studies where we've taken patients who have gone to the cath lab. We have their fractional flow reserve, and in many cases, we have fractional flow reserve data for the entire pullback across the entire artery. We have their CT scanning and so we can, in a deterministic way, train an algorithm to recognize that relationship between plaque and fractional flow reserve in a very accurate way and trained and validate plaque plaque-based FFRCT model. *Id.* As to the model's training, Elucid's representative explained: for FFRCT we realized that you know, we, from a machine learning perspective, the inputs to the model are our histology-based plaque outpost. In developing the plaque analysis software, we included the damage and these thousands of cross-sections, these are annotated by pathologists. And so, in you know, with the software that's been shown to be highly accurate against pathologists, we can take the output of our plaque model and then use those annotations as inputs into the machine learning FFRCT models. So, that's exactly what we do, is use those annotated, those plaque annotations from our FDA-cleared histology-based plaque analysis software as one of the key inputs. Now, we do this down the entire coronary artery and build a model that adds to that based on a host of other variables from the CT scan itself and potentially even from the patient themselves. . . . So, we have developed thousands of cases now across, using every different available CT scanning platform, across patients with no disease versus advanced calcified disease, and different degrees of stenosis across

> the entirety of the coronary tree, so looking at all the different segments of where you might find disease clinically. So, it's important to have all of that in your training data and of course, for validation, you know, it's really important that you go out and these are, you know, cases where you haven't seen them. They're firewalled, they're typically done in a multi-center study, where you ensure that you're testing your device on a patient population, you're most likely to see in clinical use where you have the variability in the scanner technology, disease severity, et cetera, to ensure that you have hit the mark. And so, that is something that you know, we are currently in the late stages of our validation, multi-center study for our FFRCT software and those are all things that we have taken into account in designing the study.

*Id. See, e.g.*:




**Fig. 1.** Correlation matrix and heat map. Correlation matrix (left), and heat map (right) indicating relationships after unsupervised hierarchical clustering of plaque morphology measurements, by patient. Features are centered and scaled. Y denotes LOW-FFR (<0.80) and N stands for normal FFR (≥0.80). CALC, calcium; LRNC, lipid rich necrotic core; MATX, matrix; IPH, intra-plaque hemorrhage; CALCVolProp, CALC volume proportion; LRNCVol, LRNC volume; LNRCVolProp, LRNC volume proportion; MATXVol, MATX volume; MATXVolProp, MATX volume proportion; MaxCALCArea, maximum CALC area; MaxCALCAreaProp, maximum CALC area proportion; MaxDilationByArea, maximum dilation by area; MaxIPHArea, maximum IPH area; MaxLRNCArea, maximum LRNC area; MaxLRNCAreaProp, maximum LRNC area proportion; MaxMATXArea, maximum MATX area; MaxMATXAreaProp, maximum MATX area proportion; MaxPlaqueBurdenAreaRatio, maximum plaque burden area ratio; MaxRemodelingRatio, maximum remodeling ratio; MaxStenosisByArea, maximum degree of stenosis by area; MaxWallArea, maximum wall area; MaxWallThickness, maximum wall thickness; MaxWallToLumenAreaRatio, maximum wall to lumen area ratio; WallVol, wall volume.

Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 309.

**Table 1**
Plaque morphology feature summary statistics in original scale in the normal and low FFR groups.

| Feature | Training FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value | Sequestered Test FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value |
|---|---|---|---|---|---|---|
| CALC volume proportion | 0.06 | 0.07 | 0.324 | 0.04 | 0.08 | 0.093 |
| LRNC volume ($mm^3$) | 17.31 | 39.37 | <0.001 | 15.09 | 38.52 | 0.035 |
| LRNC volume proportion | 0.1 | 0.11 | 0.337 | 0.11 | 0.11 | 0.445 |
| MATX volume ($mm^3$) | 69.02 | 175.63 | <0.001 | 53.74 | 197.89 | <0.001 |
| MATX volume proportion | 0.61 | 0.58 | 0.167 | 0.62 | 0.58 | 0.206 |
| Maximum CALC area ($mm^2$) | 1.96 | 4.01 | 0.008 | 1.38 | 3.54 | 0.026 |
| Maximum CALC area proportion | 0.18 | 0.27 | 0.032 | 0.11 | 0.29 | 0.01 |
| Maximum dilation by area ($mm^2$) | 0.67 | 1.99 | <0.001 | 0.78 | 2.18 | 0.031 |
| Maximum IPH area ($mm^2$) | 1.61 | 3.26 | <0.001 | 1.17 | 3.13 | 0.017 |
| Maximum LRNC area ($mm^2$) | 2.55 | 4.23 | 0.005 | 2.23 | 4.29 | 0.039 |
| Maximum LRNC area proportion | 0.23 | 0.34 | 0.002 | 0.2 | 0.33 | 0.041 |
| Maximum MATX area ($mm^2$) | 6.61 | 10.36 | 0.002 | 5.87 | 11.71 | 0.001 |
| Maximum MATX area proportion | 0.86 | 0.87 | 0.373 | 0.85 | 0.87 | 0.733 |
| Maximum plaque burden area ratio | 0.76 | 0.86 | <0.001 | 0.76 | 0.83 | 0.096 |
| Maximum remodeling ratio | 1.65 | 2.92 | <0.001 | 1.61 | 3.12 | 0.014 |
| Maximum degree of stenosis by area ($mm^2$) | 0.43 | 0.6 | 0.004 | 0.29 | 0.49 | 0.019 |
| Maximum wall area ($mm^2$) | 10.91 | 18.29 | <0.001 | 9.64 | 19.78 | 0.003 |
| Maximum wall thickness (mm) | 1.94 | 2.58 | 0.001 | 1.74 | 2.32 | 0.036 |
| Maximum wall to lumen area ratio | 6.12 | 9.03 | <0.001 | 4.85 | 8.26 | 0.091 |
| Wall volume ($mm^3$) | 124.25 | 314.42 | <0.001 | 96.3 | 339.93 | <0.001 |

FFR, fractional flow reserve; CALC, calcium; LRNC, lipid reach necrotic core; MATX, matrix, IPH, intra-plaque hemorrhage.

*Id.* at 310.

166. At least Claim 1 also requires "determining a FFR value for the stenosis of interest based on the extracted set of anatomical and/or geometric features using the trained machine-learning algorithm mapping anatomical and/or geometric features to FFR values." Upon information and belief, the Accused '255 Elucid Products apply the patient's extracted features to FFR-IQ's trained model to determine FFR values for each stenosis. Elucid FFR-IQ is "AI-enabled," and "[u]sing the 3D segmentation results of Plaque-IQ, an AI-enabled algorithm assesses FFR-CT (CT-derived FFR) values along the coronary tree." Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 6. FFR-IQ outputs "[g]raphics and text results of noninvasively derived FFR-CT." *Id.*

167. For example, Elucid's report lists an $FFR_{CT}$ value for each analyzed coronary segment and proximal, distal, and ΔFFR values for each lesion. Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-4. Upon information and belief, Elucid's FFR-CT model was trained using features extracted from individuals other than the patient. For example, Elucid represented to the FDA that the ground truth for FFR-IQ model training is "[p]aired CT and

invasive FFR data"—the "[s]ame" as Heartflow's $FFR_{CT}$. Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 7. The model thereby learns associations between the hemodynamic values (invasive FFR) and the features extracted from those individuals' arterial geometry, which it then applies to each new patient. Elucid explains that "[m]achine learning is foundational to making the software go." Ex. 64 (Transcript of Preventing Heart Attacks and Strokes with Todd Villines from Elucid, https://share.transistor.fm/s/751e78b2/transcript). Elucid's FFR-CT "uses machine learning. It integrates all of the plaque outputs . . . that is already included in [Elucid's] FDA-cleared software, and then using machine learning can predict across the entirety of the coronary arteries what the invasive FFR or fractional flow reserve would be." *Id.*

168. In explaining its machine-learning process, Elucid's representative explained: "we use machine learning to take all of those outputs from our software and to integrate them across the entire coronary tree. These have been trained on thousands of invasive fractural flow reserve studies where we've taken patients who have gone to the cath lab. We have their fractional flow reserve, and in many cases, we have fractional flow reserve data for the entire pullback across the entire artery. We have their CT scanning and so we can, in a deterministic way, train an algorithm to recognize that relationship between plaque and fractional flow reserve in a very accurate way and trained and validate plaque plaque-based FFRCT model." *Id.* As to the model's training, Elucid's representative explained:

> [F]or FFRCT we realized that you know, we, from a machine learning perspective, the inputs to the model are our histology-based plaque outpost. In developing the plaque analysis software, we included the damage and these thousands of cross-sections, these are annotated by pathologists. And so, in you know, with the software that's been shown to be highly accurate against pathologists, we can take the output of our plaque model and then use those annotations as inputs into the machine learning FFRCT models. So, that's exactly what we do, is use those annotated, those plaque annotations from our FDA-cleared histology-based plaque

analysis software as one of the key inputs. Now, we do this down the entire coronary artery and build a model that adds to that based on a host of other variables from the CT scan itself and potentially even from the patient themselves. . . . So, we have developed thousands of cases now across, using every different available CT scanning platform, across patients with no disease versus advanced calcified disease, and different degrees of stenosis across the entirety of the coronary tree, so looking at all the different segments of where you might find disease clinically. So, it's important to have all of that in your training data and of course, for validation, you know, it's really important that you go out and these are, you know, cases where you haven't seen them. They're firewalled, they're typically done in a multi-center study, where you ensure that you're testing your device on a patient population, you're most likely to see in clinical use where you have the variability in the scanner technology, disease severity, et cetera, to ensure that you have hit the mark. And so, that is something that you know, we are currently in the late stages of our validation, multi-center study for our FFRCT software and those are all things that we have taken into account in designing the study.

*Id. See, e.g.*:




**Fig. 1.** Correlation matrix and heat map. Correlation matrix (left), and heat map (right) indicating relationships after unsupervised hierarchical clustering of plaque morphology measurements, by patient. Features are centered and scaled. Y denotes LOW-FFR (<0.80) and N stands for normal FFR (≥0.80). CALC, calcium; LRNC, lipid rich necrotic core; MATX, matrix; IPH, intra-plaque hemorrhage; CALCVolProp, CALC volume proportion; LRNCVol, LRNC volume; LNRCVolProp, LRNC volume proportion; MATXVol, MATX volume; MATXVolProp, MATX volume proportion; MaxCALCArea, maximum CALC area; MaxCALCAreaProp, maximum CALC area proportion; MaxDilationByArea, maximum dilation by area; MaxIPHArea, maximum IPH area; MaxLRNCArea, maximum LRNC area; MaxLRNCAreaProp, maximum LRNC area proportion; MaxMATXArea, maximum MATX area; MaxMATXAreaProp, maximum MATX area proportion; MaxPlaqueBurdenAreaRatio, maximum plaque burden area ratio; MaxRemodelingRatio, maximum remodeling ratio; MaxStenosisByArea, maximum degree of stenosis by area; MaxWallArea, maximum wall area; MaxWallThickness, maximum wall thickness; MaxWallToLumenAreaRatio, maximum wall to lumen area ratio; WallVol, wall volume.

Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International*

*Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier,

https://doi.org/10.1016/j.ijcard.2021.01.040) at 309.

**Table 1**
Plaque morphology feature summary statistics in original scale in the normal and low FFR groups.

| Feature | Training FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value | Sequestered Test FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value |
|---|---|---|---|---|---|---|
| CALC volume proportion | 0.06 | 0.07 | 0.324 | 0.04 | 0.08 | 0.093 |
| LRNC volume ($mm^3$) | 17.31 | 39.37 | <0.001 | 15.09 | 38.52 | 0.035 |
| LRNC volume proportion | 0.1 | 0.11 | 0.337 | 0.11 | 0.11 | 0.445 |
| MATX volume ($mm^3$) | 69.02 | 175.63 | <0.001 | 53.74 | 197.89 | <0.001 |
| MATX volume proportion | 0.61 | 0.58 | 0.167 | 0.62 | 0.58 | 0.206 |
| Maximum CALC area ($mm^2$) | 1.96 | 4.01 | 0.008 | 1.38 | 3.54 | 0.026 |
| Maximum CALC area proportion | 0.18 | 0.27 | 0.032 | 0.11 | 0.29 | 0.01 |
| Maximum dilation by area ($mm^2$) | 0.67 | 1.99 | <0.001 | 0.78 | 2.18 | 0.031 |
| Maximum IPH area ($mm^2$) | 1.61 | 3.26 | <0.001 | 1.17 | 3.13 | 0.017 |
| Maximum LRNC area ($mm^2$) | 2.55 | 4.23 | 0.005 | 2.23 | 4.29 | 0.039 |
| Maximum LRNC area proportion | 0.23 | 0.34 | 0.002 | 0.2 | 0.33 | 0.041 |
| Maximum MATX area ($mm^2$) | 6.61 | 10.36 | 0.002 | 5.87 | 11.71 | 0.001 |
| Maximum MATX area proportion | 0.86 | 0.87 | 0.373 | 0.85 | 0.87 | 0.733 |
| Maximum plaque burden area ratio | 0.76 | 0.86 | <0.001 | 0.76 | 0.83 | 0.096 |
| Maximum remodeling ratio | 1.65 | 2.92 | <0.001 | 1.61 | 3.12 | 0.014 |
| Maximum degree of stenosis by area ($mm^2$) | 0.43 | 0.6 | 0.004 | 0.29 | 0.49 | 0.019 |
| Maximum wall area ($mm^2$) | 10.91 | 18.29 | <0.001 | 9.64 | 19.78 | 0.003 |
| Maximum wall thickness (mm) | 1.94 | 2.58 | 0.001 | 1.74 | 2.32 | 0.036 |
| Maximum wall to lumen area ratio | 6.12 | 9.03 | <0.001 | 4.85 | 8.26 | 0.091 |
| Wall volume ($mm^3$) | 124.25 | 314.42 | <0.001 | 96.3 | 339.93 | <0.001 |

FFR, fractional flow reserve; CALC, calcium; LRNC, lipid reach necrotic core; MATX, matrix, IPH, intra-plaque hemorrhage.

*Id.* at 310.

169. At least Claim 1 also requires "generating and displaying a geometric model of at least the stenosis of interest of the patient, and indicating the determined FFR value for the stenosis of interest in the geometric model." Upon information and belief, the Accused '255 Elucid Products generate and display a 3D model of the patient's coronary arteries, including each stenosis, with the FFR values indicated on it. As Elucid's presenter explained in an Elucid-sponsored webinar, a user can "add the FFR the bio-integrated FFR…both in the [] numerical fashion that you can [] put any point and then get a number there or in a color scheme fashion on a straight NPR or a curved NPR or in a 3D fashion or a pullback curve." Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform) at 24:47-25:03. Elucid's platform presents a "comprehensive clinical platform with plaque on top[,] the actual vessel in the middle[,] lesion detection[,] the FFR[,] the lesion related tool and a cross-sectional view." *Id.* at 12:17-12:25.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:17.




Ex. 50 (https://elucid.com/healthcare-professionals/).




Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:49.

170. The foregoing features and capabilities of each of the Accused ’255 Elucid Products, and Elucid’s description and/or demonstration thereof, including in advertising and FDA submissions, reflect Elucid’s direct infringement by satisfying every element of at least Claims 1-4 of the ’255 Patent, including every element of Claim 1 from which they depend, under 35 U.S.C. § 271(a).

171. Upon information and belief, Elucid has induced infringement, and continues to induce infringement, of one or more claims of the ’255 Patent, including at least Claims 1-4, by actively and knowingly inducing others, including healthcare providers and hospitals in the District of Massachusetts and throughout the United States, to directly infringe one or more claims of the ’255 Patent through the use of Elucid’s products and services. For example, Elucid instructs hospital employees and physicians, including through its website, webinars, product

demonstrations, events, instructional videos, and labeling and Instructions for Use, to use the Accused ’255 Elucid Products in an infringing manner. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/).

172. Upon information and belief, Elucid has contributed to the infringement of one or more claims of the ’255 Patent, including at least Claims 1-4, by providing products and services that constitute material parts of the claimed inventions, knowing the same to be especially made or adapted for use in an infringing manner. For example, the Accused ’255 Elucid Products include at least one deep learning component trained on paired CT and invasive FFR data that maps a stenosis’s anatomical and geometric features to FFR values for display on a model of the patient’s coronary arteries. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention, and upon information and belief, is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Elucid is liable for infringement of the ’255 Patent pursuant to 35 U.S.C. § 271(c).

173. Upon information and belief, Elucid has been on notice of the ’255 Patent at least since its issuance, and Elucid’s infringement of the ’255 Patent has been and continues to be willful. For example, through its hiring of eleven Heartflow employees, including Windi Hary, a nearly thirteen-year Heartflow veteran who served on Heartflow’s leadership team and as a fiduciary of the company, Elucid acquired actual knowledge of Heartflow’s technology, patent portfolio, product development strategies, regulatory strategies, and commercial plans. Indeed, Ms. Hary is the primary correspondent on Elucid’s FDA 510(k) submission for FFR-IQ, in which

Elucid identified Heartflow's $FFR_{CT}$ product as the predicate device and compared its technological characteristics to Heartflow's $FFR_{CT}$. Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 5. Elucid also had actual or constructive knowledge of Heartflow's patents given Heartflow's pioneering role in the AI-powered cardiac CT analysis market since 2014, Heartflow's extensive patent portfolio of over 600 patents globally, Heartflow's status as a publicly traded company, and Elucid's direct competition with Heartflow in the same market. Despite this knowledge, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license.

174. By the time of trial, Elucid will thus have known and intended (since receiving such notice) that its continued actions would actively induce and contribute to actual infringement of one or more claims of the '255 Patent, including at least Claims 1-4.

175. Despite this actual knowledge of Heartflow's patents, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license of those patents.

176. Elucid undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '255 Patent, which has been duly issued by the USPTO and is presumed valid. For example, Elucid has been aware of an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '255 Patent based on the actual knowledge of its former Heartflow employees, its express benchmarking of FFR-IQ against Heartflow's $FFR_{CT}$ in its FDA submission, and Heartflow's prominence in the field, and that the '255 Patent is valid. On information and belief, Elucid cannot reasonably, subjectively believe that its actions do not constitute infringement of the '255 Patent, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively

high likelihood that its actions constitute infringement, Elucid has continued its infringing activities. As such, Elucid willfully infringes the ’255 Patent.

177. Heartflow has been damaged by Elucid’s infringement of the ’255 Patent and is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284.

**COUNT III – ELUCID’S INFRINGEMENT OF U.S. PATENT NO. 9,770,303**

178. Heartflow incorporates all preceding paragraphs by reference.

179. U.S. Patent No. 9,770,303 (the “’303 Patent”) duly issued on September 26, 2017, and is entitled “Systems and methods for predicting coronary plaque vulnerability from patient-specific anatomic image data.” A copy of the ’303 Patent is attached as Exhibit 15.

180. Heartflow is the owner by assignment of the ’303 Patent and possesses all rights under the ’303 Patent, including the exclusive right to recover for past and future infringement.

181. The ’303 Patent is directed to computer-implemented methods, systems, and computer-readable media for predicting a patient’s cardiac risk from patient-specific anatomic image data. For example, the ’303 Patent discloses acquiring anatomical image data of at least part of a patient’s vascular system; performing one or more of image characteristics analysis, geometrical analysis, computational fluid dynamics analysis, and structural mechanics analysis on that data; determining a coronary plaque vulnerability present at a selected location in the patient’s vascular system based on that analysis; determining, for each of a plurality of individuals other than the patient, a model of vascular geometry, a point corresponding to the selected location, and an individual-specific numerical description of one or more factors that affect cardiac risk; generating a patient-specific numerical description of those factors for the selected location based on the individual-specific numerical descriptions; and predicting the patient’s cardiac risk based

on both the determined plaque vulnerability and the patient-specific numerical description. *See* ’303 Patent at Abstract, Claim 1.

182. The ’303 Patent explains that, at the time of its priority date, patients with symptoms of coronary artery disease were subjected to tests that provided only “indirect evidence relating to coronary lesions,” such as electrocardiograms, biomarker evaluation, treadmill tests, echocardiography, SPECT, and PET. ’303 Patent at 1:37-44. While vulnerable plaque features, such as adverse plaque characteristics (APCs), have been purely visually “investigated for prognosis of major adverse cardiac events (MACE) using both invasive and noninvasive techniques, such as intravascular ultrasound (IVUS), optical coherence tomography (OCT), and coronary computed tomography data (CCTA),” “a need exists for systems and methods for predicting coronary plaque vulnerability from patient-specific anatomic image data.” *Id.* at 1:51-60.

183. The ’303 Patent solved these problems by providing “a new approach for providing prognosis of adverse cardiac events and for guiding medical therapy based on patient-specific geometry,” including through “machine learning or rule-based methods” that incorporate coronary geometry and other factors. *Id.* at 5:39-63. More specifically, the claimed invention analyzes a patient’s anatomical image data to determine plaque vulnerability at a selected location—for example, by computing adverse plaque characteristics such as positive remodeling, low attenuation plaque, spotty calcification, plaque burden, and necrotic core—and compares numerical descriptions of cardiac risk factors at the corresponding locations in models derived from “patients other than the patient” to “provide indicators or patterns associated with MI occurrences and/or plaque vulnerability.” *Id.* at 6:38-52, 7:12-8:65, 9:36-50, 10:49-55. Therefore, a computer-implemented method of predicting cardiac risk with improved accuracy, through the integration

of patient-specific plaque vulnerability analysis with numerical descriptions derived from a plurality of other individuals, is achieved.

184. Evidence that the ’303 Patent is valid and is directed to novel and inventive technology is discussed above in at least paragraphs 20-29 and 111-121 and incorporated by reference. Further, the ’303 Patent has been recognized as a foundational patent as shown by the fact that it has been cited in at least 120 additional patents, including patents filed by Elucid.

185. Upon information and belief, Elucid has directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’303 Patent, including at least Claims 1-20, by making, using, testing, offering to sell, and/or selling in the United States products and services that practice the inventions claimed therein, including, but not limited to, Elucid’s Plaque-IQ™ software, including its Lesion Inspection Tool, alone or in combination with Elucid FFR-IQ (“the Accused ’303 Elucid Products”). For example, Plaque-IQ received FDA 510(k) clearance in October 2024 as imaging analysis software “to help physicians diagnose cardiovascular disease.” Ex. 72 (Elucid Receives U.S. 510(k) Clearance of PlaqueIQ™ Image Analysis Software, https://elucid.com/elucid-receives-u-s-510k-clearance-of-plaqueiq-image-analysis-software-to-aid-cardiovascular-disease-assessment/). Elucid markets Plaque-IQ as delivering “comprehensive patient, vessel, and lesion-level plaque composition and quantification data” and as “capable of identifying highly-vulnerable lipid-rich necrotic core (LRNC), a plaque type strongly linked with cardiovascular risk.” Ex. 50 (https://elucid.com/healthcare-professionals/).

186. Heartflow reserves the right to discover and pursue any additional infringing products and services that incorporate infringing functionalities. For the avoidance of doubt, the Accused ’303 Elucid Products are identified on an exemplary basis to describe Elucid’s

infringement and in no way limit the discovery and infringement allegations against Elucid concerning other products that incorporate the same or reasonably similar functionalities.

187. Upon information and belief, Elucid directly infringes by performing one or more of the claims in the United States when, for example, processing patient CCTA data as a service, performing testing and validation studies, generating tutorial videos for training purposes, training hospital employees, conducting webinars, conducting demos at events, and/or producing instructional videos showing how the Accused ’303 Elucid Products operate. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/). For example, Elucid states that “[p]hysicians send patient images to Elucid with a single mouse click,” after which Elucid applies its image-restoration algorithms and analysts “segment the data to create a 3D model of the patient’s coronary arteries.” Ex. 55 (FDA approves Elucid’s PlaqueIQ software for CVD assessment, https://www.medicaldevice-developments.com/news/fda-approves-elucids-plaqueiq-software-for-cvd-assessment/); Ex. 56 (Elucid’s PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance).

188. Each of the Accused ’303 Elucid Products, either alone or in combination with each other, performs a computer-implemented method of predicting a cardiac risk of a patient. Elucid states that Plaque-IQ “equips physicians with critical information regarding the type and amount of plaque in arteries that can lead to heart attack and stroke” and is “designed to help physicians prioritize and personalize treatment based on actual disease, rather than population-based risk of disease.” Ex. 73 (Elucid Announces Commercial Availability of Lesion Inspection Tool for

Plaque-IQ, https://elucid.com/elucid-lesion-inspection-tool/). "Plaque-IQ non-invasively delivers a quantitative and qualitative assessment of systemic atherosclerotic risk and enables the ability to perform both coronary and carotid plaque analysis in a single scan." Ex. 74 (https://elucid.com/healthcare-professionals/#carotid). "Elucid's Plaque-IQ is capable of identifying highly-vulnerable lipid-rich necrotic core (LRNC), a plaque type strongly linked with cardiovascular risk," which "offers direct insights into high-risk plaque features associated with heart attack and stroke." *Id.*




Ex. 73 (Elucid Announces Commercial Availability of Lesion Inspection Tool for Plaque-IQ, https://elucid.com/elucid-lesion-inspection-tool/).




Ex. 74 (https://elucid.com/healthcare-professionals/#carotid).

## Quantify High-Risk Plaque

### The Only Non-Invasive Assessment Tool Capable of Identifying LRNC

For both its coronary and carotid applications, Elucid's Plaque-IQ is capable of identifying highly-vulnerable lipid-rich necrotic core (LRNC), a plaque type strongly linked with cardiovascular risk.[2,3] This offers direct insights into high-risk plaque features associated with heart attack and stroke, measuring true disease rather than directional proxies. By focusing on true disease biology rather than population-based risk estimates, this approach is designed to help physicians prioritize and personalize treatment for each individual patient.




*Id.*

189. At least Claim 1 requires "acquiring anatomical image data of at least part of a patient's vascular system." Upon information and belief, the Accused '303 Elucid Products acquire a patient's CCTA image data. For example, Plaque-IQ "utilizes first-line diagnostic coronary CT angiography," and physicians "send patient images to Elucid with a single mouse click." Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). "Elucid PlaqueIQ is an image analysis software that is used to process, review, and analyze CT images," such as for "the non-invasive evaluation and assessment of plaque quantification and morphology (e.g., atherosclerosis) from previously acquired CT angiography." Ex. 57 (K241524 510(k) Summary, https://www.accessdata.fda.gov/cdrh_docs/pdf24/K241524.pdf) at 4, 6. "Elucid analyzes a CT scan by applying machine learning to determine plaque type and quantity as though you were looking at excised patient tissue under microscope, providing information not

discernable from a standard CT scan." Ex. 58 (Elucid - Delivering Personalized Patient Care, https://medhealthoutlook.com/elucid/).




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 12:49.




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 17:38.




Ex. 60 (Elucid at SCCT 2024: Precision Cardiovascular Pathways with Histology-based Plaque Quantitation, https://www.youtube.com/watch?v=XGVvOo0kWzc) at 17:29.

190. At least Claim 1 also requires "performing, using a processor, one or more of image characteristics analysis, geometrical analysis, computational fluid dynamics analysis, and structural mechanics analysis on the anatomical image data." Upon information and belief, the Accused '303 Elucid Products perform at least image characteristics analysis and geometrical analysis. Plaque-IQ "uses convolutional neural networks trained on carotid endarterectomy histopathologic images of atherosclerotic plaques that were co-registered to CTA images" to "classify individual plaque components," and "uses spatial distribution of tissue properties instead of fixed HU ranges to interpret adjacent voxels." Ex. 75 (Basunia, Azfar, Dinesh Jagasia, and Faisal Jamal. "AI-Guided Coronary Plaque Analysis from Coronary CTA: An Emerging Paradigm for Personalized Preventive Cardiology." *Applied Radiology*, vol. 55, no. 3, 2026, pp. 1–9. https://appliedradiologystorage.blob.core.windows.net/jats-development/10.37549-AR-D-25-0140/AR-D-25-0140.pdf) at 4. Elucid's software performs "lumen and vessel wall segmentation"

and measures tissue characteristics including calcification, lipid-rich necrotic core, intra-plaque hemorrhage, and matrix, "each with volume and cross-sectional area measurements." Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48. Elsevier, https://doi.org/10.1016/j.jcct.2026.05.120) at S47; Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 308.




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 12:49.




Ex. 74 (https://elucid.com/healthcare-professionals/#carotid).

191. At least Claim 1 also requires "determining, using the processor, a coronary plaque vulnerability present at a selected location in the patient's vascular system based on results of one or more of the image characteristics analysis, geometrical analysis, computational fluid dynamics analysis, and structural mechanics analysis of the anatomical image data." Upon information and belief, the Accused '303 Elucid Products determine plaque vulnerability at selected locations. Elucid states that Plaque-IQ "is capable of identifying highly-vulnerable lipid-rich necrotic core (LRNC)," which "offers direct insights into high-risk plaque features associated with heart attack and stroke." Ex. 50 (https://elucid.com/healthcare-professionals/). Elucid's Lesion Inspection Tool "provides physicians the ability to interrogate lesion-specific composition and plaque burden across any vessel." Ex. 73 (https://elucid.com/elucid-lesion-inspection-tool/).




Ex. 50 (https://elucid.com/healthcare-professionals/).

## Quantify High-Risk Plaque

### The Only Non-Invasive Assessment Tool Capable of Identifying LRNC

For both its coronary and carotid applications, Elucid's Plaque-IQ is capable of identifying highly-vulnerable lipid-rich necrotic core (LRNC), a plaque type strongly linked with cardiovascular risk.[2,3] This offers direct insights into high-risk plaque features associated with heart attack and stroke, measuring true disease rather than directional proxies. By focusing on true disease biology rather than population-based risk estimates, this approach is designed to help physicians prioritize and personalize treatment for each individual patient.




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 12:49.

192. At least Claim 1 also requires "acquiring image data of each individual in a plurality of individuals" and "determining a model of vascular geometry present in each individual in the plurality of individuals other than the patient, wherein each model comprises one or more points." Upon information and belief, Elucid acquired CT image data from a plurality of individuals other than the patient and determined models of their vascular geometry to develop and validate the Accused '303 Elucid Products. Elucid states that its technology is "validated against tens of thousands of tissue samples." Ex. 76 (Elucid's Next-Generation Plaque Analysis and FFRCT Technology to be Featured on 2022 AHA Scientific Sessions Program, https://elucid.com/elucids-next-generation-plaque-analysis-and-ffrct-technology-to-be-featured-on-2022-aha-scientific-sessions-program/). Elucid's plaque-based model was further developed using CCTA data from "935 patients from seven institutions," each of which "underwent lumen and vessel wall segmentation." Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation

on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48. Elsevier, https://doi.org/10.1016/j.jcct.2026.05.120) at S47.

193. At least Claim 1 also requires "determining, for each individual's model, a selected point corresponding to the selected location in the patient's vascular system" and "determining, for each selected point of each individual's model, an individual-specific numerical description of one or more factors that affect cardiac risk." Upon information and belief, in developing the Accused '303 Elucid Products, Elucid co-registered histology and other ground-truth data to specific locations in each individual's CTA-derived vessel model and quantified, at those locations, plaque components—such as LRNC, calcification, intra-plaque hemorrhage, and matrix—that affect cardiac risk. Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48. Elsevier, https://doi.org/10.1016/j.jcct.2026.05.120) at S47 (data "co-registered to corresponding CCTA-derived vessel locations"); Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 308; Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 7. Elucid also describes its AI PREDICT study, in which it analyzes "culprit lesion[s]" in patients who suffered myocardial infarction and lesions in control patients, looking at "pretty much every anatomical[,] physiological features and morphological features." Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 32:12-32:27. Elucid explains that "[m]achine learning is foundational to making the software go" and

Elucid uses "algorithms that were trained by histology, using traditional image processing techniques to recognize different types of plaque based on histology." Ex. 64 (Transcript of Preventing Heart Attacks and Strokes with Todd Villines from Elucid, https://share.transistor.fm/s/751e78b2/transcript). Elucid's FFR-CT "uses machine learning. It integrates all of the plaque outputs . . . that is already included in [Elucid's] FDA-cleared software, and then using machine learning can predict across the entirety of the coronary arteries what the invasive FFR or fractional flow reserve would be." *Id.* In explaining its machine-learning process, Elucid's representative explained:

> [W]e use machine learning to take all of those outputs from our software and to integrate them across the entire coronary tree. These have been trained on thousands of invasive fractural flow reserve studies where we've taken patients who have gone to the cath lab. We have their fractional flow reserve, and in many cases, we have fractional flow reserve data for the entire pullback across the entire artery. We have their CT scanning and so we can, in a deterministic way, train an algorithm to recognize that relationship between plaque and fractional flow reserve in a very accurate way and trained and validate plaque plaque-based FFRCT model." *Id.* As to the model's training, Elucid's representative explained: "for FFRCT we realized that you know, we, from a machine learning perspective, the inputs to the model are our histology-based plaque outpost. In developing the plaque analysis software, we included the damage and these thousands of cross-sections, these are annotated by pathologists. And so, in you know, with the software that's been shown to be highly accurate against pathologists, we can take the output of our plaque model and then use those annotations as inputs into the machine learning FFRCT models. So, that's exactly what we do, is use those annotated, those plaque annotations from our FDA-cleared histology-based plaque analysis software as one of the key inputs. Now, we do this down the entire coronary artery and build a model that adds to that based on a host of other variables from the CT scan itself and potentially even from the patient themselves. . . . So, we have developed thousands of cases now across, using every different available CT scanning platform, across patients with no disease versus advanced calcified disease, and different degrees of stenosis across the entirety of the coronary tree, so looking at all the different segments of where you might find disease clinically. So, it's important to have all of that in your training data and of course, for validation, you know, it's really important that you go out and these are, you know, cases where you haven't seen them. They're firewalled, they're typically done in a multi-center study, where you ensure that you're testing your device on a patient population, you're most likely to see in clinical use where you have the variability in the scanner technology, disease severity, et cetera, to ensure that you have hit the mark. And so, that is something

that you know, we are currently in the late stages of our validation, multi-center study for our FFRCT software and those are all things that we have taken into account in designing the study.

*Id. See, e.g.*:




**Fig. 1.** Correlation matrix and heat map. Correlation matrix (left), and heat map (right) indicating relationships after unsupervised hierarchical clustering of plaque morphology measurements, by patient. Features are centered and scaled. *Y* denotes LOW-FFR (<0.80) and *N* stands for normal FFR (≥0.80). CALC, calcium; LRNC, lipid rich necrotic core; MATX, matrix; IPH, intra-plaque hemorrhage; CALCVolProp, CALC volume proportion; LRNCVol, LRNC volume; LNRCVolProp, LRNC volume proportion; MATXVol, MATX volume; MATXVolProp, MATX volume proportion; MaxCALCArea, maximum CALC area; MaxCALCAreaProp, maximum CALC area proportion; MaxDilationByArea, maximum dilation by area; MaxIPHArea, maximum IPH area; MaxLRNCArea, maximum LRNC area; MaxLRNCAreaProp, maximum LRNC area proportion; MaxMATXArea, maximum MATX area; MaxMATXAreaProp, maximum MATX area proportion; MaxPlaqueBurdenAreaRatio, maximum plaque burden area ratio; MaxRemodelingRatio, maximum remodeling ratio; MaxStenosisByArea, maximum degree of stenosis by area; MaxWallArea, maximum wall area; MaxWallThickness, maximum wall thickness; MaxWallToLumenAreaRatio, maximum wall to lumen area ratio; WallVol, wall volume.

Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 309.

**Table 1**
Plaque morphology feature summary statistics in original scale in the normal and low FFR groups.

| Feature | Training FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | P Value | Sequestered Test FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | P Value |
|---|---|---|---|---|---|---|
| CALC volume proportion | 0.06 | 0.07 | 0.324 | 0.04 | 0.08 | 0.093 |
| LRNC volume (mm$^3$) | 17.31 | 39.37 | <0.001 | 15.09 | 38.52 | 0.035 |
| LRNC volume proportion | 0.1 | 0.11 | 0.337 | 0.11 | 0.11 | 0.445 |
| MATX volume (mm$^3$) | 69.02 | 175.63 | <0.001 | 53.74 | 197.89 | <0.001 |
| MATX volume proportion | 0.61 | 0.58 | 0.167 | 0.62 | 0.58 | 0.206 |
| Maximum CALC area (mm$^2$) | 1.96 | 4.01 | 0.008 | 1.38 | 3.54 | 0.026 |
| Maximum CALC area proportion | 0.18 | 0.27 | 0.032 | 0.11 | 0.29 | 0.01 |
| Maximum dilation by area (mm$^2$) | 0.67 | 1.99 | <0.001 | 0.78 | 2.18 | 0.031 |
| Maximum IPH area (mm$^2$) | 1.61 | 3.26 | <0.001 | 1.17 | 3.13 | 0.017 |
| Maximum LRNC area (mm$^2$) | 2.55 | 4.23 | 0.005 | 2.23 | 4.29 | 0.039 |
| Maximum LRNC area proportion | 0.23 | 0.34 | 0.002 | 0.2 | 0.33 | 0.041 |
| Maximum MATX area (mm$^2$) | 6.61 | 10.36 | 0.002 | 5.87 | 11.71 | 0.001 |
| Maximum MATX area proportion | 0.86 | 0.87 | 0.373 | 0.85 | 0.87 | 0.733 |
| Maximum plaque burden area ratio | 0.76 | 0.86 | <0.001 | 0.76 | 0.83 | 0.096 |
| Maximum remodeling ratio | 1.65 | 2.92 | <0.001 | 1.61 | 3.12 | 0.014 |
| Maximum degree of stenosis by area (mm$^2$) | 0.43 | 0.6 | 0.004 | 0.29 | 0.49 | 0.019 |
| Maximum wall area (mm$^2$) | 10.91 | 18.29 | <0.001 | 9.64 | 19.78 | 0.003 |
| Maximum wall thickness (mm) | 1.94 | 2.58 | 0.001 | 1.74 | 2.32 | 0.036 |
| Maximum wall to lumen area ratio | 6.12 | 9.03 | <0.001 | 4.85 | 8.26 | 0.091 |
| Wall volume (mm$^3$) | 124.25 | 314.42 | <0.001 | 96.3 | 339.93 | <0.001 |

FFR, fractional flow reserve; CALC, calcium; LRNC, lipid reach necrotic core; MATX, matrix, IPH, intra-plaque hemorrhage.

*Id.* at 310.

# Quantify High-Risk Plaque

## The Only Non-Invasive Assessment Tool Capable of Identifying LRNC

For both its coronary and carotid applications, Elucid's Plaque-IQ is capable of identifying highly-vulnerable lipid-rich necrotic core (LRNC), a plaque type strongly linked with cardiovascular risk.[2,3] This offers direct insights into high-risk plaque features associated with heart attack and stroke, measuring true disease rather than directional proxies. By focusing on true disease biology rather than population-based risk estimates, this approach is designed to help physicians prioritize and personalize treatment for each individual patient.

Carotid Plaque-IQ can help physicians identify carotid plaques at risk for rupture and develop patient-specific treatment pathways to prevent and monitor against ischemic stroke. When used for both the coronary and carotid arteries, Plaque-IQ non-invasively delivers a quantitative and qualitative assessment of systemic atherosclerotic risk and enables the ability to perform both coronary and carotid plaque analysis in a single scan.




Ex. 74 (https://elucid.com/healthcare-professionals/#carotid).

194. At least Claim 1 also requires "generating, for the selected location of the patient's vascular system, a patient-specific numerical description of one or more factors that affect cardiac risk based on each of the individual-specific numerical descriptions." Upon information and belief, the Accused '303 Elucid Products apply the models trained on the individual-specific data described above to generate, for each lesion and segment of the patient's coronary arteries, numerical quantities of plaque components that affect cardiac risk. For example, Elucid's report lists, for each lesion, total plaque, non-calcified matrix (NCM), calcified plaque (CP), and LRNC volumes, together with percent stenosis and FFR values. Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-3. Elucid states that Plaque-IQ delivers "lesion-level plaque composition and quantification data beyond Hounsfield Unit Thresholds." Ex. 50 (https://elucid.com/healthcare-professionals/). Plaque-IQ "uses convolutional neural networks trained on carotid endarterectomy histopathologic images of atherosclerotic plaques that were co-registered to CTA images for establishing ground truth to classify individual plaque components." Ex. 75 (Basunia, Azfar, Dinesh Jagasia, and Faisal Jamal. "AI-Guided Coronary Plaque Analysis

from Coronary CTA: An Emerging Paradigm for Personalized Preventive Cardiology." *Applied Radiology*, vol. 55, no. 3, 2026, pp. 1–9. https://appliedradiologystorage.blob.core.windows.net/jats-development/10.37549-AR-D-25-0140/AR-D-25-0140.pdf) at 4.




| Segment | FFRct | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.98 | 55.3 | 2 | 53.3 | 0 | 25-49% |
| pLAD | 0.79 | 114.4 | 31.5 | 80.3 | 2.6 | 50-69% |
| mLAD | 0.79 | 5.2 | 1.2 | 4 | 0 | 25-49% |
| dLAD | 0.74 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.93 | 54.4 | 10 | 43.5 | 0.9 | 1-24% |
| dLCX | 0.92 | 0 | 0 | 0 | 0 | 0% |
| pRCA | 0.95 | 197.8 | 0.8 | 179.4 | 17.6 | 1-24% |
| mRCA | 0.93 | 78 | 0 | 71.9 | 6.1 | 1-24% |
| dRCA | 0.90 | 47.1 | 0 | 47.1 | 0 | 1-24% |

Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1.




*Id.* at 2.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:11.

195. At least Claim 1 also requires "predicting a cardiac risk of the patient based on (i) the determined coronary plaque vulnerability present at the location in the patient's vascular system and (ii) the patient-specific numerical description." Upon information and belief, the Accused '303 Elucid Products predict cardiac risk based on both. Elucid states that its LRNC identification "offers direct insights into high-risk plaque features associated with heart attack and

stroke," and that "this approach is designed to help physicians prioritize and personalize treatment for each individual patient." Ex. 50 (https://elucid.com/healthcare-professionals/). Elucid describes its platform as providing "From Lesion-Level Risk to Patient-Level Impact," and states that "High-Risk Plaque is the Strongest Predictor of Heart Attack and Stroke." Ex. 8 (https://elucid.com/). Elucid's report further provides a CAD-RADS classification incorporating plaque burden (*e.g.*, "4B / P4 / I+"). Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1.

## Quantify High-Risk Plaque

### The Only Non-Invasive Assessment Tool Capable of Identifying LRNC

For both its coronary and carotid applications, Elucid's Plaque-IQ is capable of identifying highly-vulnerable lipid-rich necrotic core (LRNC), a plaque type strongly linked with cardiovascular risk.[2,3] This offers direct insights into high-risk plaque features associated with heart attack and stroke, measuring true disease rather than directional proxies. By focusing on true disease biology rather than population-based risk estimates, this approach is designed to help physicians prioritize and personalize treatment for each individual patient.

Carotid Plaque-IQ can help physicians identify carotid plaques at risk for rupture and develop patient-specific treatment pathways to prevent and monitor against ischemic stroke. When used for both the coronary and carotid arteries, Plaque-IQ non-invasively delivers a quantitative and qualitative assessment of systemic atherosclerotic risk and enables the ability to perform both coronary and carotid plaque analysis in a single scan.




Ex. 74 (https://elucid.com/healthcare-professionals/#carotid).




| Segment | FFRct | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.98 | 55.3 | 2 | 53.3 | 0 | 25-49% |
| pLAD | 0.79 | 114.4 | 31.5 | 80.3 | 2.6 | 50-69% |
| mLAD | 0.79 | 5.2 | 1.2 | 4 | 0 | 25-49% |
| dLAD | 0.74 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.93 | 54.4 | 10 | 43.5 | 0.9 | 1-24% |
| dLCX | 0.92 | 0 | 0 | 0 | 0 | 0% |
| pRCA | 0.95 | 197.8 | 0.8 | 179.4 | 17.6 | 1-24% |
| mRCA | 0.93 | 78 | 0 | 71.9 | 6.1 | 1-24% |
| dRCA | 0.90 | 47.1 | 0 | 47.1 | 0 | 1-24% |

Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:11.

## Identifying Individual Cardiovascular Risk

Cardiovascular disease is the most common cause of death and disability globally, largely driven by heart attack (myocardial infarction, or MI) and ischemic stroke.[1] Despite advances in therapies, many high-risk patients remain undiagnosed until they experience serious cardiac events.

Moreover, WHO estimates 80 to 90% of heart attacks are preventable. At Elucid, we believe that current diagnostics miss key information on the type of plaque patients have in their arteries. While traditional clinical guidelines for coronary artery disease begin with identifying patient risk factors, such as age, diet, and lifestyle, the strongest predictor of heart attack is atherosclerosis, or coronary and carotid plaque buildup.

Ex. 77 (https://elucid.com/patients/)

196. The foregoing features and capabilities of each of the Accused ’303 Elucid Products, and Elucid’s description and/or demonstration thereof, including in advertising, reflect Elucid’s direct infringement by satisfying every element of at least Claims 1-20 of the ’303 Patent under 35 U.S.C. § 271(a).

197. Upon information and belief, Elucid has induced infringement, and continues to induce infringement, of one or more claims of the ’303 Patent, including at least Claims 1-20, by actively and knowingly inducing others, including healthcare providers and hospitals in the District

of Massachusetts and throughout the United States, to directly infringe one or more claims of the ’303 Patent through the use of Elucid’s products and services. For example, Elucid instructs hospital employees and physicians, including through its website, webinars, product demonstrations, events, instructional videos, and labeling and Instructions for Use, to use the Accused ’303 Elucid Products in an infringing manner. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/).

198. Upon information and belief, Elucid has contributed to the infringement of one or more claims of the ’303 Patent, including at least Claims 1-20, by providing products and services that constitute material parts of the claimed inventions, knowing the same to be especially made or adapted for use in an infringing manner. For example, the Accused ’303 Elucid Products include at least one histology-trained software component that characterizes plaque composition, identifies high-risk plaque such as LRNC at specific lesions, and quantifies plaque components for use in assessing cardiac risk. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention, and upon information and belief, is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Elucid is liable for infringement of the ’303 Patent pursuant to 35 U.S.C. § 271(c).

199. Upon information and belief, Elucid has been on notice of the ’303 Patent at least since its issuance, and Elucid’s infringement of the ’303 Patent has been and continues to be willful. For example, through its hiring of eleven Heartflow employees, including Windi Hary, a nearly thirteen-year Heartflow veteran who served on Heartflow’s leadership team and as a

fiduciary of the company, Elucid acquired actual knowledge of Heartflow's technology, patent portfolio, product development strategies, regulatory strategies, and commercial plans. Indeed, Ms. Hary is the primary correspondent on Elucid's FDA 510(k) submission for FFR-IQ, in which Elucid identified Heartflow's $FFR_{CT}$ product as the predicate device and compared its technological characteristics to Heartflow's $FFR_{CT}$. Ex. 6 (FDA 510(k) Clearance Letter and Summary, K262015 (Sept. 29, 2026)) at 5. Elucid also had actual or constructive knowledge of Heartflow's patents given Heartflow's pioneering role in the AI-powered cardiac CT analysis market since 2014, Heartflow's extensive patent portfolio of over 600 patents globally, Heartflow's status as a publicly traded company, and Elucid's direct competition with Heartflow in the same market. Despite this knowledge, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license.

200. By the time of trial, Elucid will thus have known and intended (since receiving such notice) that its continued actions would actively induce and contribute to actual infringement of one or more claims of the '303 Patent, including at least Claims 1-20.

201. Despite this actual knowledge of Heartflow's patents, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license of those patents.

202. Elucid undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '303 Patent, which has been duly issued by the USPTO and is presumed valid. For example, Elucid has been aware of an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '303 Patent based on the actual knowledge of its former Heartflow employees, Elucid's citation of the '303 Patent family in its own patents, and Heartflow's prominence in the field, and that the '303 Patent is valid. On information and belief, Elucid cannot reasonably, subjectively believe that its actions do not

constitute infringement of the ’303 Patent, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Elucid has continued its infringing activities. As such, Elucid willfully infringes the ’303 Patent.

203. Heartflow has been damaged by Elucid’s infringement of the ’303 Patent and is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284.

## COUNT IV – ELUCID’S INFRINGEMENT OF U.S. PATENT NO. 9,070,214

204. Heartflow incorporates all preceding paragraphs by reference.

205. U.S. Patent No. 9,070,214 (the “’214 Patent”) duly issued on June 30, 2015, and is entitled “Systems and methods for data and model-driven image reconstruction and enhancement.” A copy of the ’214 Patent is attached as Exhibit 16.

206. Heartflow is the owner by assignment of the ’214 Patent and possesses all rights under the ’214 Patent, including the exclusive right to recover for past and future infringement.

207. The ’214 Patent is directed to computer-implemented methods, systems, and computer-readable media for reconstructing and enhancing medical images using prior information derived from associations between anatomy and image regions. For example, the ’214 Patent discloses acquiring image information associated with a target anatomy; determining a collection of images associated with that anatomy; determining subdivisions of localized anatomy within each image; determining associations between image regions and respective subdivisions of the localized anatomy; and generating an image reconstruction and/or enhancement based on the image information and those associations. *See* ’214 Patent at Abstract, Claim 1. In certain embodiments, the method localizes anatomy within an image, subdivides it, and determines image

priors for regions of the image based on the associations, which are then used to reconstruct or enhance the image. *Id.* at Claim 2.

208. The ’214 Patent explains that, at the time of its priority date, common forms of medical imaging such as CT and MR relied on “reconstruction and image enhancement on raw acquired data in order to produce better images,” for example to “decrease noise in an image, smooth the effects of incomplete data, and/or optimize imaging.” ’214 Patent at 1:25-29. Prior information used for this purpose typically took “the form of assumptions about image smoothness or image patches from reference images.” *Id.* at 1:37-39. But using reference images merely as image patches meant that their use was “piecemeal and/or may apply only to regions of an image identified as problematic,” that “[e]valuation of whether reference images are suitable for use as image patches may be lacking,” and that portions of an image not flagged as problematic “may not have the opportunity to benefit from comparison to a reference image.” *Id.* at 1:51-59. Accordingly, “a need exist[ed] for systems and methods for reconstructing and enhancing images based on reference images and associated anatomical models.” *Id.* at 1:60-61.

209. The ’214 Patent solved these problems through “data and model-driven image reconstruction and enhancement using target anatomy reference images as more than image patches,” by “incorporating into image reconstruction and/or enhancement, associations between anatomical subdivisions and image regions available from reference images.” *Id.* at 3:42-50. In a training phase, the invention builds “a model of image regions associated with respective portions of the localized anatomy,” for example, associating a 3-D region of each cardiac CT image with each point along the centerlines of a coronary artery vessel tree model. *Id.* at 3:64-4:4, 9:63-10:15. In a production phase, the invention localizes coronary centerlines in the patient’s image, matches them to the trained models, determines “a local image prior for each centerline point,” and

performs reconstruction or enhancement "using the acquisition information and image priors." *Id.* at 11:27-12:10, Fig. 4A. Therefore, a computer-implemented method of producing higher-quality, anatomically informed medical images, including "cardiac CT images with improved image quality and interpretability," is achieved. *Id.* at 10:19-21.

210. Evidence that the '214 Patent is valid and is directed to novel and inventive technology is discussed above in at least paragraphs 20-29 and 111-121 and incorporated by reference. Further, the '214 Patent has been recognized as a foundational patent as shown by the fact that it has been cited in at least 50 additional patents.

211. Upon information and belief, Elucid has directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '214 Patent, including at least Claims 2, 4, 5, 7, and 8 (that include the limitations of Claim 1 via dependency), by making, using, testing, offering to sell, and/or selling in the United States products and services that practice the inventions claimed therein, including, but not limited to, Elucid's Plaque-IQ™ software, including its image-restoration algorithms, CT Virtual Histology™ processing, and viewer, alone or in combination with Elucid FFR-IQ ("the Accused '214 Elucid Products"). For example, Elucid states that, after physicians send patient images, "Elucid applies PlaqueIQ's image-restoration algorithms to the file to mitigate motion and calcium blooming artifacts," after which "[s]pecially trained analysts segment the data creating a three-dimensional model of the patient's coronary arteries" and "[t]he software then identifies, classifies, and quantifies tissue structure and composition." Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance).

212. Heartflow reserves the right to discover and pursue any additional infringing products and services that incorporate infringing functionalities. For the avoidance of doubt, the Accused '214 Elucid Products are identified to describe Elucid's infringement and in no way limit the discovery and infringement allegations against Elucid concerning other products that incorporate the same or reasonably similar functionalities.

213. Upon information and belief, Elucid directly infringes by performing one or more of the claims in the United States when, for example, processing patient CCTA data as a service, performing testing and validation studies, generating tutorial videos for training purposes, training hospital employees, conducting webinars, conducting demos at events, and/or producing instructional videos showing how the Accused '214 Elucid Products operate. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/). For example, Elucid states that "[p]hysicians send patient images to Elucid with a single mouse click," after which Elucid applies its image-restoration algorithms and analysts "segment the data to create a 3D model of the patient's coronary arteries." Ex. 55 (FDA approves Elucid's PlaqueIQ software for CVD assessment, https://www.medicaldevice-developments.com/news/fda-approves-elucids-plaqueiq-software-for-cvd-assessment/); Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance).

214. Each of the Accused '214 Elucid Products, either alone or in combination with each other, performs a computer-implemented method of image reconstruction and enhancement. Elucid states that its software applies "AI-based image-restoration algorithms to mitigate motion

and calcium blooming artefacts to create an interactive image to help physicians virtually 'see' plaque at the vessel level." Ex. 78 (Elucid scoops FDA approval for AI cardiovascular risk diagnostic, https://www.medicaldevice-network.com/news/elucid-scoops-fda-approval-for-ai-cardiovascular-risk-diagnostic/). Elucid's "software corrects the HU values for the partial volume effect, often experienced as blooming artifacts from calcified plaque and enhanced arterial lumen, as well as reduced ability to discriminate LRNC plaque. The software then runs proprietary, histology-validated plaque characterization algorithms to categorize and quantify plaque." Ex. 79 (The Depths of the Heart: Advances in Heart Imaging, https://www.radiologytoday.net/the-depths-of-the-heart/).

215. At least Claim 2, which depends from Claim 1 and includes the limitations of Claim 1, requires "acquiring image information associated with a target anatomy." Upon information and belief, the Accused '214 Elucid Products acquire CCTA image information of a patient's coronary arteries. Plaque-IQ "utilizes first-line diagnostic coronary CT angiography," and "[p]hysicians send patient images to Elucid with a single mouse click." Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). Elucid's report identifies the acquired CCTA series and its acquisition parameters (*e.g.*, "CCTA, 79%, AF2 Medium, DLIR, CardiacCTA"). Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 5. "Elucid PlaqueIQ is an image analysis software that is used to process, review, and analyze CT images," such as for "the non-invasive evaluation and assessment of plaque quantification and morphology (e.g., atherosclerosis) from previously acquired CT angiography." Ex. 57 (K241524 510(k) Summary, https://www.accessdata.fda.gov/cdrh_docs/pdf24/K241524.pdf) at 4, 6. "Elucid analyzes a CT scan by applying machine learning to determine plaque type and quantity as though you were

looking at excised patient tissue under microscope, providing information not discernable from a standard CT scan.” Ex. 58 (Elucid - Delivering Personalized Patient Care, https://medhealthoutlook.com/elucid/).




Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 12:49.



Ex. 59 (Webinar | Advanced Plaque Analysis and Next-generation FFRCT: A Case-Based Discussion, https://www.youtube.com/watch?v=jUOwOOx-0aI) at 17:38.




Ex. 60 (Elucid at SCCT 2024: Precision Cardiovascular Pathways with Histology-based Plaque Quantitation, https://www.youtube.com/watch?v=XGVvOo0kWzc) at 17:29.

216. At least Claim 2 also requires "determining a collection of images associated with the target anatomy." Upon information and belief, the Accused '214 Elucid Products determine a collection of images associated with the patient's coronary arteries, including the CCTA image volume and the series of cross-sectional images generated along each vessel. Elucid's software takes measurements "at all cross sections, spaced at 0.5 mm," along each vessel. Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 308. The Elucid viewer further presents the coronary images as straightened and curved multiplanar reformations and 3D views. Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and

a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:13-25:11.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:05 (showing 3D, straightened, curved multiplanar, and cross-sectional views of a given artery location).




Ex. 74 (https://elucid.com/healthcare-professionals/#carotid).

217. At least Claim 2 also requires "determining a subdivision of localized anatomy of the target anatomy, within each of the images." Upon information and belief, the Accused '214 Elucid Products determine subdivisions of the localized coronary anatomy within each image, including lumen and vessel wall boundaries, vessel centerlines, named coronary segments, cross-

sections, and lesions, as well as sample or reformat received image data into slices and cross-sections along the vessel. Elucid "segment[s] the data creating a three-dimensional model of the patient's coronary arteries." Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). Elucid-authored research confirms that "CCTA datasets underwent lumen and vessel wall segmentation" and that features were "sampled along the vessel centerline." Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48. Elsevier, https://doi.org/10.1016/j.jcct.2026.05.120) at S47. Elucid's report breaks the coronary tree into segments such as the LM, LAD, LCX, and RCA and their branches. Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-5.




| Segment | FFRct | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.98 | 55.3 | 2 | 53.3 | 0 | 25-49% |
| pLAD | 0.79 | 114.4 | 31.5 | 80.3 | 2.6 | 50-69% |
| mLAD | 0.79 | 5.2 | 1.2 | 4 | 0 | 25-49% |
| dLAD | 0.74 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.93 | 54.4 | 10 | 43.5 | 0.9 | 1-24% |
| dLCX | 0.92 | 0 | 0 | 0 | 0 | 0% |
| pRCA | 0.95 | 197.8 | 0.8 | 179.4 | 17.6 | 1-24% |
| mRCA | 0.93 | 78 | 0 | 71.9 | 6.1 | 1-24% |
| dRCA | 0.90 | 47.1 | 0 | 47.1 | 0 | 1-24% |

*Id.* at 1.

## Left Main + Left Anterior Descending






| Total Plaque | NCM | CP | LRNC |
|---|---|---|---|
| 184.9 mm3 | 147.6 mm3<br>80% | 34.7 mm3<br>19% | 2.6 mm3<br>1% |

**50-69%** Highest Degree of Stenosis pLAD

**0.70** Lowest FFR D1

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|
| LM-1 | 50-69% | -- | -- | -- | 229.8 | 181.5 | 44.8 | 3.5 |
| D1 | 25-49% | 0.99 | 0.94 | -0.05 | 112.5 | 104.0 | 5.9 | 2.6 |
| LAD | 50-69% | 0.99 | 0.79 | -0.20 | 175.1 | 137.7 | 34.8 | 2.6 |
| D1-1 | 50-69% | 0.94 | 0.70 | -0.24 | 9.5 | 9.5 | 0.0 | 0.0 |




*Id.* at 2.

## Left Circumflex






| Total Plaque | NCM | CP | LRNC |
|---|---|---|---|
| 97.3 mm3 | 74.3 mm3<br>76% | 10.0 mm3<br>10% | 13.0 mm3<br>14% |

**50-69%** Highest Degree of Stenosis OM1

**0.73** Lowest FFR OM1

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|
| LM-1 | 50-69% | -- | -- | -- | 229.8 | 181.5 | 44.8 | 3.5 |
| LCX | 25-49% | 0.99 | 0.96 | -0.03 | 109.7 | 96.7 | 12.1 | 0.9 |
| OM1-1 | 50-69% | 0.95 | 0.74 | -0.21 | 43.0 | 30.9 | 0.0 | 12.1 |



*Id.* at 3.




*Id.* at 4.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:05.

218. At least Claim 2 also requires "determining, using a processor, one or more associations between an image region of one of the images and a respective subdivision of localized anatomy of the one of the images." Upon information and belief, the Accused '214 Elucid Products associate image regions (*e.g.*, voxels within the segmented vessel wall at each cross-section) with respective subdivisions of the localized anatomy (*e.g.*, the vessel wall, centerline location, segment, and lesion). Plaque-IQ "uses convolutional neural networks trained on carotid endarterectomy histopathologic images of atherosclerotic plaques that were co-registered to CTA images," and "uses spatial distribution of tissue properties instead of fixed HU ranges to interpret adjacent voxels." Ex. 75 (Basunia, Azfar, Dinesh Jagasia, and Faisal Jamal. "AI-Guided Coronary Plaque Analysis from Coronary CTA: An Emerging Paradigm for Personalized Preventive Cardiology." *Applied Radiology*, vol. 55, no. 3, 2026, pp. 1–9. https://appliedradiologystorage.blob.core.windows.net/jats-development/10.37549-AR-D-25-0140/AR-D-25-0140.pdf) at 4. Elucid's software likewise classifies plaque voxels within the segmented wall into tissue classes such as lipid-rich necrotic core, intraplaque hemorrhage, calcification, and matrix. Ex. 80 (Sakai, Yu, et al. "Explainable Machine-Learning Model to Classify Culprit Calcified Carotid Plaque in Embolic Stroke of Undetermined Source." *Journal of Neuroimaging*, vol. 36, no. 1, 2026, article e70119. *PubMed Central*, https://pmc.ncbi.nlm.nih.gov/articles/PMC12825938/) at 2-3.

219. At least Claim 2 also requires "generating an image reconstruction, an image enhancement, or a combination thereof for the target anatomy, based on the image information and the one or more determined associations." Upon information and belief, the Accused '214 Elucid Products generate an image enhancement and/or reconstruction of the patient's coronary arteries based on the CCTA image information and the determined associations. Elucid "applies

PlaqueIQ's image-restoration algorithms to the file to mitigate motion and calcium blooming artifacts." Ex. 56 (Elucid's PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). The Elucid viewer displays the restored image with the lumen, wall, and plaque composition overlaid, "the red is a necrotic cor[e], the yellow is a fibrous and the blue is a calcified plaque." Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:39.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:05.




Ex. 74 (https://elucid.com/healthcare-professionals/#carotid)

## FFR-IQ™

**Remove the blindfold: Integrating plaque biology and plaque-based physiology for smart clinical decisions**

Traditional computational approaches to CT-derived FFR model physiology primarily from anatomical geometry. Elucid's BioIntegrated approach is based on a different premise: coronary arteries are living vessels, not rigid pipes.

FFR-IQ goes beyond the physical properties of the vessel and the lesion to include biological and morphological properties as well. The performance of the vessel during maximum hyperemia is dependent upon plaque composition, making highly accurate plaque and FFR-CT both necessary for patient treatment decisions. Elucid's is the first non-invasive FFR-CT analysis solution to take this into consideration, offering concordance between plaque data and FFR-CT data.

Ex. 74 (https://elucid.com/healthcare-professionals/#carotid).

220. At least Claim 2 also requires "localizing anatomy within an image associated with the image information." Upon information and belief, the Accused '214 Elucid Products localize the coronary arteries within the patient's CCTA image, including by extracting vessel centerlines and lumen and outer wall boundaries. Elucid "segment[s] the data creating a three-dimensional model of the patient's coronary arteries." Ex. 56 (Elucid's PlaqueIQ Image Analysis Software

Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). Elucid-authored research confirms that “CCTA datasets underwent lumen and vessel wall segmentation” and that features were “sampled along the vessel centerline.” Ex. 68 (Kolossváry, M., et al. “Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences.” *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48. Elsevier, https://doi.org/10.1016/j.jcct.2026.05.120) at S47. Elucid’s report breaks the coronary tree into segments such as the LM, LAD, LCX, and RCA and their branches. Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-5.

## Patient Overview

**Dominance:** Right Dominant

CADRADS
**4B / P4 / I+**

Total Plaque
**623.5** mm³

| LRNC | NCM | CP |
|---|---|---|
| 39.3 | 538.7 | 45.5 |

**High Stenosis:** 50-69%
pLAD D1 OM1

**Segments with FFRct ≤ 0.8**
D1 OM1 dLAD mLAD pLAD







| Segment | FFRct | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.98 | 55.3 | 2 | 53.3 | 0 | 25-49% |
| pLAD | 0.79 | 114.4 | 31.5 | 80.3 | 2.6 | 50-69% |
| mLAD | 0.79 | 5.2 | 1.2 | 4 | 0 | 25-49% |
| dLAD | 0.74 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.93 | 54.4 | 10 | 43.5 | 0.9 | 1-24% |
| dLCX | 0.92 | 0 | 0 | 0 | 0 | 0% |
| pRCA | 0.95 | 197.8 | 0.8 | 179.4 | 17.6 | 1-24% |
| mRCA | 0.93 | 78 | 0 | 71.9 | 6.1 | 1-24% |
| dRCA | 0.90 | 47.1 | 0 | 47.1 | 0 | 1-24% |

*Id.* at 1.

## Left Main + Left Anterior Descending




Total Plaque 184.9 mm3

NCM 147.6 mm3 80%

CP 34.7 mm3 19%

LRNC 2.6 mm3 1%

**50-69%** Highest Degree of Stenosis pLAD

**0.70** Lowest FFR D1

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|
| LM-1 | 50-69% | -- | -- | -- | 229.8 | 181.5 | 44.8 | 3.5 |
| D1 | 25-49% | 0.99 | 0.94 | -0.05 | 112.5 | 104.0 | 5.9 | 2.6 |
| LAD | 50-69% | 0.99 | 0.79 | -0.20 | 175.1 | 137.7 | 34.8 | 2.6 |
| D1-1 | 50-69% | 0.94 | 0.70 | -0.24 | 9.5 | 9.5 | 0.0 | 0.0 |




*Id.* at 2.

## Left Circumflex




Total Plaque 97.3 mm3

NCM 74.3 mm3 76%

CP 10.0 mm3 10%

LRNC 13.0 mm3 14%

**50-69%** Highest Degree of Stenosis OM1

**0.73** Lowest FFR OM1

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|
| LM-1 | 50-69% | -- | -- | -- | 229.8 | 181.5 | 44.8 | 3.5 |
| LCX | 25-49% | 0.99 | 0.96 | -0.03 | 109.7 | 96.7 | 12.1 | 0.9 |
| OM1-1 | 50-69% | 0.95 | 0.74 | -0.21 | 43.0 | 30.9 | 0.0 | 12.1 |



*Id.* at 3.




*Id.* at 4.

221. At least Claim 2 also requires "generating one or more subdivisions in the localized anatomy." Upon information and belief, the Accused '214 Elucid Products generate subdivisions in the localized coronary anatomy, including the lumen and vessel wall, named coronary segments and branches, cross-sections spaced at 0.5 mm along each centerline, and user-selected lesions. At least Claim 2 also requires "determining a collection of images associated with the target anatomy." Upon information and belief, the Accused '214 Elucid Products determine a collection of images associated with the patient's coronary arteries, including the CCTA image volume and the series of cross-sectional images generated along each vessel. Elucid's software takes measurements "at all cross sections, spaced at 0.5 mm," along each vessel. Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography

Effectively Estimates Fractional Flow Reserve.” *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 308; Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1-5. The Elucid viewer further presents the coronary images as straightened and curved multiplanar reformations and 3D views. Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:13-25:11.




| Segment | FFRct | Total Plaque | CP | NCM | LRNC | Stenosis |
|---|---|---|---|---|---|---|
| LM | 0.98 | 55.3 | 2 | 53.3 | 0 | 25-49% |
| pLAD | 0.79 | 114.4 | 31.5 | 80.3 | 2.6 | 50-69% |
| mLAD | 0.79 | 5.2 | 1.2 | 4 | 0 | 25-49% |
| dLAD | 0.74 | 0 | 0 | 0 | 0 | 0% |
| pLCX | 0.93 | 54.4 | 10 | 43.5 | 0.9 | 1-24% |
| dLCX | 0.92 | 0 | 0 | 0 | 0 | 0% |
| pRCA | 0.95 | 197.8 | 0.8 | 179.4 | 17.6 | 1-24% |
| mRCA | 0.93 | 78 | 0 | 71.9 | 6.1 | 1-24% |
| dRCA | 0.90 | 47.1 | 0 | 47.1 | 0 | 1-24% |

Ex. 54 (Elucid Plaque-IQ™ and FFR-IQ™ Analysis Report) at 1.



Left Main + Left Anterior Descending



Total Plaque 184.9 mm3

NCM 147.6 mm3 80%

CP 34.7 mm3 19%

LRNC 2.6 mm3 1%

50-69% Highest Degree of Stenosis pLAD

0.70 Lowest FFR D1

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|
| LM-1 | 50-69% | -- | -- | -- | 229.8 | 181.5 | 44.8 | 3.5 |
| D1 | 25-49% | 0.99 | 0.94 | -0.05 | 112.5 | 104.0 | 5.9 | 2.6 |
| LAD | 50-69% | 0.99 | 0.79 | -0.20 | 175.1 | 137.7 | 34.8 | 2.6 |
| D1-1 | 50-69% | 0.94 | 0.70 | -0.24 | 9.5 | 9.5 | 0.0 | 0.0 |



*Id.* at 2.

## Left Circumflex




| Total Plaque | NCM | CP | LRNC |
|---|---|---|---|
| 97.3 mm3 | 74.3 mm3 76% | 10.0 mm3 10% | 13.0 mm3 14% |

**50-69%** Highest Degree of Stenosis OM1

**0.73** Lowest FFR OM1

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|
| LM-1 | 50-69% | -- | -- | -- | 229.8 | 181.5 | 44.8 | 3.5 |
| LCX | 25-49% | 0.99 | 0.96 | -0.03 | 109.7 | 96.7 | 12.1 | 0.9 |
| OM1-1 | 50-69% | 0.95 | 0.74 | -0.21 | 43.0 | 30.9 | 0.0 | 12.1 |




*Id.* at 3.

## Right Coronary Artery



| Total Plaque | NCM | CP | LRNC |
|---|---|---|---|
| 341.3 mm3 | 316.8 mm3 93% | 0.8 mm3 0% | 23.7 mm3 7% |

**1-24%** Highest Degree of Stenosis dRCA

**0.85** Lowest FFR R-PLB

| Lesion | % Stenosis | PFFR | DFFR | ΔFFR | Plaque | NCM | CP | LRNC |
|---|---|---|---|---|---|---|---|---|

No lesions over 50% stenosis detected.



*Id.* at 4.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:05 (showing 3D, straightened, curved multiplanar, and cross-sectional views of a given artery location).

222. At least Claim 2 also requires "determining one or more image priors associated with one or more regions of the image, wherein the one or more image priors are based on the one or more determined associations." Upon information and belief, the Accused '214 Elucid Products determine image priors associated with regions of the patient's CCTA image that are based on the determined associations between image regions and subdivisions of the localized anatomy. The '214 Patent describes image priors as "prior information about a target reconstructed/enhanced image," including "associations between reference image regions and parts of the target anatomy," which may be drawn from "images of the anatomical part of other patients." '214 Patent at 1:34-37, 3:51-57.

223. As one example, the image priors include image regions from other images used in Elucid's analysis and training. Plaque-IQ's neural networks were "trained on carotid endarterectomy histopathologic images of atherosclerotic plaques that were co-registered to CTA

images for establishing ground truth." Ex. 75 (Basunia, Azfar, Dinesh Jagasia, and Faisal Jamal. "AI-Guided Coronary Plaque Analysis from Coronary CTA: An Emerging Paradigm for Personalized Preventive Cardiology." *Applied Radiology*, vol. 55, no. 3, 2026, pp. 1–9. https://appliedradiologystorage.blob.core.windows.net/jats-development/10.37549-AR-D-25-0140/AR-D-25-0140.pdf) at 4. Elucid's plaque-based model was further developed using CCTA datasets from "935 patients from seven institutions," each of which "underwent lumen and vessel wall segmentation followed by histology-based plaque characterization (Plaque-IQ™)," with features "sampled along the vessel centerline." Ex. 68 (Kolossváry, M., et al. "Plaque-Based Fractional Flow Reserve Estimation on Coronary CT Images: Initial Experiences." *Journal of Cardiovascular Computed Tomography*, vol. 20, no. 4, 2026, pp. S47-S48. Elsevier, https://doi.org/10.1016/j.jcct.2026.05.120) at S47. Elucid states that its technology is "validated against tens of thousands of tissue samples." Ex. 76 (Elucid's Next-Generation Plaque Analysis and FFRCT Technology to be Featured on 2022 AHA Scientific Sessions Program, https://elucid.com/elucids-next-generation-plaque-analysis-and-ffrct-technology-to-be-featured-on-2022-aha-scientific-sessions-program/). Upon information and belief, the image regions of these reference images, as associated with the corresponding vessel wall, lumen, and centerline locations, are applied as prior information to corresponding regions of the patient's image.

224. As another example, the image priors include vessel and plaque shape definitions associated with regions of the image. In Plaque-IQ, "[k]ey plaque characteristics such as LRNC, stenosis, remodeling ratio, dilation, and ulceration are identified using semantic segmentation." Ex. 75 (Basunia, Azfar, Dinesh Jagasia, and Faisal Jamal. "AI-Guided Coronary Plaque Analysis from Coronary CTA: An Emerging Paradigm for Personalized Preventive Cardiology." *Applied Radiology*, vol. 55, no. 3, 2026, pp. 1–9.

https://appliedradiologystorage.blob.core.windows.net/jats-development/10.37549-AR-D-25-0140/AR-D-25-0140.pdf) at 4. Elucid's software also defines vessel and plaque shape relative to a disease-free reference—for example, remodeling ratio, wall thickness, wall-to-lumen ratio, and "MaxDilationByArea"—measured "at all cross sections, spaced at 0.5 mm." Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 308-10. Upon information and belief, these shape definitions are associated with regions of the image (*e.g.*, each cross-section along the centerline) and are based on the associations between image regions and subdivisions of the localized vessel anatomy.




**Fig. 1.** Correlation matrix and heat map. Correlation matrix (left), and heat map (right) indicating relationships after unsupervised hierarchical clustering of plaque morphology measurements, by patient. Features are centered and scaled. Y denotes LOW-FFR (<0.80) and N stands for normal FFR (≥0.80). CALC, calcium; LRNC, lipid rich necrotic core; MATX, matrix; IPH, intra-plaque hemorrhage; CALCVolProp, CALC volume proportion; LRNCVol, LRNC volume; LNRCVolProp, LRNC volume proportion; MATXVol, MATX volume; MATXVolProp, MATX volume proportion; MaxCALCArea, maximum CALC area; MaxCALCAreaProp, maximum CALC area proportion; MaxDilationByArea, maximum dilation by area; MaxIPHArea, maximum IPH area; MaxLRNCArea, maximum LRNC area; MaxLRNCAreaProp, maximum LRNC area proportion; MaxMATXArea, maximum MATX area; MaxMATXAreaProp, maximum MATX area proportion; MaxPlaqueBurdenAreaRatio, maximum plaque burden area ratio; MaxRemodelingRatio, maximum remodeling ratio; MaxStenosisByArea, maximum degree of stenosis by area; MaxWallArea, maximum wall area; MaxWallThickness, maximum wall thickness; MaxWallToLumenAreaRatio, maximum wall to lumen area ratio; WallVol, wall volume.

Ex. 69 (Varga-Szemes, Ákos, et al. "Coronary Plaque Assessment of Vasodilative Capacity by CT Angiography Effectively Estimates Fractional Flow Reserve." *International Journal of*

*Cardiology*, vol. 331, 2021, pp. 307–315. Elsevier, https://doi.org/10.1016/j.ijcard.2021.01.040) at 309.

**Table 1**
Plaque morphology feature summary statistics in original scale in the normal and low FFR groups.

| Feature | Training FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value | Sequestered Test FFR ≥ 0.8 (n = 42) | FFR < 0.8 (n = 39) | *P* Value |
|---|---|---|---|---|---|---|
| CALC volume proportion | 0.06 | 0.07 | 0.324 | 0.04 | 0.08 | 0.093 |
| LRNC volume ($mm^3$) | 17.31 | 39.37 | <0.001 | 15.09 | 38.52 | 0.035 |
| LRNC volume proportion | 0.1 | 0.11 | 0.337 | 0.11 | 0.11 | 0.445 |
| MATX volume ($mm^3$) | 69.02 | 175.63 | <0.001 | 53.74 | 197.89 | <0.001 |
| MATX volume proportion | 0.61 | 0.58 | 0.167 | 0.62 | 0.58 | 0.206 |
| Maximum CALC area ($mm^2$) | 1.96 | 4.01 | 0.008 | 1.38 | 3.54 | 0.026 |
| Maximum CALC area proportion | 0.18 | 0.27 | 0.032 | 0.11 | 0.29 | 0.01 |
| Maximum dilation by area ($mm^2$) | 0.67 | 1.99 | <0.001 | 0.78 | 2.18 | 0.031 |
| Maximum IPH area ($mm^2$) | 1.61 | 3.26 | <0.001 | 1.17 | 3.13 | 0.017 |
| Maximum LRNC area ($mm^2$) | 2.55 | 4.23 | 0.005 | 2.23 | 4.29 | 0.039 |
| Maximum LRNC area proportion | 0.23 | 0.34 | 0.002 | 0.2 | 0.33 | 0.041 |
| Maximum MATX area ($mm^2$) | 6.61 | 10.36 | 0.002 | 5.87 | 11.71 | 0.001 |
| Maximum MATX area proportion | 0.86 | 0.87 | 0.373 | 0.85 | 0.87 | 0.733 |
| Maximum plaque burden area ratio | 0.76 | 0.86 | <0.001 | 0.76 | 0.83 | 0.096 |
| Maximum remodeling ratio | 1.65 | 2.92 | <0.001 | 1.61 | 3.12 | 0.014 |
| Maximum degree of stenosis by area ($mm^2$) | 0.43 | 0.6 | 0.004 | 0.29 | 0.49 | 0.019 |
| Maximum wall area ($mm^2$) | 10.91 | 18.29 | <0.001 | 9.64 | 19.78 | 0.003 |
| Maximum wall thickness (mm) | 1.94 | 2.58 | 0.001 | 1.74 | 2.32 | 0.036 |
| Maximum wall to lumen area ratio | 6.12 | 9.03 | <0.001 | 4.85 | 8.26 | 0.091 |
| Wall volume ($mm^3$) | 124.25 | 314.42 | <0.001 | 96.3 | 339.93 | <0.001 |

FFR, fractional flow reserve; CALC, calcium; LRNC, lipid reach necrotic core; MATX, matrix, IPH, intra-plaque hemorrhage.

*Id.* at 310.

225. As another example, the image priors include plaque tissue definitions learned from histology image analysis. Because "CCTA voxel Hounsfield values can overlap between different histopathologic tissue types such as lipid-rich necrotic core (LRNC), intraplaque hemorrhage, and other components," Plaque-IQ "uses spatial distribution of tissue properties instead of fixed HU ranges to interpret adjacent voxels," based on networks trained on histopathologic images co-registered to CTA. Ex. 75 (Basunia, Azfar, Dinesh Jagasia, and Faisal Jamal. "AI-Guided Coronary Plaque Analysis from Coronary CTA: An Emerging Paradigm for Personalized Preventive Cardiology." *Applied Radiology*, vol. 55, no. 3, 2026, pp. 1–9. https://appliedradiologystorage.blob.core.windows.net/jats-development/10.37549-AR-D-25-0140/AR-D-25-0140.pdf) at 4. As a presenter in an Elucid-sponsored webinar explained, Elucid "started [] its journey by looking into [histology] samples . . . with [co-registration] of CT scans to develop an algorithm that looks [] not just at the Houndsville unit but incorporate[s] that learning

from [histology].” Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 59:14-59:30. Upon information and belief, these histology-derived tissue definitions are prior information about the expected appearance of each tissue type within regions of the vessel wall, and they are based on associations between image regions (CTA voxels) and the corresponding subdivisions of the localized anatomy (histologically labeled regions of the vessel wall).

226. At least Claim 2 also requires “wherein the image reconstruction, the image enhancement, or a combination thereof is based on the one or more image priors.” Upon information and belief, the Accused ’214 Elucid Products generate the restored and enhanced coronary images, and the 3D color-coded reconstruction of the coronary arteries, based on these image priors. Elucid describes its process as “non-invasive CT virtual histology” that applies “AI-based image-restoration algorithms to mitigate motion and calcium blooming artefacts” so that the software “mimics tissue-level analysis without the need for a biopsy.” Ex. 81 (Elucid launches AI software for arterial plaque measurement, https://www.medicaldevice-network.com/news/elucid-launches-ai-software-for-arterial-plaque-measurement/). Elucid “applies PlaqueIQ’s image-restoration algorithms to the file to mitigate motion and calcium blooming artifacts.” Ex. 56 (Elucid’s PlaqueIQ Image Analysis Software Receives FDA Clearance, https://citoday.com/news/elucids-plaqueiq-image-analysis-software-receives-fda-clearance). The Elucid viewer displays the restored image with the lumen, wall, and plaque composition overlaid, “the red is a necrotic cor[e], the yellow is a fibrous and the blue is a calcified plaque.” Ex. 61 (Transcript of Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform, https://www.youtube.com/watch?v=YyS0DX6e3eA) at 24:39.




Ex. 65 (https://elucid.com/wp-content/uploads/2026/09/Plauqe-IQ.mp4) at 0:05.

227. The foregoing features and capabilities of each of the Accused ’214 Elucid Products, and Elucid’s description and/or demonstration thereof, including in advertising, reflect Elucid’s direct infringement by satisfying every element of at least Claims 1 and 2 of the ’214 Patent under 35 U.S.C. § 271(a).

228. Upon information and belief, Elucid has induced infringement, and continues to induce infringement, of one or more claims of the ’214 Patent, including at least Claims 1 and 2, by actively and knowingly inducing others, including healthcare providers and hospitals in the District of Massachusetts and throughout the United States, to directly infringe one or more claims of the ’214 Patent through the use of Elucid’s products and services. For example, Elucid instructs hospital employees and physicians, including through its website, webinars, product demonstrations, events, instructional videos, and labeling and Instructions for Use, to use the Accused ’214 Elucid Products in an infringing manner. Ex. 51 (Webinar | CCTA 3.0: From Plaque Analysis to FFR-CT and a comprehensive clinical platform,

https://www.youtube.com/watch?v=YyS0DX6e3eA); Ex. 52 (https://www.youtube.com/@elucidbioimaging); Ex. 53 (https://elucid.com/contact/).

229. Upon information and belief, Elucid has contributed to the infringement of one or more claims of the ’214 Patent, including at least Claims 1 and 2, by providing products and services that constitute material parts of the claimed inventions, knowing the same to be especially made or adapted for use in an infringing manner. For example, the Accused ’214 Elucid Products include at least one image-restoration software component that localizes and subdivides the coronary anatomy, applies histology-derived priors to regions of the CCTA image, and mitigates motion, blooming, and blur artifacts to produce enhanced coronary images. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention, and upon information and belief, is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Elucid is liable for infringement of the ’214 Patent pursuant to 35 U.S.C. § 271(c).

230. Upon information and belief, Elucid has been on notice of the ’214 Patent at least since its issuance, and Elucid’s infringement of the ’214 Patent has been and continues to be willful. For example, through its hiring of eleven Heartflow employees, including Windi Hary, a nearly thirteen-year Heartflow veteran who served on Heartflow’s leadership team and as a fiduciary of the company, Elucid acquired actual knowledge of Heartflow’s technology, patent portfolio, product development strategies, regulatory strategies, and commercial plans. Indeed, Ms. Hary is the primary correspondent on Elucid’s FDA 510(k) submission for FFR-IQ, in which Elucid identified Heartflow’s $FFR_{CT}$ product as the predicate device and compared its technological characteristics to Heartflow’s $FFR_{CT}$. Ex. 6 (FDA 510(k) Clearance Letter and

Summary, K262015 (Sept. 29, 2026)) at 5. Elucid also had actual or constructive knowledge of Heartflow's patents given Heartflow's pioneering role in the AI-powered cardiac CT analysis market since 2014, Heartflow's extensive patent portfolio of over 600 patents globally, Heartflow's status as a publicly traded company, and Elucid's direct competition with Heartflow in the same market. Despite this knowledge, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license.

231. By the time of trial, Elucid will thus have known and intended (since receiving such notice) that its continued actions would actively induce and contribute to actual infringement of one or more claims of the '214 Patent, including at least Claim 1 and 2.

232. Despite this actual knowledge of Heartflow's patents, Elucid deliberately chose to develop and commercialize infringing products rather than seek a license of those patents.

233. Elucid undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '214 Patent, which has been duly issued by the USPTO and is presumed valid. For example, Elucid has been aware of an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '214 Patent based on the actual knowledge of its former Heartflow employees, Elucid's citation of the '214 Patent family in its own patents, and Heartflow's prominence in the field, and that the '214 Patent is valid. On information and belief, Elucid cannot reasonably, subjectively believe that its actions do not constitute infringement of the '214 Patent, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Elucid has continued its infringing activities. As such, Elucid willfully infringes the '214 Patent.

234. Heartflow has been damaged by Elucid's infringement of the '214 Patent and is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284.

**COUNT V – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *et seq.***

235. Heartflow incorporates by reference all preceding paragraphs as if fully set forth herein.

236. This is a cause of action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), based upon Elucid's wrongful and improper acquisition, use, and disclosure of Heartflow's confidential and proprietary trade secret information. Heartflow's trade secrets relate to products and services used in, and intended for use in, interstate commerce, including Heartflow's $FFR_{CT}$ Analysis, which is sold to hospitals throughout the United States.

**A. Heartflow's Trade Secrets**

237. Heartflow's trade secrets at issue in this Count include, but are not limited to, the Regulatory Information and Commercial Information described in Section E above, together with combinations and compilations of that information (the "Trade Secrets"). Without limiting the foregoing, the Trade Secrets include, but are not limited to, the following, including documents that Heartflow treated as confidential and that a former Heartflow employee now or formerly at Elucid forwarded to a personal email account shortly before leaving Heartflow:

a. Recent sales performance and strategy documents (2021 through 2024): Heartflow's 2023 Quarterly Business Review (ASD Q2 Review, Q3 Plan to Win); Heartflow's "US Sales Daily-At-A-Glance" reports for 2022 and for the first three quarters of 2023; and Heartflow's "Commercial, billable

completed volume by region" charts containing data from July 2021 through January 2024.

b. Sales strategy and business plans: Heartflow's West Area Business Plan; Q4 2019 and Q4 2020 sales power rankings; Center of Excellence Kickoff (Aug. 2017); Oct. 2017 Territory Splits; East US Headcount Proposal (July 12, 2017); Commercial Funnel and Close Date Protocols; and the Heartflow Business Development Plan for Piedmont Healthcare.

c. Hospital, account, and physician targeting materials: July 2017 Preliminary US Hospital Segmentation; July 2017 List of Target Hospitals; Sept. 2017 List of Account Opportunities; Sept. 2017 List of Physicians by cCTA Count; Nov. 2017 List of Pilot Site Physicians; Targeting Data & U.S. Customer Targeting (May 2019); Physician Referral and Billing Lists (Versions 3 and 4); and a list of cardiologists who ordered CTA Heart from January through November 2020.

d. Market models, forecasts, and growth strategy: July 2017 Preliminary US Market Assumptions; July 2017 US Market Assumptions, Model Assumptions on Model Rates; Key Assumptions, Driving Revenue; July 2017 Commercial Resources; July 2017 Headcount Data by Territory & State Data; the 2018 Revenue Forecast; and the Board of Directors presentation "Creating a Hyper Growth Environment within Heartflow."

e. Customer contracts, implementation, and reimbursement resources: the Emergency Department Proposal for Baptist Health South Florida; the Huntsville Analysis and Product & Access Program Agreement (original

and amended); $FFR_{CT}$ v2.1.0 IT Overview; Heartflow $FFR_{CT}$ Analysis Implementation Prep Resources; Reimbursement Update (April 2020); and U.S. Area Calls: OPPS Update and Reimbursement Calculator Training (Nov. 2019).

238. Heartflow's non-public Regulatory Information, including the non-public contents of its *de novo* request (DEN130045) and later $FFR_{CT}$ submissions, its pre-submission communications with and feedback from the FDA, and its regulatory strategy and negative know-how, which Ms. Hary learned as Heartflow's regulatory lead.

239. The documents identified above are examples, not an exhaustive list. To protect their confidentiality, Heartflow does not attach the documents to this Complaint and will produce them under an appropriate protective order. Heartflow will further identify its Trade Secrets with reasonable particularity before commencing discovery relating to them, as M.G.L. c. 93, § 42D(b) requires, under an appropriate protective order.

**B. Secrecy and Independent Economic Value**

240. Heartflow's Confidential Information is not, and at all relevant times was not, generally known to the public or to the persons who could obtain economic value from its disclosure or use, and is not readily ascertainable through proper means. The FDA publicly releases only a short summary of a premarket submission, and copies obtained through the Freedom of Information Act are redacted, first by the FDA and then at the submitter's request.

241. Heartflow's Trade Secrets derive independent economic value, actual and potential, from not being generally known. Heartflow's investment in its technology and its regulatory path has been measured in hundreds of millions of dollars, and Heartflow has raised more than $1.2 billion of capital. Heartflow's Regulatory Information is especially valuable to a competitor seeking clearance of a CT-derived FFR device: the FDA received Heartflow's *de novo* request on

November 6, 2013, and did not grant it until November 2014, and Heartflow conducted three clinical studies to support it. A competitor in possession of Heartflow's non-public submissions, FDA correspondence, study designs, and negative know-how could avoid much of that time and expense.

242. Heartflow's Commercial Information has independent economic value because a competitor seeking to launch a CT-derived FFR and plaque-analysis business could use Heartflow's account and physician lists, pricing and contract terms, forecasts, and implementation playbooks to target Heartflow's customers and to build a competing sales organization without the investment Heartflow made to develop them.

**C. Reasonable Measures to Protect Secrecy**

243. Heartflow has taken reasonable measures under the circumstances to keep its Trade Secrets secret. Among other things: (a) Heartflow requires employees to sign agreements obligating them to hold Company Confidential Information in strictest confidence, not to use or disclose it except for Heartflow's benefit, to return all Company property and confidential information on departure, and to participate in an exit interview concerning the return of Heartflow information; (b) Heartflow restricts access to confidential information through access controls in nearly all of its IT systems and uses encryption; (c) Heartflow trains its employees regarding confidentiality; (d) Heartflow marks confidential information in its FDA submissions as confidential and trade secret, segregates that material, and seeks redaction of non-public information before any FDA release; (e) Heartflow requires customers that receive non-public pipeline information to sign nondisclosure agreements, and requires its consultants to sign written agreements; and (f) on separation, Heartflow requires departing employees to acknowledge their receipt of confidential information and to return all confidential and proprietary information and

Company property, including through exit checklists and Termination Certifications. These measures were reasonable in light of Heartflow's size and resources at the time of each departure.

**D. Acquisition of Heartflow's Trade Secrets**

244. **Windi Hary.** Ms. Hary joined Heartflow in 2010. On June 3, 2010, she signed an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "Hary Agreement"). In it, she agreed to hold Heartflow's Company Confidential Information in strictest confidence during and after her employment, not to use or disclose it, to return it on departure, and to participate in an exit interview concerning its return.

245. During nearly thirteen years at Heartflow, Ms. Hary held senior regulatory and quality roles, including Director (Quality and Regulatory), Vice President (Global Clinical, Quality and Regulatory Affairs), Senior Vice President (Global Clinical, Quality and Regulatory Affairs), and, at her departure, Chief Regulatory and Quality Officer. She was a member of Heartflow's leadership team during the period in which Heartflow sought and obtained its first-of-its-kind *de novo* classification for $FFR_{CT}$ and its later FDA clearances. In those roles she had full access to Heartflow's technology, planned product strategies, data, clinical trials, and regulatory strategies, including Heartflow's Regulatory Information.

246. Ms. Hary's employment with Heartflow ended on January 19, 2023, in connection with a reorganization. In her separation agreement, she acknowledged that she had access to and received Heartflow's confidential and proprietary information, agreed not to make it known to the public, and agreed to return all confidential and proprietary information and all copies or excerpts before her termination date.

247. Upon information and belief, however, Ms. Hary retained in memory Heartflow's Regulatory Information, including Heartflow's non-public regulatory strategy, FDA

communications, and negative know-how, and Elucid has had the benefit of that information in preparing and pursuing FDA clearance of FFR-IQ. The basis for this belief includes Ms. Hary's role as Heartflow's regulatory lead; Elucid's decision to hire her into a role virtually identical to the one she held at Heartflow; Elucid's public emphasis on her regulatory strategy expertise; and the facts alleged above concerning Elucid's FDA submission, on which she was Elucid's primary correspondent.

248. **Scott Burger.** Mr. Burger worked at Heartflow for approximately three years and eleven months, most recently as Commercial Vice President (West), and had access to Heartflow's sales strategies, customer relationships, pricing models, competitive positioning, and board-level commercial strategy. On July 31, 2016, Mr. Burger signed Heartflow's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, which bound him to hold Heartflow's confidential information in strict confidence and to return it, and not keep, recreate, or deliver it to anyone, when he left. Mr. Burger submitted his resignation on June 10, 2020, and departed thereafter.

249. Shortly before his departure, Mr. Burger forwarded to his personal Gmail account the Heartflow materials described above, including hospital-segmentation spreadsheets, target-hospital and physician lists, market models, a revenue forecast, contracts, and implementation and prior-authorization resources. He also sent a medical-technology recruiter the presentation he had given to Heartflow's Board of Directors on creating a "hyper growth environment." Mr. Burger had no legitimate business reason to send this information outside Heartflow, and doing so was contrary to the confidentiality obligations in his written agreement with Heartflow.

250. Mr. Burger joined Elucid in January 2023 as its Chief Commercial Officer, leading marketing, market access, and customer-success functions, as well as the same sales function he

had overseen at Heartflow. Upon information and belief, Mr. Burger retained the Heartflow information he forwarded to his personal account and has used it for Elucid's benefit; the basis for that belief is the transmission of that information shortly before his departure, the absence of any legitimate reason for it, and his role at Elucid directing the functions to which that information relates.

251. **Bowen Freeman.** Mr. Freeman worked at Heartflow for approximately three years and one month as an Area Sales Director and District Sales Manager, with access to Heartflow's area dashboards, sales data, physician referral information, and compensation models. On July 5, 2016, Mr. Freeman signed Heartflow's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, which bound him to hold Heartflow's confidential information in strict confidence and to return it, and not keep, recreate, or deliver it to anyone, when he left. On August 30, 2019, the day before his last day at Heartflow, Mr. Freeman requested additional IT access and then emailed himself the materials described above. Mr. Freeman now serves as Elucid's U.S. Director of Sales and Marketing.

252. **Bill Atteridg.** Mr. Atteridg was an Area Sales Director at Heartflow, with access to Heartflow's regional business plans, sales rankings, daily U.S. sales data, quarterly business reviews, and regional volume data. He signed a Nondisclosure Agreement with Heartflow on September 22, 2021. Before his departure in early January 2024, he forwarded to a personal account the materials described above, including Heartflow's 2023 quarterly business review, 2022 and 2023 daily U.S. sales reports, and regional volume data through January 2024. Mr. Atteridg is now an Area Sales Director at Elucid.

253. **Jeremy Stralla.** Mr. Stralla was a District Sales Manager at Heartflow until December 11, 2020, with access to Heartflow's physician, referral, targeting, and customer-

program information. Shortly before his departure, he forwarded to a personal account the materials described above, including physician referral and billing lists and Heartflow's May 2019 targeting data and customer-targeting strategy. Mr. Stralla became an Area Sales Director at Elucid in 2025.

254. **Elucid's Knowledge.** Elucid knew or had reason to know that Ms. Hary, Mr. Burger, Mr. Freeman, Mr. Atteridg, and Mr. Stralla acquired Heartflow's Trade Secrets under a duty to maintain their secrecy. On September 12, 2023, Heartflow's counsel wrote to Elucid's Chief Executive Officer, enclosing the Hary Agreement, describing Ms. Hary's continuing obligations, explaining that she had been intimately familiar with Heartflow's technology, data, clinical trials, and regulatory strategies, and asking Elucid to confirm that it would prevent any violation of those obligations. Elucid also knew that each of these individuals came to it from Heartflow, its most direct competitor, and Elucid has hired more employees from Heartflow than from any other company.

255. Elucid thus acquired Heartflow's trade secrets by improper means, including breach and inducement of a breach of a duty to maintain secrecy, and Elucid acquired them from persons it knew or had reason to know owed Heartflow a duty to maintain their secrecy.

**E. Use and Disclosure**

256. Upon information and belief, Elucid has used Heartflow's Confidential Information in developing, seeking regulatory clearance for, and commercializing its competing products, including Elucid FFR-IQ, without Heartflow's express or implied consent.

257. Upon information and belief, Elucid sought to hire persons who had worked at Heartflow. Through these persons, Elucid could gain access to persons with experience seeking approval of and marketing for $FFR_{CT}$. In the companies' September 2023 communications

concerning Ms. Hary, Heartflow made Elucid aware of the fact that former Heartflow employees would possess proprietary and confidential material from Heartflow. While in November 2023, Elucid had informed the public that it was “pursuing an indication for non-invasive measurement of fractional flow reserve ($FFR_{CT}$), uniquely derived from its PlaqueIQ technology, to measure coronary blockages and the extent of ischemia,” the device it previewed in 2025 appears to be a copy of Heartflow’s product as opposed to a device built upon PlaqueIQ technology. *See* Ex. 7 (https://www.biospace.com/elucid-raises-80-million-in-series-c-round-led-by-elevage-medical-technologies); ¶¶ , 10 and 53 above. Upon information and belief, through the above-recited information, it is clear that Elucid knew or should have known that it was using Heartflow proprietary and confidential information to develop its regulatory and commercial strategies to obtain approval for and market Elucid FFR-IQ in direct competition with Heartflow.

258. On August 28, 2026, Elucid submitted a traditional 510(k) premarket notification (K262015) for Elucid FFR-IQ, a coronary vascular physiologic simulation software device that provides CT-derived FFR values. The FDA received the submission on August 31, 2026, and on September 29, 2026 determined the device substantially equivalent to its predicate, Heartflow $FFR_{CT}$, under the same regulation (21 C.F.R. § 870.1415) and product code (PJA) created through Heartflow’s *de novo* classification. The FDA’s letter was addressed to Ms. Hary. Elucid’s 510(k) Summary identifies Ms. Hary as the primary correspondent and states that Elucid’s device, like Heartflow’s, uses “[p]aired CT and invasive FFR data” as the “[g]round [t]ruth for [m]odel [t]raining.”

259. Heartflow does not contend that Elucid’s reliance on a predicate device, or the speed of the FDA’s review, is wrongful in itself; a 510(k) applicant ordinarily identifies a predicate, and an existing classification and special controls shorten any later applicant’s path. The

FDA cleared FFR-IQ 29 days after receiving Elucid's submission, while Heartflow's pioneering *de novo* request, made without any predicate and with the regulatory path undefined, was pending for about one year. Upon information and belief, Elucid's submission, prepared under the direction of Heartflow's former regulatory lead, also had the benefit of Heartflow's non-public Regulatory Information, including Heartflow's knowledge of how the FDA evaluated a CT-derived FFR device and what it questioned or required.

260. Upon information and belief, Elucid has also used Heartflow's Commercial Information to build and direct its commercial organization, to choose which markets and accounts to pursue, and to approach Heartflow's hospital customers. The basis for this belief includes the transmission of that information by Mr. Burger, Mr. Freeman, Mr. Atteridg, and Mr. Stralla before their departures; their later leadership roles in Elucid's commercial organization; and the market research alleged above describing Elucid's product as a near-duplicate of Heartflow's that physicians would switch to on price.

**F. Timeliness, Discovery, and Concealment**

261. Heartflow did not know, and had no reason to know, that Mr. Burger, Mr. Freeman, Mr. Atteridg, and Mr. Stralla had taken its Trade Secrets until 2026. That year, prompted by the 2025 appearance of Elucid's look-alike device, the significantly increased level of marketing of the device in 2026, and Elucid's 2026 FDA clearance, Heartflow reviewed departed employees' email accounts, and the review revealed for the first time that they had sent Heartflow files to personal accounts before leaving. The emails were sent from Heartflow accounts to private addresses and were not flagged at the time.

262. Heartflow likewise had no reason to suspect that Elucid had used Heartflow's Regulatory Information until, at the earliest, September 29, 2026, when the FDA cleared Elucid

FFR-IQ as substantially equivalent to Heartflow $FFR_{CT}$ on a submission for which Ms. Hary was Elucid's primary correspondent. Before that date, Elucid's FDA submission and its contents were not public. Elucid's 2022 assurances that it respected third-party intellectual property coupled with Elucid's statement that it was independently developing its $FFR_{CT}$ product gave Heartflow further reason to believe that its information was not being used.

263. Concealment. At least Mr. Burger, Mr. Freeman, Mr. Atteridg, and Mr. Stralla transmitted Heartflow's information to private email accounts outside Heartflow's systems without disclosing that they had done so, and Elucid's FDA submission was confidential until the FDA's clearance (and even now only a small portion of the submission is public). Mr. Stralla went further: on his last day, he signed a Termination Certification stating that he did not have, and had not failed to return, any Heartflow records, data, lists, or other documents.

264. Continuing use or disclosure by a given defendant of a given trade secret constitutes a single claim under both statutes. 18 U.S.C. § 1836(d); M.G.L. c. 93, § 42E. Heartflow alleges that Elucid's misappropriation of each category of trade secret was first discoverable on the dates alleged above.

**G. Harm and Remedies**

265. Heartflow has been harmed by Elucid's misappropriation, and that misappropriation was a substantial factor in causing the harm. Even apart from any lost sales, Elucid has been unjustly enriched. Heartflow's Commercial Information gave Elucid a strategic blueprint showing which markets and hospitals adopt CT-derived FFR, which physicians drive referrals, how quickly accounts convert, and how to size and deploy a sales force. That blueprint guided Elucid's product and market choices and allowed it to limit its own research, market-development, and commercial spending in the critical early days of product development. Elucid

thereby avoided the cost and time Heartflow invested to develop that information and gained a head start in a market Heartflow created. Heartflow is entitled to recover its actual loss and Elucid's unjust enrichment not taken into account in computing actual loss, including Elucid's avoided development, regulatory, and market-development costs and the value of its head start, or, in the alternative, a reasonable royalty for Elucid's unauthorized use of Heartflow's Trade Secrets. 18 U.S.C. § 1836(b)(3)(B); M.G.L. c. 93, § 42B(a).

266. Elucid's misappropriation has caused and, unless enjoined, will continue to cause Heartflow irreparable harm for which there is no adequate remedy at law. Heartflow is entitled to injunctive relief against actual and threatened misappropriation. 18 U.S.C. § 1836(b)(3)(A); M.G.L. c. 93, § 42A. Heartflow does not seek to prevent any person from entering into an employment relationship; it seeks to enjoin use and disclosure of its trade secrets.

267. Elucid's misappropriation was willful and malicious. On September 12, 2023, Heartflow wrote to Elucid and Ms. Hary about Heartflow's concern that Elucid intended for Ms. Hary to use Heartflow's confidential and proprietary information. Ex. 82. Heartflow also gave Elucid a copy of Ms. Hary's employment agreement. Elucid acknowledged receiving it, thanking Heartflow for "informing Elucid of Ms. Hary's obligations to Heartflow." Elucid then assured Heartflow that it "respects the confidentiality and intellectual property rights of other companies, including HeartFlow." Ex. 82. It also said it "is not seeking to acquire – and has not acquired – Heartflow's trade secrets or proprietary information" and "did not hire Ms. Hary to obtain such information." Ex. 82. Despite this notice and these assurances, Elucid kept Ms. Hary in charge of its regulatory function and directed its competing FDA submission through her. It also put the former Heartflow sales leaders who took Heartflow's commercial materials in charge of its commercial organization. Elucid thus acted with actual knowledge of Heartflow's rights and in

conscious disregard of them. Heartflow is therefore entitled to exemplary damages of up to twice its damages and to its reasonable attorneys' fees. 18 U.S.C. § 1836(b)(3)(C)–(D).

**COUNT VI – MISAPPROPRIATION OF TRADE SECRETS UNDER THE MASSACHUSETTS UNIFORM TRADE SECRETS ACT, M.G.L. c. 93, §§ 42–42G**

268. Heartflow incorporates by reference all preceding paragraphs as if fully set forth herein.

269. This is a cause of action for misappropriation of trade secrets under the MUTSA, M.G.L. c. 93, §§42-42G. This cause of action is based on Elucid's wrongful and improper acquisition, use, and disclosure of Heartflow's trade secrets. This Court has supplemental jurisdiction over this claim under 28 U.S.C. §1367(a).

270. The Trade Secrets include, but are not limited to, the Regulatory Information and Commercial Information described in Sections E and F above and in paragraphs 42-43, together with combinations and compilations of that information. Heartflow will identify its Trade Secrets with reasonable particularity, under an appropriate protective order, before starting discovery relating to them, as M.G.L. c. 93, §42D(b) requires.

271. The Trade Secrets are "trade secrets" within the meaning of M.G.L. c. 93, §42. Each is specified or specifiable information that Heartflow uses in its business. Each derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, others who might obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to protect it from unauthorized disclosure.

272. The Trade Secrets are not generally known or readily ascertainable. The FDA publishes only a short summary of a premarket submission, and FOIA copies are redacted first by

the FDA and then at the submitter's request. Heartflow's account lists, physician targeting, forecasts, contract terms, and performance data are internal and non-public.

273. The Trade Secrets have independent economic value. A competitor holding Heartflow's Regulatory Information could avoid much of the time and expense Heartflow spent obtaining its first-of-its-kind *de novo* classification for $FFR_{CT}$ Analysis. A competitor holding Heartflow's Commercial Information could target Heartflow's customers and build a competing sales organization without making the investment Heartflow made.

274. Heartflow took reasonable measures under the circumstances to keep the Trade Secrets secret. These measures include: (1) written confidentiality and return-of-property agreements; (2) access controls and encryption; (3) employee training; (4) confidential-treatment requests and redaction at the FDA; (5) non-disclosure agreements with customers and consultants; and (6) exit procedures and Termination Certifications.

275. Elucid misappropriated the Trade Secrets within the meaning of M.G.L. c. 93, §42. It acquired them knowing or having reason to know that they were acquired by improper means. It also used them without Heartflow's express or implied consent, knowing or having reason to know that its knowledge of them was derived from or through persons who owed Heartflow a duty to maintain their secrecy and limit their use.

276. At least each of Ms. Hary, Mr. Burger, Mr. Freeman, Mr. Atteridg, and Mr. Stralla acquired the Trade Secrets while employed by Heartflow and under written duties to keep them confidential, not to use or disclose them, and to return them on departure. At least Mr. Burger, Mr. Freeman, Mr. Atteridg, and Mr. Stralla forwarded Heartflow's Commercial Information to personal email accounts shortly before leaving Heartflow, with no legitimate business reason. Each later joined Elucid's commercial organization.

277. Elucid knew or had reason to know of these duties. On September 12, 2023, Heartflow notified Elucid in writing of Ms. Hary's continuing obligations and enclosed her agreement. Elucid acknowledged receiving that notice. Elucid also knew that each of these individuals came to it from Heartflow, its most direct competitor and Elucid's largest source of hires.

278. Upon information and belief, Elucid sought to hire persons who had worked at Heartflow. Through these persons, Elucid could gain access to persons with experience seeking approval of and marketing for $FFR_{CT}$. In the companies' September 2023 communications concerning Ms. Hary, Heartflow made Elucid aware of the fact that former Heartflow employees would possess proprietary and confidential material from Heartflow. While in November 2023, Elucid had informed the public that it was "pursuing an indication for non-invasive measurement of fractional flow reserve ($FFR_{CT}$), uniquely derived from its PlaqueIQ technology, to measure coronary blockages and the extent of ischemia," the device it previewed in 2025 appears to be a copy of Heartflow's product as opposed to a device built upon PlaqueIQ technology. *See* Ex. 7 (https://www.biospace.com/elucid-raises-80-million-in-series-c-round-led-by-elevage-medical-technologies); ¶¶ , 10 and 53. Upon information and belief, through the above-recited information, it is clear that Elucid knew or should have known that it was using Heartflow proprietary and confidential information to develop its regulatory and commercial strategies to obtain approval for and market Elucid FFR-IQ in direct competition with Heartflow.

279. Upon information and belief, Elucid has used the Trade Secrets without Heartflow's consent. It has used Heartflow's Regulatory Information in preparing and pursuing FDA clearance of Elucid FFR-IQ, a submission on which Ms. Hary was Elucid's primary correspondent. It has used Heartflow's Commercial Information to build and direct its commercial

organization, to choose which markets and accounts to pursue, and to approach Heartflow's hospital customers.

280. Elucid's misappropriation was willful and malicious. It was done intentionally, knowingly, and in conscious disregard of Heartflow's rights, to harm Heartflow and benefit Elucid. After Heartflow's notice, and despite its own assurances that it "is not seeking to acquire – and has not acquired – Heartflow's trade secrets," Elucid kept Ms. Hary in charge of its regulatory function and directed its competing FDA submission through her. It also placed the former Heartflow sales leaders who took Heartflow's commercial materials in charge of its commercial organization.

281. This claim is timely under M.G.L. c. 93, §42E. Heartflow did not discover, and by exercising reasonable diligence could not have discovered, the misappropriation until 2026. Continuing misappropriation is a single claim.

282. Elucid's misappropriation has caused and will continue to cause Heartflow irreparable harm and damages. These include loss of profits, loss of goodwill, loss of competitive advantage, and Elucid's unjust enrichment through avoided development, regulatory, and market-development costs, and an unearned head start.

283. Heartflow is entitled to injunctive relief under M.G.L. c. 93, §42A against actual and threatened misappropriation of the Trade Secrets by Elucid or anyone acting in concert with it. Heartflow does not seek to prevent any person from entering into an employment relationship.

284. Heartflow is entitled to damages under M.G.L. c. 93, §42B(a). These cover actual loss and Elucid's unjust enrichment not taken into account in computing actual loss, or, in the alternative, a reasonable royalty for Elucid's unauthorized disclosure or use of the Trade Secrets.

285. Because Elucid's misappropriation was willful and malicious, Heartflow is further entitled to exemplary damages of up to twice the damages awarded under M.G.L. c. 93, §42C because Elucid's misappropriation was willful and malicious.

**PRAYER FOR RELIEF**

WHEREFORE, Heartflow prays for relief as follows:

1. A judgment declaring that Elucid has infringed and is infringing one or more claims of the '082, '255, '303, and '214 Patents;

2. A judgment awarding Heartflow damages as a result of Elucid's infringement of one or more claims of the '082, '255, '303, and '214 Patents, together with interest and costs, consistent with lost profits and in no event less than a reasonable royalty;

3. A judgment awarding Heartflow treble damages and pre-judgment interest under 35 U.S.C. § 284 as a result of Elucid's willful and deliberate infringement of one or more claims of the '082, '255, '303, and '214 Patents;

4. A judgment declaring that this case is exceptional and awarding Heartflow its expenses, costs, and attorneys' fees in accordance with 35 U.S.C. §§ 284 and 285 and Rule 54(d) of the Federal Rules of Civil Procedure;

5. A grant of a permanent injunction enjoining Defendant from further acts of infringement of one or more claims of the '082, '255, '303, and '214 Patents;

6. A judgment that Elucid has misappropriated Heartflow's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and the Massachusetts Uniform Trade Secrets Act, M.G.L. c. 93, §§ 42–42G, and that such misappropriation was willful and malicious;

7. An order, pursuant to 18 U.S.C. § 1836(b)(3)(A) and M.G.L. c. 93, § 42A, permanently enjoining Elucid, its officers, agents, servants, employees, and attorneys, and all

persons in active concert or participation with them, from using or disclosing Heartflow's trade secrets and Confidential Information, and requiring Elucid to return to Heartflow, and not retain any copies of, all Heartflow trade secrets and Confidential Information in their possession, custody, or control, including in personal email and cloud accounts;

8. An order enjoining Elucid from making, selling, offering to sell, or seeking further regulatory clearance for any product, including Elucid FFR-IQ, that was developed or cleared using Heartflow's trade secrets, or, in the alternative, conditioning future use on payment of a reasonable royalty pursuant to 18 U.S.C. § 1836(b)(3)(A)(iii) and M.G.L. c. 93, § 42A;

9. An order directing Elucid to file with the Court and serve on Heartflow, within thirty (30) days after service of the injunction, a written report under oath setting forth in detail the manner and form in which Elucid has complied with the injunction;

10. An accounting of all gains, profits, cost savings, and advantages Elucid derived from its misappropriation, and the imposition of a constructive trust on such gains, profits, and advantages for Heartflow's benefit;

11. An award of damages for Heartflow's actual loss and Elucid's unjust enrichment, or in the alternative a reasonable royalty, pursuant to 18 U.S.C. § 1836(b)(3)(B) and M.G.L. c. 93, § 42B(a);

12. An award of exemplary damages of up to two times the damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C) and M.G.L. c. 93, § 42B(b);

13. An award of reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D) and M.G.L. c. 93, § 42C, together with pre- and post-judgment interest; and

14. Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Heartflow hereby demands a trial by jury.

Dated: October 22, 2026

Respectfully submitted,

*/s/ Aaron S. Jacobs*

Patrick A. Fitch (BBO No. 672797)
pfitch@princelobel.com
Aaron S. Jacobs (BBO No. 677545)
ajacobs@princelobel.com
**Prince Lobel Tye LLP**
One International Place, Suite 3700
Boston, Massachusetts 02110
Telephone: +1 (617) 456-8000
Facsimile: +1 (617) 456-8100

Saqib J. Siddiqui*
Jamie B. Beaber*
William J. Barrow*
Michael L. Lindinger*
Clark S. Bakewell*
Alison T. Gelsleichter*
Baldine B. Paul, Ph.D.*
Tariq Javed*
Courtney Krawice*
Angeline L. Premraj*
Séké Godo*
So Ra Ko*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000
ssiddiqui@mayerbrown.com
jbeaber@mayerbrown.com
wbarrow@mayerbrown.com
mlindinger@mayerbrown.com
cbakewell@mayerbrown.com
agelsleichter@mayerbrown.com
bpaul@mayerbrown.com
tjaved@mayerbrown.com
ckrawice@mayerbrown.com
apremraj@mayerbrown.com
sgodo@mayerbrown.com
sko@mayerbrown.com

Amanda Streff Bonner*
Wade Weaver*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
asbonner@mayerbrown.com
wweaver@mayerbrown.com

Brian W. Nolan*
Shantelle L. LaFayette*
Jane Tullis*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
bnolan@mayerbrown.com
slafayette@mayerbrown.com
jtullis@mayerbrown.com

*Counsel for Plaintiff Heartflow, Inc.*

**pro hac vice forthcoming*